**[ORAL ARGUMENT NOT SCHEDULED]**
**Nos. 25-5099, 25-5101, 25-5108 (consol.)**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

JANE DOE, et al.,
>                    Plaintiffs-Appellees,

v.

PAMELA BONDI, in her official capacity as Attorney General
of the United States, et al.,
>                    Defendants-Appellants.

JANE JONES, et al.,
>                    Plaintiffs-Appellees,

v.

PAMELA BONDI, in her official capacity as Attorney General
of the United States, et al.,
>                    Defendants-Appellants.

MARIA MOE,
>                    Plaintiff-Appellee,

v.

DONALD J. TRUMP, in his official capacity as President
of the United States, et al.,
>                    Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

### CONSOLIDATED BRIEF FOR APPELLANTS

>                    YAAKOV M. ROTH
>                      *Acting Assistant Attorney General*
>
>                    ERIC D. MCARTHUR
>                      *Deputy Assistant Attorney General*
>
>                    GERARD SINZDAK
>                    MCKAYE L. NEUMEISTER
>                      *Attorneys, Appellate Staff*
>                      *Civil Division, Room 7231*
>                      *U.S. Department of Justice*
>                      *950 Pennsylvania Avenue NW*
>                      *Washington, DC 20530*
>                      *(202) 514-8100*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

In *Jones v. Bondi*, plaintiffs in district court, and appellees here, are five inmates in the custody of the Federal Bureau of Prisons (BOP). With the permission of the district court, those inmates are proceeding pseudonymously in this litigation. *Jones*, Dkts. 14, 47. Their pseudonyms are Jane Jones, Amy Jones, Barbara Jones, Carla Jones, and Donna Jones.

In *Doe v. Bondi*, plaintiffs in district court, and appellees here, are 14 inmates in the custody of BOP. With the permission of the district court, those inmates are proceeding pseudonymously in this litigation. *Doe*, Dkt. 7. Their pseudonyms are Jane Doe, Mary Doe, Sara Doe, Emily Doe, Zoe Doe, Tori Doe, Olivia Doe, Susan Doe, Lois Doe, Sophia Doe, Sally Doe, Wendy Doe, Rachel Doe, and Ellen Doe.

In *Moe v. Trump*, plaintiff in district court, and appellee here, is an inmate in the custody of BOP. With the permission of the district court, plaintiff is proceeding pseudonymously in this litigation. *Moe*, Dkts. 7, 67. The pseudonym being used is Maria Moe.

In all three consolidated cases, defendants in district court, and appellants here, are Pamela Bondi, in her official capacity as Attorney General of the United States; and William K. Marshall, III, in his official capacity as Director of BOP.[1]

In *Moe v. Trump*, defendants in district court, and appellants here, also include Donald J. Trump, in his official capacity as President of the United States.  In *Jones v. Bondi*, plaintiffs' original complaint also listed Donald J. Trump, in his official capacity as President of the United States, as a defendant.  The *Jones* plaintiffs later omitted President Trump as a defendant in filing their Amended Complaint, and the President is thus no longer a party in that case.  *See* JA341.

There were no additional parties and no *amici curiae* in district court, and none have entered an appearance before this Court.

## B.    Rulings Under Review

The rulings under review are the February 24, 2025, and March 3, 2025 Orders in *Jones* (Dkts. 28, 46); the March 10, 2025 Order in *Moe* (Dkt.

---

[1] These actions were originally brought against defendant James R. McHenry, III, in his official capacity as Acting Attorney General of the United States, and defendant William Lothrop, in his official capacity as Acting Director of BOP.  Attorney General Bondi was automatically substituted as a party under Federal Rule of Civil Procedure 25(d).  Director Marshall was automatically substituted as a party under Federal Rule of Appellate Procedure 43(c)(2).

62); and the February 18, 2025, February 24, 2025, and March 19, 2025 Orders in *Doe* (Dkts. 44, 55, 68), entered by the Honorable Royce C. Lamberth, granting plaintiffs' motions for preliminary injunctions.  Some of the orders are available at *Doe v. Bondi*, No. 1:25-cv-286, 2025 WL 596653 (D.D.C. Feb. 24, 2025); *Doe v. McHenry*, No. 1:25-cv-286, 2025 WL 596651 (D.D.C. Feb. 18, 2025); *Jones v. Bondi*, No. 1:25-cv-401, 2025 WL 923117 (D.D.C. Feb. 24, 2025); and *Jones v. Bondi*, No. 1:25-cv-401, 2025 WL 923755 (D.D.C. Mar. 3, 2025).  The orders are located in the Joint Appendix at JA168-69 (*Doe* February 18 Order), JA185-88 (*Doe* February 24 Order), JA240-43 (*Doe* March 19 Order), JA333-34 (*Jones* February 24 Order), JA445-49 (*Jones* March 3 Order), and JA569-71 (*Moe* March 10 Order).

## C.    Related Cases

This case has not previously been before this Court.  Counsel are aware of one related case within the meaning of D.C. Circuit Rule 28(a)(1)(C): *Kingdom v. Trump*, No. 1:25-cv-691 (D.D.C.).

  */s/ McKaye L. Neumeister*
McKaye L. Neumeister

## TABLE OF CONTENTS

**Page**

GLOSSARY

TABLE OF AUTHORITIES ........................................................................ vii

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION ............................................................ 4

STATEMENT OF THE ISSUE .................................................................. 5

PERTINENT STATUTES AND REGULATIONS ....................................... 5

STATEMENT OF THE CASE .................................................................... 5

    A.    Executive Order 14168 ................................................................ 5

    B.    BOP's Designation Authority and Management of Trans-Identifying Inmates ..................................................................... 7

    C.    Factual Background ................................................................... 11

    D.    Prior Proceedings ..................................................................... 14

SUMMARY OF ARGUMENT ................................................................... 21

STANDARD OF REVIEW ....................................................................... 25

ARGUMENT ........................................................................................... 25

I.    Plaintiffs Have Not Shown A Likelihood Of Success On The Merits Of Their Eighth Amendment Transfer Claims ...................... 25

    A.    The Prison Litigation Reform Act Bars this Challenge. ............. 26

    B.    The Eighth Amendment Does Not Require BOP to House Plaintiffs, Who Are Male Inmates, in Female Prisons. ............. 33

II.    Plaintiffs Have Not Satisfied The Remaining Preliminary-Injunction Factors.................................................................................48

III.    The Preliminary Injunctions At Issue Violate The PLRA. .................55

CONCLUSION ...............................................................................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:**                                                           **Page(s)**

*Abdullah v. Obama,*
   753 F.3d 193 (D.C. Cir. 2014) ............................................ 25, 26

*Alexander v. S.C. State Conf. of the NAACP,*
   602 U.S. 1 (2024) ................................................................. 25

*Alpine Sec. Corp. v. FINRA,*
   121 F.4th 1314 (D.C. Cir. 2024) ........................................ 52

*Baxter v. Wexford Healthcare,* No. 16-cv-291,
   2017 WL 2772333 (W.D. Pa. June 27, 2017) ......................... 55

*Becker v. Sherman,* No. 16-cv-828,
   2017 WL 6316836 (E.D. Cal. Dec. 11, 2017) ........................ 49

*Booth v. Churner,*
   532 U.S. 731 (2001) ..................................................... 30, 32-33

*Bryant v. Johnson,* No. 7:11-cv-75,
   2012 WL 4459930 (W.D. Va. June 15, 2012) ....................... 55

*Calhoun v. DeTella,*
   319 F.3d 936 (7th Cir. 2003) .............................................. 47

*Cason v. Seckinger,*
   231 F.3d 777 (11th Cir. 2000) ............................................. 56

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) ............................................ 48

*Citizens for Responsibility & Ethics in Washington v. Federal
   Election Comm'n,*
   904 F.3d 1014 (D.C. Cir. 2018) .......................................... 50

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) .............................................................. 52

*Davis v. District of Columbia,*
   158 F.3d 1342 (D.C. Cir. 1998) .......................................... 50

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) ................................................................ 26

*Doe v. District of Columbia*,
    215 F. Supp. 3d 62 (D.D.C. 2016) ......................................................... 45

*Doe v. Georgia Dep't of Corr.*,
    730 F. Supp. 3d 1327 (N.D. Ga. 2024) ................................................. 36

*Does 1-26 v. Musk*, No. 25-1273,
    2025 WL 1020995 (4th Cir. Mar. 28, 2025) .......................................... 51

*Farmer v. Brennan*,
    511 U.S. 825 (1994) .............................................. 21, 22, 34, 41, 42, 44, 57

*Finstuen v. Crutcher*,
    496 F.3d 1139 (10th Cir. 2007) ............................................................... 52

*Fisher v. BOP*, No. 4:19-cv-1169,
    2022 WL 2648950 (N.D. Ohio July 8, 2022) ....................................... 36

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.* (TOC), Inc.,
    528 U.S. 167 (2000) ................................................................................. 52

*Green v. Hooks*,
    798 F. App'x 411 (11th Cir. 2020) .................................................... 39, 44

*Greene v. Bowles*,
    361 F.3d 290 (6th Cir. 2004) ................................................................. 49

*Hampton v. Baldwin*, No. 3:18-cv-550,
    2018 WL 5830730 (S.D. Ill. Nov. 7, 2018) ...................................... 36, 49

*Hange v. City of Mansfield*,
    257 F. App'x 887 (6th Cir. 2007) .......................................................... 52

*Hanson v. District of Columbia*,
    120 F.4th 223 (D.C. Cir. 2024) ............................................................. 50

*Hatim v. Obama*,
    760 F.3d 54 (D.C. Cir. 2014) ................................................................. 54

*Hoffer v. Secretary, Fla. Dep't of Corr.*,
    973 F.3d 1263 (11th Cir. 2020) ............................................................. 56

*Irving v. Dormire*,
    519 F.3d 441 (8th Cir. 2008)  .................................................................. 39

*Jiau v. Tews*,
    812 F. App'x 638 (9th Cir. 2020) ........................................................... 28

*JJS v. Pliler*, No. 19-cv-2020,
    2022 WL 16578124 (S.D.N.Y. Aug. 3, 2022),
    *report and recommendation adopted sub nom.*
    *Shelby v. Petrucci*, No. 19-cv-2020,
    2022 WL 16575766 (S.D.N.Y. Nov. 1, 2022)  ......................................... 36

*Jones v. Bock*,
    549 U.S. 199 (2007)  .................................................................... 29, 30

*Kaemmerling v. Lappin*,
    553 F.3d 669 (D.C. Cir. 2008)  ............................................................... 33

*Lakin v. Barnhart*,
    758 F.3d 66 (1st Cir. 2014) ................................................................... 34

*Lojan v. Crumbsie*, No. 12-cv-320,
    2013 WL 411356 (S.D.N.Y. Feb. 1, 2013) ......................................... 45, 49

*Matheis v. CDCR*, No. 20-cv-2100,
    2021 WL 718603 (S.D. Cal. Feb. 24, 2021) ............................................ 55

*McBryde v. Committee to Review Circuit Council Conduct*
    *& Disability Orders of the Judicial Conference*,
    264 F.3d 52 (D.C. Cir. 2001) ................................................................. 28

*McKune v. Lile*,
    536 U.S. 24 (2002) ........................................................................ 47, 54

*MediNatura, Inc. v. FDA*,
    998 F.3d 931 (D.C. Cir. 2021) .......................................................... 48, 53

*Miller v. French*,
    530 U.S. 327 (2000) .............................................................................. 26

*Murphy v. United States*,
    653 F.2d 637 (D.C. Cir. 1981) .................................................... 34, 35, 38

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) ............................................................. 14

*Ross v. Blake*,
    578 U.S. 632 (2016) .................................................... 30, 31, 32

*Savage v. U.S. Dep't of Justice*,
    91 F.4th 480 (D.C. Cir. 2024) ................................. 30

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ................................. 25

*Shrader v. White*,
    761 F.2d 975 (4th Cir. 1985) ................................... 35

*Soneeya v. Mici*,
    717 F. Supp. 3d 132 (D. Mass. 2024) ...................... 36

*Stover v. Corrections Corp. of Am.*, No. 1:12-cv-393,
    2015 WL 874288 (D. Idaho Feb. 27, 2015) ............... 45

*Tay v. Dennison*,
    457 F. Supp. 3d 657 (S.D. Ill. 2020) ........................ 49

*Touizer v. U.S. Attorney Gen.*, No. 21-10761,
    2021 WL 3829618 (11th Cir. Aug. 27, 2021) ............. 28

*Turner v. Safley*,
    482 U.S. 78 (1987) ................................................... 53

*Vandevender v. Sass*,
    970 F.3d 972 (8th Cir. 2020) ................................. 34-35

*Wade v. McDade*,
    106 F.4th 1251 (11th Cir. 2024) .............................. 34

*Wills v. Barnhardt*, No. 21-1383,
    2022 WL 4481492 (10th Cir. Sept. 27, 2022) ........... 28, 29

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................... 25, 26

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*,
    93 F.3d 910 (D.C. Cir. 1996) ................................. 33

*Woodford v. Ngo*,
    548 U.S. 81 (2006) ................................................. 30

x

*Wrenn v. District of Columbia*,
   864 F.3d 650 (D.C. Cir. 2017) ................................................................ 48

*Zollicoffer v. Livingston*,
   169 F. Supp. 3d 687 (S.D. Tex. 2016) ................................................ 45-46

**Statutes:**

18 U.S.C. § 3621(b) ........................................ 7, 15, 21, 27, 28, 29

18 U.S.C. § 3626(a) ........................................................... 54

18 U.S.C. § 3626(a)(2) ...................................................... 24, 55, 56

18 U.S.C. § 3626(b)(2) ............................................................. 56

18 U.S.C. § 3626(g)(2) ............................................................. 26

28 U.S.C. § 1292(a)(1) ................................................................ 5

28 U.S.C. § 1331 ............................................................................ 4

28 U.S.C. § 2201 .......................................................................... 4

28 U.S.C. § 2202 .......................................................................... 4

42 U.S.C. § 1997e(a) ................................................................ 9, 29

**Regulatory Materials:**

28 C.F.R. § 115.41(a) ............................................................... 7-8

28 C.F.R. § 115.42 .................................................................... 32

28 C.F.R. § 115.42(a) .................................................................. 8

28 C.F.R. § 115.42(c) ............................................................... 8, 43

28 C.F.R. §§ 542.13-.15 ........................................................ 10, 30

Exec. Order No. 14168,
   *Defending Women From Gender Ideology Extremism and
   Restoring Biological Truth to the Federal Government*,
   90 Fed. Reg. 8615 (Jan. 30, 2025) ........................... 1, 5, 6, 7, 53

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ................................................................. 5

Fed. R. App. P. 43(c)(2) ................................................................. 14

Fed. R. Civ. P. 25(d) ..................................................................... 14

**Other Authorities:**

BOP, Program Statement 5100.08, *Inmate Security Designation and Custody Classification* (Mar. 6, 2025), https://perma.cc/G43K-8BD8 ................................................... 9

Memorandum from Dana R. DiGiacomo, Acting Assistant Dir., Reentry Servs. Div., BOP, and S. Salem, Assistant Dir., Corr. Programs Div., BOP, to All Chief Exec. Officers, *Compliance with Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"* (Feb. 21, 2025), https://perma.cc/J5K2-3NU5 ................................................... 9

U.S. Dep't of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12* (May 2013), https://perma.cc/RLB3-CY8Q ................. 37, 38, 39

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| BJS | Bureau of Justice Statistics |
| BOP | Federal Bureau of Prisons |
| EO | Executive Order |
| JA | Joint Appendix |
| PI | Preliminary Injunction |
| PLRA | Prison Litigation Reform Act |
| PREA | Prison Rape Elimination Act |
| TRO | Temporary Restraining Order |

## INTRODUCTION

On January 20, 2025, President Trump issued Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025) (EO 14168). Among other things, EO 14168 directs the Federal Bureau of Prisons (BOP) to ensure that male inmates are not housed in women's prisons, in order to protect female inmates' safety, privacy, and dignity. Consistent with the executive order, BOP informed male trans-identifying inmates who were housed in women's facilities before January 20 that they would be transferred to men's prisons, and BOP began to transfer inmates accordingly.

Plaintiffs, who are 20 such male trans-identifying inmates housed in women's facilities, sued seeking preliminary injunctions to block their transfer to men's prisons. The district court granted the injunctions, concluding that plaintiffs were likely to succeed in showing that their transfer to male prisons would constitute cruel and unusual punishment, in violation of the Eighth Amendment. The district court's conclusions find no support in fact or law; and in substituting its policy judgment for that of the Executive Branch, the court forces the government to perpetuate harm to female

inmates' safety, privacy, and dignity.     Accordingly, the preliminary injunctions should be vacated.

The district court's injunctions fundamentally misunderstand the requirements of the Prison Litigation Reform Act (PLRA) and the Eighth Amendment.  The PLRA requires inmates to raise complaints about the conditions of confinement within BOP's administrative grievance scheme before suing and bars all judicial review of BOP's housing placement and transfer decisions.  Plaintiffs here failed to satisfy this mandatory exhaustion requirement and raise challenges to transfer decisions that Congress left to BOP's discretion and placed outside the jurisdiction of courts.

Even if plaintiffs could circumvent these threshold obstacles, their constitutional claims would fail.  The Eighth Amendment's bar on cruel and unusual punishment prohibits the wanton infliction of pain caused by deliberate indifference to inmates' safety or serious medical needs.  Plaintiffs cannot show that their transfer to male facilities would meet that high bar. The district court rested its conclusion that plaintiffs would experience substantially elevated risks of sexual assault in male facilities on statistics showing that trans-identifying inmates experience violence at higher rates, on average, than other inmates.  But those statistics do not establish that plaintiffs' transfer to male prisons would necessarily expose them to a

2

uniquely high rate of assault.  Ninety-nine percent of male trans-identifying inmates are currently housed in male prisons, a fact that defeats plaintiffs' claim that BOP cannot adequately protect trans-identifying inmates housed in male prisons.  Moreover, many male prison facilities in the federal system have very low rates of sexual assault; indeed, several have lower rates than female facilities.  And plaintiffs' and the district court's conclusion that transferring plaintiffs to male facilities would necessarily place them at a significantly elevated risk of assault fails to account for measures BOP would undertake to ensure their safety in such facilities—as BOP has done with other trans-identifying inmates and even some of the plaintiffs here.  For these reasons, plaintiffs cannot show that merely housing them in male prisons would expose them to objectively intolerable levels of risk or that BOP will not take reasonable measures to abate any such risks.

Fundamentally, plaintiffs' theory proves too much.  Many male inmates face an above-average risk of sexual and other assault based on identifiable characteristics, such as, for example, their offense of conviction, their sexual orientation, their status as government informants, and their mental health.  Under plaintiffs' and the district court's reasoning, BOP would violate the Eighth Amendment any time it assigned such individuals to a men's prison rather than a theoretically lower-risk female prison.  That

is patently wrong.  Put simply, the Eighth Amendment does not prevent BOP from treating males as males and females as females; nor does the Constitution force BOP to house men with women, endangering female inmates' safety, invading their privacy, or causing them significant distress—especially female inmates who have experienced domestic abuse and sexual assault from men.

In addition to being legally erroneous, the district court's orders harm the government and the public interest, particularly given the importance of the policies in the executive order at issue and the complexities of managing the federal prison system.  By requiring all inmates to reside in facilities that align with their sex, EO 14168 reflects the federal government's compelling interest in ensuring the safety, privacy, and dignity of prisoners in federal custody.  Against such harms, plaintiffs identify only a speculative possibility of future harm from the executive order's implementation.  Accordingly, this Court should vacate the preliminary injunctions.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 2201, and 2202.  JA201-02; JA340; JA461.  On February 18, 2025, February 24, 2025, March 3, 2025, March 10, 2025, and March 19, 2025, the district court issued orders granting plaintiffs' motions for preliminary

injunctions.    JA168-69;  JA185-88;  JA240-43;  JA333-34;  JA445-49;
JA569-71.  The federal government filed timely notices of appeal of those
preliminary-injunction orders on April 2, 2025.    JA244-45;  JA450-51;
JA572-73; *see* Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction under
28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in granting preliminary
injunctions blocking the transfer of male trans-identifying inmates to male
facilities, on the ground that any such transfer violates the Eighth
Amendment.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to
this brief.

## STATEMENT OF THE CASE

### A.    Executive Order 14168

On January 20, 2025, President Trump issued Executive Order 14168,
*Defending Women From Gender Ideology Extremism and Restoring
Biological Truth to the Federal Government*.  EO 14168, 90 Fed. Reg. 8615.
The order proclaims that, as a result of "deny[ing] the biological reality of
sex," "legal and other socially coercive means" have increasingly been used
"to permit men to self-identify as women and gain access to intimate single-

sex spaces and activities designed for women." *Id.* § 1, 90 Fed. Reg. at 8615. "Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being." *Id.* The executive order's purpose is thus to "defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male." *Id.* The order directs that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2, 90 Fed. Reg. at 8615. Further, "the Executive Branch will enforce all sex-protective laws to promote this reality." *Id.* The order also directs that it "shall be implemented consistent with applicable law." *Id.* § 8(b), 90 Fed. Reg. at 8618.

As to "privacy in intimate spaces" in particular, EO 14168, § 4, 90 Fed. Reg. at 8616 (formatting altered), the order contains specific directives regarding the Federal Bureau of Prisons. As relevant here, Section 4(a) requires the Attorney General to "ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal

Regulations and interpretation guidance regarding the Americans with Disabilities Act." *Id.* § 4(a), 90 Fed. Reg. at 8616.[2]

## B.  BOP's Designation Authority and Management of Trans-Identifying Inmates

**1.**  Decisions on classification and designation of inmates to a particular prison facility are vested in BOP.  *See* 18 U.S.C. § 3621(b).  In making decisions regarding "the place of [a] prisoner's imprisonment," BOP "may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau … that the Bureau determines to be appropriate and suitable."  *Id.* Additionally, "[t]he Bureau may at any time … direct the transfer of a prisoner from one penal or correctional facility to another."  *Id.*  And the statute expressly provides that "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court." *Id.*

In designating inmates to a facility, BOP follows the applicable regulations under the Prison Rape Elimination Act (PREA).  During intake and upon transfer, BOP screens inmates for "their risk of being sexually abused by other inmates or sexually abusive toward other inmates."  28

---

[2] The other directive to BOP—Section 4(c), which pertains to medical care for inmates—is implicated in the district court litigation in these cases but is not at issue in this appeal.

C.F.R. § 115.41(a). This information is used to "inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." *Id.* § 115.42(a). Regarding the assignment of trans-identifying inmates in particular, BOP "considers on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." JA177-78 (Stover Second *Doe* Decl. ¶ 26); *see* 28 C.F.R. § 115.42(c).

**2.** Previously, BOP used a specialized decisionmaking body to handle the placements of the trans-identifying inmate population. As BOP has explained in former guidance documents, this body—called the "Transgender Executive Council"—oversaw the initial facility designations of trans-identifying inmates, and "review[ed] all transfers" of trans-identifying inmates "for approval." JA123, 124-25. From May 2018 to January 2022, the guidance provided that in deciding the facility assignment for a trans-identifying inmate, BOP would "use biological sex as the initial determination for designation." JA103. The guidance further provided that "designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the [identified] factors." JA103. In January 2022, BOP revised the guidance to state that in

deciding the facility assignment for a trans-identifying inmate, the Transgender Executive Council would consider as one factor, among other things, the inmate's "current gender expression." *See* JA125. Pursuant to EO 14168, BOP has rescinded this guidance and disbanded the Transgender Executive Council.[3]

Now, the Designation and Sentence Computation Center makes the initial placement and transfer decisions for all trans-identifying inmates, just as it does for the rest of BOP's inmate population. BOP, Program Statement 5100.08, *Inmate Security Designation and Custody Classification*, ch. 1, at 1-3 (Mar. 6, 2025), https://perma.cc/G43K-8BD8.

**3.** When trans-identifying inmates wish to raise concerns about their treatment in BOP custody, like all other inmates they must pursue BOP's Administrative Remedy Program before bringing any legal action. *See* 42 U.S.C. § 1997e(a) (PLRA exhaustion requirement). The program has four levels: aggrieved inmates must first attempt an informal resolution with unit

---

[3] The responsibility for trans-identifying inmate housing decisions was then briefly taken over by the Special Populations Oversight Committee, which has also since disbanded. *See* Memorandum from Dana R. DiGiacomo, Acting Assistant Dir., Reentry Servs. Div., BOP, and S. Salem, Assistant Dir., Corr. Programs Div., BOP, to All Chief Exec. Officers, *Compliance with Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"* 2 (Feb. 21, 2025), https://perma.cc/J5K2-3NU5.

staff, then submit an administrative remedy request to the Warden, then appeal to BOP's Regional Director, and then, if necessary, appeal to BOP's General Counsel. *See* 28 C.F.R. §§ 542.13-.15. After fully exhausting this administrative review process, if the inmate's concerns have not been resolved, the inmate can pursue legal action.

For complaints regarding sexual assault and harassment, in particular, there are numerous ways for inmates to report incidents. "An inmate can write directly to the Warden, Regional Director or Director" of BOP; "file a Request for Administrative Remedy"; or contact the U.S. Department of Justice Office of Inspector General directly. JA310 (Stover First *Jones* Decl. ¶ 16).

**4.** BOP, however, does not merely wait to react to any such complaints. Rather, staff are trained to "monitor" and proactively "intervene when they observe problematic interactions between inmates." JA178 (Stover Second *Doe* Decl. ¶ 28). BOP implements a "zero tolerance" policy toward "sexual abuse and sexual harassment," and provides "[r]outine training" to all staff "to help detect incidents, perpetrators, and inmate victims of sexually abusive behavior," and instruction on how to properly and timely intervene. JA178 (Stover Second *Doe* Decl. ¶ 27). If staff ever have reason to "believe that an inmate's safety may be jeopardized by placement

in the general population," staff can temporarily move the inmate to "more restrictive conditions as a protective custody case in the Special Housing Unit," to ensure inmate safety while determining how to properly protect the inmate going forward.  JA394 (Stover Second *Jones* Decl. ¶ 25); *see* JA179 (Stover Second *Doe* Decl. ¶ 30).

Staff at each institution also regularly review a file regarding certain inmates, including those who "present a threat to staff or institutional security," or "pose a significant threat to inmate … safety."  JA178 (Stover Second *Doe* Decl. ¶ 28).  Staff review the file "for the purpose of determining inmates with a history of assaultive behavior or a history of sexual offenses, for the purpose of keeping the institution safe and secure."  *Id.*

### C.    Factual Background

**1.**    There are approximately 2,198 trans-identifying inmates housed in BOP facilities and halfway houses.  JA174 (Stover *Second Doe* Decl. ¶ 5) (describing trans-identifying inmate population as of February 20, 2025).  Of those, 1,488 are male inmates who trans-identify as female, and 710 are female inmates trans-identifying as male.  *Id.*  Of the 1,488 male trans-identifying inmates, 22 were housed in female institutions as of February 20, 2025. *Id.*

11

**2.** Plaintiffs are 20 male trans-identifying inmates in BOP custody who were housed in female facilities at the time EO 14168 was issued. They are proceeding in this litigation under the pseudonyms Jane, Mary, Sara, Emily, Zoe, Tori, Olivia, Susan, Lois, Sophia, Sally, Wendy, Rachel, and Ellen Doe; Jane, Amy, Barbara, Carla, and Donna Jones; and Maria Moe. *See* Doe, Dkt. 7; *Jones*, Dkts. 14, 47; *Moe*, Dkts. 7, 67. Plaintiffs allege that, although their "birth sex" is male, they identify as female, take cross-sex hormones, and have been housed in female prison facilities. Some of the plaintiffs have had cross-sex surgeries. *See* JA190-200, 211; JA336-39, 344; JA460, 465.

Following the issuance of EO 14168, BOP officials informed plaintiffs that they would be transferred to men's facilities. JA205-06; JA342-43; JA463. BOP individually reviewed the housing placements for the plaintiffs, taking "into consideration the inmates' assigned security level, disciplinary record, medical record, and psychology record." JA174 (Stover Second *Doe* Decl. ¶ 10); *see* JA390 (Stover Second *Jones* Decl. ¶ 11); JA239 (Associate Warden *Doe* Decl. ¶ 6); JA307 (Stover First *Jones* Decl. ¶ 7); JA100 (Stover First *Doe* Decl. ¶ 11); JA513, 910 (Stover *Moe* Decl. ¶ 10).

Through that review, BOP determined that plaintiffs should be assigned to low-security male facilities. JA307, 747 (Stover First *Jones* Decl. ¶ 8); JA100-01, 653-54 (Stover First *Doe* Decl. ¶ 12); JA513, 910 (Stover *Moe*

Decl. ¶ 11); JA390, 824 (Stover Second *Jones* Decl. ¶ 12); JA175-76, 657-58 (Stover Second *Doe* Decl. ¶¶ 12-16); JA239, 710 (Associate Warden *Doe* Decl. ¶ 5). The particular facilities selected house "a large number of nonviolent offenders" whose crimes of incarceration did "not involve a threat of harm or an actual attack upon a victim," and who "tend to have minor infractions in their disciplinary history with [BOP]." JA307, 747 (Stover First *Jones* Decl. ¶ 8). "Based on the [BOP decisionmakers'] experience and range of expertise, placing [plaintiffs] at a low security institution with non-violent offenders would minimize the likelihood that they would be victimized." JA100-01, 653-54 (Stover First *Doe* Decl. ¶ 12); *see* JA390, 824 (Stover *Second* Jones Decl. ¶ 13); JA307-08, 747-48 (Stover First *Jones* Decl. ¶¶ 8-9); JA176-77, 658-59 (Stover Second *Doe* Decl. ¶¶ 18, 25); JA513, 910 (Stover *Moe* Decl. ¶ 11).

Specifically, BOP observed that the rates of sexual assault at the chosen facilities were low, and that the overall rates of assault are often lower than at the female facilities where plaintiffs are currently housed. *See* JA176-77, 658-59 (Stover Second *Doe* Decl. ¶¶ 19-23); JA308, 748 (Stover First *Jones* Decl. ¶ 9); JA390-91, 824-25 (Stover Second *Jones* Decl. ¶¶ 13-16); *see also* JA391, 825 (Stover Second *Jones* Decl. ¶ 16) ("In the seven facilities that the *Jones* and *Doe* plaintiffs may be transferred, there was only one guilty

finding ... of sexual assault ... in 2024.").  And BOP noted that various facilities it has selected for plaintiffs' new housing assignments already house "other inmates who identify as female, thereby ensuring that the staff members at the facilities are experienced in managing and providing care to this special population."  JA177, 659 (Stover Second *Doe* Decl. ¶ 24); *see* JA308, 748 (Stover First *Jones* Decl. ¶ 9); JA390-91, 824-25 (Stover Second *Jones* Decl. ¶¶ 12-15).

### D.  Prior Proceedings

Plaintiffs brought three lawsuits against the Attorney General and the Director of BOP,[4] challenging the transfer of plaintiffs to male facilities and the alleged imminent cessation of certain medical treatment for their gender dysphoria.  Plaintiffs collectively assert that the relevant provisions of EO 14168, BOP's implementation of those provisions, and the resulting anticipated transfer of plaintiffs to male facilities and alleged termination of hormone interventions would violate Equal Protection principles, the Eighth Amendment, the Rehabilitation Act, the Administrative Procedure Act

---

[4] The complaints originally named the Acting Attorney General and Acting Director of BOP; upon taking office, the Attorney General and Director were automatically substituted as defendants.  *See* Fed. R. Civ. P. 25(d); Fed. R. App. P. 43(c)(2).  Although President Trump is also currently named as a defendant in one of these actions, no relief is available against the President. *See Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("[C]ourts do not have jurisdiction to enjoin [the President], and have never submitted the President to declaratory relief[.]" (citation omitted)).

(APA), and the separation of powers. *See* JA213-23; JA356-67; JA472-81. Plaintiffs seek a declaratory judgment that Section 4(a) and 4(c) of EO 14168 violate plaintiffs' legal and constitutional rights, damages and costs, and injunctive relief prohibiting the government "from implementing Sectio[n] 4(a) and 4(c) of Executive Order 14168, and requiring Defendants to maintain Plaintiffs' housing and medical treatment consistent with the status quo before January 20, 2025." JA223; *see* JA367; JA481.

1.      Plaintiffs Jane, Mary, and Sara Doe filed their action on January 30, 2025, simultaneously moving for a temporary restraining order (TRO) and preliminary injunction (PI). *See Doe*, Dkt. 5.  The government filed an opposition to the TRO motion on February 3. *Doe*, Dkt. 11.  On February 4, the district court held a hearing and issued a nationwide TRO barring BOP from transferring any inmates pursuant to EO 14168. *See* JA157-67 (TRO Order).

a.      The district court determined that it had jurisdiction to entertain the motion, explaining that the exclusion of review over BOP placement decisions in 18 U.S.C. § 3621(b) did not foreclose review of constitutional claims, and that plaintiffs did not need to first pursue their claims through BOP's administrative grievance process under the PLRA's exhaustion requirements, because no relief was available through that process.

15

JA159-63 (TRO Order 3-7).  On the merits, the court concluded that plaintiffs were likely to succeed on their Eighth Amendment claims.[5]  As relevant here, the court observed that the claims were ripe because EO 14168 afforded BOP "no discretion to keep the plaintiffs in a female penitentiary, nor to continue providing hormonal therapy."  JA165 (TRO Order 9).[6]  And the court concluded that plaintiffs had established objectively intolerable risks of harm—of which BOP was aware—with respect to transfer and termination of hormones.  JA164-65 (TRO Order 8-9).  Finally, the court concluded that the remaining TRO factors favored plaintiffs.  JA166-67 (TRO Order 10-11).

The district court ordered "that the defendants are temporarily enjoined and restrained from implementing Sectio[n] 4(a) and 4(c) of Executive Order 14168, pending further Order of this Court," and that "defendants shall maintain and continue the plaintiffs' housing status and medical care as they existed immediately prior to January 20, 2025."  JA167 (TRO Order 11).

---

[5] The court has declined to reach plaintiffs' other claims.  *See* JA158 (TRO Order 2); JA187.

[6] The government maintains that the district court's understanding of EO 14168 with respect to hormone medication is incorrect.  *See Doe*, Dkt. 11, at 3; *Doe*, Dkt. 63; Defendants' Response to Plaintiffs' Motion for a PI at 1, 13, *Kingdom v. Trump*, No. 1:25-cv-691 (D.D.C. Mar. 28, 2025), Dkt. 36.  In any event, plaintiffs' medical-treatment claims are not at issue in this appeal.

**b.**    On February 18, 2025, the district court converted the TRO to a preliminary injunction and narrowed the scope of that injunction to cover only the plaintiffs. JA168-69. The court enjoined the government "from implementing Sectio[n] 4(a) and 4(c) of Executive Order 14168 against plaintiffs Jane, Mary and Sara Doe, pending further Order of this Court," and again ordered that the government "shall maintain and continue the plaintiffs' housing status and medical care as they existed immediately prior to January 20, 2025," pending further court order. JA169.

**c.**    On February 21, the Doe plaintiffs filed an amended complaint, adding nine new individuals as plaintiffs: Emily, Zoe, Tori, Olivia, Susan, Lois, Sophia, Sally, and Wendy Doe. *Doe*, Dkt. 47. At the same time, the Doe plaintiffs moved for a TRO and expanded PI to cover the new plaintiffs. *Doe*, Dkt. 50.

On February 24, the district court granted the motion, determining that "the same reasoning from the Court's original TRO Order … still applies, with nothing in the record to compel a different outcome." JA186. In opposition to this new motion, the government had provided a declaration explaining that BOP individually reevaluated the plaintiffs' placements and identified specific low-security men's facilities at which to place plaintiffs, where the risk of victimization would be minimized. JA174, 176, 656, 658

(Stover Second *Doe* Decl. ¶¶ 10-11, 18); *see* JA186. But according to the court, the fact that BOP had previously deemed "a women's facility [as] the appropriate facility for each named plaintiff"—and only reassessed their housing due to EO 14168—was alone sufficient to establish likely success on the merits of the Eighth Amendment claim. JA186-87. The court thus enjoined the government from implementing EO 14168 as to the original three plaintiffs and nine new plaintiffs, and required BOP to continue the same "housing status and medical care [for plaintiffs] as they existed immediately prior to January 20, 2025." JA187-88.

**d.** On March 14, the Doe plaintiffs moved to file a second amended complaint to add two additional individual plaintiffs—Rachel and Ellen Doe—and moved for additional emergency relief that same day. *Doe*, Dkts. 58, 61. The district court granted the motion on March 19, issuing a preliminary injunction covering just those two new plaintiffs. JA240-43.

The district court determined that the two new plaintiffs were similarly situated to the other 12, with the caveat that they had already been transferred to male facilities. JA240-41. The court noted that the new plaintiffs presented new factual allegations, but "even supposing that ... each of the plaintiffs' new arguments is either factually or legally defunct, the new plaintiffs are at least as strongly situated, in terms of the merits of their

18

Eighth Amendment claims, as the existing plaintiffs," and, if anything, the balance of the equities and irreparable harm prongs were more favorable to these new plaintiffs. JA241. Accordingly, the court concluded that a preliminary injunction was appropriate "for the same reasons that it was appropriate for the existing [plaintiffs]." JA242. The court thus enjoined the government from implementing EO 14168 against the two new plaintiffs, and ordered BOP to "immediately transfer plaintiffs Rachel Doe and Ellen Doe back to women's penitentiaries." JA243.

      **2.** Plaintiff Jane Jones filed a second action on February 10, 2025, listing the case as related to *Doe*, and moved for a TRO and PI on February 21. *See Jones*, Dkts. 1, 2, 21. The district court granted the motion on February 24, determining that "the same reasoning from the Court's TRO Order in *Doe v. McHenry* applies here," and "also appl[ying] the reasoning from the Court's most recent [February 24] Order in *Doe v. Bondi*, granting the plaintiffs' renewed Motion for TRO and Preliminary Injunction in that case." JA333. The court thus enjoined the government from implementing EO 14168 against Jones, and directed BOP to "maintain and continue [Jones's] housing status and medical care as they existed immediately prior to January 20, 2025." JA334.

On February 28, an amended complaint was filed in the *Jones* action, adding four new individual plaintiffs—Amy, Barbara, Carla, and Donna Jones—and a second motion for a TRO and PI was filed.  JA335-68; *Jones*, Dkt. 37.  On March 3, the district court granted the motion, determining again that "the same reasoning from the Court's TRO Order in the related case, *Doe v. McHenry*, applies here."  JA445.  The court also reiterated its conclusion that the fact that BOP had previously "determined that women's facilities are the *appropriate* facilities for Plaintiffs," and now seeks a "blanket removal of the plaintiffs from their appropriate housing placement with no discretion to place them in any women's facility" due only to the executive order, "suggests … a likelihood of success on the merits."  JA446-47.  The court thus issued the same preliminary injunction as to the four additional *Jones* plaintiffs.  JA449.

**3.**      Plaintiff Moe brought the third action on January 26, 2025, in the District of Massachusetts, simultaneously moving for a TRO and PI.  *See* JA459-82; *Moe*, Dkt. 3.  The district court there entered an ex parte TRO with no reasoning that same day.  JA485.  The case was then transferred to the district where Moe is incarcerated, *Moe*, Dkt. 41, before being transferred to the District Court for the District of Columbia, *see Moe*, Dkt. 60, and assigned to the same district judge as the other two actions.  The district

court granted Moe's motion for a preliminary injunction on March 10, explaining that Moe "is similarly situated to the plaintiffs in" *Doe* and *Jones*, and determining "that the same reasoning from the Court's TRO and PI Orders in those cases applies here."  JA569-70.

**4.**    The government filed timely notices of appeal in all three actions, and moved to consolidate the cases on appeal for purposes of briefing, argument, and disposition.  The government further moved to expedite the appeals.  The Court granted those motions on April 30, 2025.

**SUMMARY OF ARGUMENT**

**I.**    The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" on criminal inmates in federal custody.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotation marks omitted).  Plaintiffs contend that transferring them to male prison facilities and housing them alongside other male inmates would categorically violate that prohibition by subjecting plaintiffs to the threat of harm from their fellow inmates.  This challenge is unlikely to succeed on the merits both because it is barred by the PLRA and because it fails to establish the substantive elements of an Eighth Amendment claim.

**A.**    The PLRA provides that BOP's "designation of a place of imprisonment ... is not reviewable by any court."  18 U.S.C. § 3621(b).

Congress has thus expressly precluded judicial review of BOP's decisions to house these particular inmates in certain low-security male facilities. And even if judicial review of those decisions were permissible, plaintiffs have not satisfied the PLRA's mandatory exhaustion requirement by pursuing complaints regarding their transfer to male facilities through BOP's Administrative Remedy Program before bringing suit.

**B.** Plaintiffs' Eighth Amendment claims fail in any event. To state a claim that prison officials violated the Eighth Amendment when they made the decision to transfer plaintiffs to male facilities, plaintiffs must show that the conditions in the chosen male facilities pose "a substantial risk of serious harm" and that the officials acted with "'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 834. Plaintiffs cannot establish either of those elements here.

Housing male trans-identifying inmates in male prison facilities does not expose those inmates to objectively intolerable risks of harm. Over 1,400 male trans-identifying inmates in BOP custody are housed in male facilities. Plaintiffs have not established that those inmates face a pervasive threat of violence and sexual assault in any male facility, much less the low-security facilities to which plaintiffs have been designated. To the contrary, BOP's assault data confirms the low rate of assaults in those facilities, including

only one guilty finding of sexual assault in the seven facilities at issue in all of 2024.  JA391, 825 (Stover Second *Jones* Decl. ¶ 16).

And even assuming that plaintiffs would face an objectively substantial risk of harm in male facilities, BOP has not been deliberately indifferent to any such risks; rather, it has procedures designed to handle any specific risk of assault to an inmate and officials trained to reasonably respond to any known risk.  And it considered and responded reasonably to possible safety concerns here by selecting particular male facilities with low rates of violence and existing trans-identifying inmate population as destination facilities for plaintiffs.  The mere fact that BOP knows that these 20 plaintiffs are trans-identifying and is choosing to house them with other male inmates alone does not evidence deliberate indifference to those inmates' safety, just as it does not establish deliberate indifference to the safety of the hundreds of other male trans-identifying inmates in male BOP facilities.

Plaintiffs' theory essentially posits that anytime a male inmate would face an elevated risk of assault in men's prisons, it would constitute cruel and unusual punishment not to transfer that inmate to a women's prison.  But there are any number of reasons that individuals might face above-average risks of assault from their fellow male inmates, such as their underlying offense of conviction or mental health issues.  The Constitution clearly does

23

not require BOP to jeopardize the safety, bodily privacy, and well-being of the female inmates in its custody by assigning all such male inmates to women's prisons. Plaintiffs' understanding of the Eighth Amendment is thus fatally overbroad.

**II.**    Nor have plaintiffs demonstrated that the remaining PI factors are satisfied. Although plaintiffs fear becoming possible victims of violence in male facilities, the record does not establish that any such victimization is certain or imminent at the particular low-security facilities to which they will be transferred. Moreover, the preliminary injunctions disrupt important Executive Branch policy judgments, disregard BOP's exercise of its expertise in the difficult and sensitive task of managing the federal prison system, and ignore the harm to female inmates' safety, privacy, and dignity from male inmates being housed in a female prison. The district court thus abused its discretion in concluding that the irreparable harm prong or the public interest and balance of the equities support blocking these transfers.

**III.**    Finally, the preliminary injunctions do not comport with the PLRA's stringent procedural and scope requirements for preliminary-injunctive relief. In issuing such relief, courts must determine that it is narrowly drawn and the least intrusive means necessary to remedy the identified harm. 18 U.S.C. § 3626(a)(2). The district court neglected to make

24

that finding for the first five PI orders, and improperly summarily addressed the PLRA in the sixth order; regardless, there are less intrusive ways of ensuring plaintiffs' safety than entirely barring any transfer to male facilities.

## STANDARD OF REVIEW

This Court "review[s] the district court's balancing of the preliminary injunction factors for abuse of discretion and review[s] questions of law underlying the district court's decision *de novo*." *Abdullah v. Obama*, 753 F.3d 193, 197-98 (D.C. Cir. 2014). Although "factual findings" are generally reviewed "for clear error," where findings are based "upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 18 (2024) (quotation marks omitted).

## ARGUMENT

### I.    Plaintiffs Have Not Shown A Likelihood Of Success On The Merits Of Their Eighth Amendment Transfer Claims.

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of

preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (alterations in original) (quotation marks omitted). "[T]he movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Id.* (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).   A preliminary injunction cannot issue if plaintiffs fail to satisfy any of these factors. *See Winter*, 555 U.S. at 32.   Plaintiffs have not done so here.

## A. The Prison Litigation Reform Act Bars this Challenge.

Because plaintiffs' Eighth Amendment claims regarding their transfer to male facilities challenge the conditions of their confinement, this suit is squarely foreclosed by the Prison Litigation Reform Act.  The PLRA creates a carefully reticulated scheme for "the entry and termination of prospective relief in civil actions challenging prison conditions." *Miller v. French*, 530 U.S. 327, 331 (2000).  The statute applies to "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison." 18 U.S.C. § 3626(g)(2).  The PLRA renders the district court's PI orders invalid for two independent reasons.

**1.** The PLRA bars judicial review of BOP decisions regarding where to house a particular inmate. In general, the PLRA grants BOP broad discretion to determine an inmate's "[p]lace of imprisonment." 18 U.S.C. § 3621(b) (emphasis omitted). The relevant provision directs that BOP "may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau," taking into account certain factors. *Id.* The statute further provides that BOP "may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another." *Id.* And at the conclusion of this provision, Congress shielded all such decisions from judicial interference, providing that "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court." *Id.* The district court improperly disregarded this restriction in reviewing whether plaintiffs should remain at the female facilities where they are currently incarcerated and blocking plaintiffs' transfer to low-security male facilities, as BOP has determined would be appropriate.

The district court acknowledged that the PLRA may "foreclose any APA challenges to facility designations and transfer decisions," but held that it does not "divest the Court of jurisdiction to entertain constitutional claims

arising from BOP facility designations." JA159-60 (TRO Order 3-4). This is incorrect. Congress used clear, categorical language to establish that such decisions were entirely exempt from "review[] by any court." 18 U.S.C. § 3621(b). This Court has determined that similar language precluded review of as-applied constitutional claims. *See McBryde v. Committee to Review Circuit Council Conduct & Disability Orders of the Judicial Conference*, 264 F.3d 52, 58, 60 (D.C. Cir. 2001) (holding that statute providing that actions "'shall not be judicially reviewable on appeal or otherwise'" had the "the requisite clarity of preclusive intent"). The same is true here as to plaintiffs' Eighth Amendment transfer claims.

Accordingly, other circuits have recognized that § 3621(b) precludes review of challenges to BOP's placement decisions where the plaintiffs raise constitutional claims challenging their individual placements. *See Wills v. Barnhardt*, No. 21-1383, 2022 WL 4481492, at *4 (10th Cir. Sept. 27, 2022) (no "jurisdiction to review" due process challenge to "the BOP's decision on [the plaintiff's] transfer request"); *Touizer v. U.S. Attorney Gen.*, No. 21-10761, 2021 WL 3829618, at *2 (11th Cir. Aug. 27, 2021) (per curiam) (no jurisdiction to order transfer to home confinement, citing § 3621(b), where inmate raised First, Fifth, and Eighth Amendment claims); *Jiau v. Tews*, 812 F. App'x 638, 639 (9th Cir. 2020) (no jurisdiction over due process

28

claim challenging length of placement in residential reentry center under § 3621(b)). The Tenth Circuit expressly rejected the argument that the text of § 3621(b) did not apply to constitutional challenges, explaining that "§ 3621(b) contains no such limiting language." *Wills*, 2022 WL 4481492, at *4. Plaintiffs here similarly challenge BOP's placement determinations, asserting that their individual transfers to male facilities will violate their Eighth Amendment rights given the conditions at those facilities. *See* JA165 (TRO Order 9) ("[P]laintiffs' alleged constitutional harms would arise entirely and narrowly out of their placement in a male penitentiary … ."). Such challenges are "not reviewable by any court." 18 U.S.C. § 3621(b).

**2.** Further, the PLRA requires plaintiffs to exhaust their claims within prison remedial schemes before seeking judicial relief. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The Supreme Court has emphasized "that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). So long as administrative remedies are "available," "a court may not excuse a failure to exhaust" under the PLRA, "even to take

[special] circumstances into account." *Ross v. Blake*, 578 U.S. 632, 638-39 (2016).

Plaintiffs do not claim to have satisfied the PLRA's requirement to "complete the administrative review process in accordance with the applicable procedural rules." *Bock*, 549 U.S. at 218 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). BOP's Administrative Remedy Program has four levels: aggrieved individuals must first attempt an informal resolution with unit staff, then submit an administrative remedy request to the Warden, then appeal to BOP's Regional Director, and then, if necessary, appeal to BOP's General Counsel. *See* 28 C.F.R. §§ 542.13-.15. This process was "available" to plaintiffs. *Ross*, 578 U.S. at 638-39; *see Savage v. U.S. Dep't of Just*ice, 91 F.4th 480, 484 (D.C. Cir. 2024) ("[A] grievance procedure is 'available' to a prisoner if it is 'capable of use to obtain some relief for the action complained of.'").[7]

The district court nonetheless determined that exhaustion was not required because plaintiffs satisfied "a narrow exception to the administrative exhaustion requirement" whereby exhaustion would

---

[7] A procedure is "available" under the PLRA even if it cannot provide "the remedial action an inmate demands"; prison officials need only have "authority to take *some* action in response to a complaint." *Booth v. Churner*, 532 U.S. 731, 736 (2001) (emphasis added).

"'operate[] as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.'" JA161 (TRO Order 5) (quoting *Ross*, 578 U.S. at 643). The court explained that EO 14168 "plainly requires the BOP to perform the allegedly unlawful facility transfer" and BOP thus lacks "discretion to provide" any relief "that would remedy the plaintiffs' supposed constitutional violations." JA161 (TRO Order 5). That conclusion misconstrues the nature of plaintiffs' claims, and conflates the failure to provide the precise relief that plaintiffs seek with the ability to take any action on plaintiffs' complaints at all.

The district court stated that "the alleged constitutional violation arises from the forthcoming transfer to a male penitentiary," an "actio[n] which the BOP has no discretion not to take." JA163 (TRO Order 7). But the alleged constitutional violation at issue involves the Eighth Amendment right to be free from cruel and unusual punishment, and specifically the knowing failure to protect plaintiffs from violence at the hands of their fellow inmates. Contrary to the court's suggestion, it is not the transfer alone that would be deemed to violate the Eighth Amendment; rather, plaintiffs must show that the risk of harm to plaintiffs in a male facility *following transfer* is constitutionally impermissible, and BOP's efforts to address that risk are constitutionally inadequate. This requires a fact-specific evaluation of the

circumstances of plaintiffs' confinement.  Although BOP lacks discretion to continue housing plaintiffs in female facilities under EO 14168, there are any number of actions that BOP can take to protect their safety in a male facility, including changes to housing and programming assignments, and protective custody.  *See* 28 C.F.R. § 115.42; JA308-10 (Stover First *Jones* Decl. ¶¶ 11-15).  If plaintiffs raised concerns about their safety in a male facility through the Administrative Remedy Program, BOP could thus take action to pursue additional safety measures.

The district court effectively concluded that because BOP's administrative scheme cannot give plaintiffs the *precise relief* they seek in this litigation—a halt to the transfer—it can provide no remedy at all.  But the specific "exception" to exhaustion under which the court exercised review does not stretch so broadly; it only covers circumstances where there is truly "no ... potential" for "'any relief.'"  *Ross*, 578 U.S. at 642-43 (contemplating circumstances where the office at issue "disclaims the capacity to consider" grievances and "'lacks authority to provide any relief,'" or as a factual matter "decline[s] ever to exercise" its authority).  Remedies are "available" under the PLRA where officials have "authority to take *some* responsive action with respect to the type of allegations" raised, even if they cannot provide "the specific relief the prisoner demands."  *Booth v. Churner*, 532 U.S. 731, 737

32

n.4, 738 (2001) (emphasis added); *cf. Kaemmerling v. Lappin*, 553 F.3d 669, 675 (D.C. Cir. 2008) (holding that exhaustion was not required where "BOP could not articulate a single possible way the prison's administrative system could provide relief or take any action at all in response to" the inmate's complaint).

BOP has discretion to take a variety of actions (other than continuing to house them in female facilities) to address plaintiffs' concerns regarding safety, should plaintiffs properly raise such grievances. Accordingly, the PLRA requires plaintiffs to exhaust their Eighth Amendment claims through BOP's administrative complaint scheme.

### B.    The Eighth Amendment Does Not Require BOP to House Plaintiffs, Who Are Male Inmates, in Female Prisons.

"[T]he segregation of inmates by sex is unquestionably constitutional." *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996). The district court abused its discretion in nonetheless concluding that BOP's decision to transfer the all-male plaintiffs to male prisons likely violated the Eighth Amendment. Under the Eighth Amendment's prohibition of "cruel and unusual punishments," prison officials must "take reasonable measures to guarantee the safety of the inmates," which includes "protect[ing] prisoners from violence at the hands

33

of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (quotation marks omitted). To establish a failure-to-protect claim, an "inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" to his health or safety and that prison officials acted with "'deliberate indifference'" to that risk. *Id.* at 834; *accord Wade v. McDade*, 106 F.4th 1251, 1261-62 (11th Cir. 2024) (en banc). Neither prong of that inquiry has been satisfied here.

**1.a.** Plaintiffs have not demonstrated that merely placing them in a male facility will inherently subject them to an objectively substantial risk of serious harm. For the level of risk to satisfy the first prong of this inquiry, it must be "'sufficiently serious'" and "objectively intolerable." *Farmer*, 511 U.S. at 834, 846. "[N]ot every risk carries an inherent threat at a substantial level, or of severity beyond the norms … ." *Lakin v. Barnhart*, 758 F.3d 66, 72 (1st Cir. 2014) (Souter, J.); *see Murphy v. United States*, 653 F.2d 637, 644 (D.C. Cir. 1981) ("[A] prisoner has no right to demand the level of protection necessary to render an institution assault-free … ."). To qualify as "substantial," the risk must be "pervasive": "violence and sexual assaults [must] occur with sufficient frequency that prisoners are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures." *Vandevender v. Sass*,

970 F.3d 972, 977 (8th Cir. 2020) (quotation marks omitted); *see Shrader v. White*, 761 F.2d 975, 978 (4th Cir. 1985) (similar); *Murphy*, 653 F.2d at 644-45 (similar).

Having initiated these actions before being transferred to specific male facilities,[8] plaintiffs' argument is not that a specific housing assignment carries an objectively intolerable risk of harm. Instead, plaintiffs assert categorically that there are no possible housing conditions at any male facility under which plaintiffs would not be subject to an objectively intolerable threat of abuse. There is no support for that assertion, and no support for the necessary implication that BOP is categorically unable to adequately manage the risk of assault for the approximately 1,466 male trans-identifying inmates (representing 99% of all such inmates) who are housed in male facilities. *See* JA174 (Stover Second *Doe* Decl. ¶ 5).

As far as the undersigned counsel are aware, no federal court has ever held that the Eighth Amendment requires BOP to house trans-identifying inmates in opposite-sex facilities as a means of protecting them from the risk

---

[8] Although two plaintiffs—Rachel and Ellen Doe—were transferred prior to joining this action, JA240-41, they "incorporate[d] by reference the arguments made in [plaintiffs'] prior motions" that transfer to any male facility was constitutionally impermissible, *Doe*, Dkt. 61-1, at 7.

of assault.[9]  *See Doe v. Georgia Dep't of Corr.*, 730 F. Supp. 3d 1327, 1344 (N.D. Ga. 2024) (observing that even if court found "some specific and immediate threat of harm" to male trans-identifying inmate in male facility, court would deny request for transfer to women's prison at PI stage); *Hampton v. Baldwin*, No. 3:18-cv-550, 2018 WL 5830730, at *13, *16-17 (S.D. Ill. Nov. 7, 2018) (finding likelihood of success on merits of failure-to-protect claim, but declining to order transfer to women's prison at PI stage).

**b.**  The district court nonetheless found that the plaintiffs had satisfied this prong by citing "various government reports and regulations recognizing that transgender persons are at a significantly elevated risk of physical and sexual violence relative to other inmates when housed in a facility corresponding to their biological sex."  JA164-65 (TRO Order 8-9). But the government "reports and regulations" relied on by the district court do not come close to establishing that plaintiffs face a significantly elevated

---

[9] And counsel are aware of only two federal district courts that have held that a trans-identifying inmate must be moved to an opposite-sex facility as relief under a deliberate indifference to medical needs claim. *See JJS v. Pliler*, No. 19-cv-2020, 2022 WL 16578124, at *16-19 (S.D.N.Y. Aug. 3, 2022), *report and recommendation adopted sub nom. Shelby v. Petrucci*, No. 19-cv-2020, 2022 WL 16575766 (S.D.N.Y. Nov. 1, 2022); *Soneeya v. Mici*, 717 F. Supp. 3d 132, 134-35 (D. Mass. 2024).  *But see Fisher v. BOP*, No. 4:19-cv-1169, 2022 WL 2648950, at *15-16 (N.D. Ohio July 8, 2022) (no Eighth Amendment violation where BOP had not transferred male trans-identifying inmate to female facility).

risk of physical and sexual assault if they are transferred to a male prison facility. Those materials indicate merely that trans-identifying inmates are generally more likely to be the victims of sexual violence than non-trans-identifying inmates. *See* JA209 (*Doe*, Second Am. Compl. ¶ 105). But that fact alone does not support the conclusion that transferring a trans-identifying inmate to a male prison significantly increases the risk of assault. Indeed, the government report on which plaintiffs rely indicates that the rate of sexual victimization is almost two-and-a-half times *higher* at female prisons (8.5%) than at male prisons (3.7%). U.S. Dep't of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates*, 2011-12, at 15 (May 2013) (Table 5), https://perma.cc/RLB3-CY8Q (BJS Report); *see id.* at 54 (Appendix Table 2) (showing overall lower rates at federal facilities, with similar disparity between male and female facilities).

Moreover, even if plaintiffs could show that male prisons have, on average, higher rates of sexual assault than do female prisons, that showing would not mean that plaintiffs necessarily face a higher risk of assault in the facilities that BOP designated for their transfers. As the cited government report found, many male facilities in the federal prison system have very low rates of sexual victimization, BJS Report 48 (Appendix Table 1), including a

37

number that "had no reported incidents of sexual victimization of any kind" when surveyed, BJS Report 15.  Indeed, BOP's declarant explained that, in "the seven facilities that the *Jones* and *Doe* plaintiffs may be transferred [to], there was only one guilty finding … of sexual assault … in 2024."  JA391, 825 (Stover Second *Jones* Decl. ¶ 16).  And the rates of assault generally at the male facilities to which plaintiffs will be transferred are often lower than the rates in the facilities where plaintiffs are currently housed.  JA390-91, 824-25 (Stover Second *Jones* Decl. ¶¶ 13-15).

The district court discounted the government's statistics because they "do not disaggregate assaults against transgender inmates from overall rates of assault."  JA187 n.2.  But that objection is inapposite; the overall rate of assaults in these male facilities—which already house trans-identifying inmates—is so low that merely being housed there cannot constitute being subject to a substantial risk of serious harm.  *See* JA390-91, 824-25 (Stover Second *Jones* Decl. ¶¶ 13-16); JA176-77, 658-59 (Stover Second *Doe* Decl. ¶¶ 19-24); JA396-443.

Plaintiffs thus have not and cannot show that their transfer to a male prison will expose them to a "pervasive" and "objectively intolerable" risk of assault.  *See Murphy*, 653 F.2d at 645 (concluding that showing was insufficient where 20 assaults occurred within calendar year and the plaintiff

38

made "no attempt to show that the rate of assaults in this facility exceeded the norm for like institutions"); *Green v. Hooks*, 798 F. App'x 411, 426-27 (11th Cir. 2020) ("28 reported incidents of sexual assault … over five years" did not demonstrate "substantial risk of serious harm").

Under plaintiffs' reasoning, moreover, BOP would violate the Constitution any time it assigned to a male prison a male inmate who, statistically speaking, faced an elevated risk of sexual assault.  The absurd results produced by plaintiffs' theory reveal the fundamental flaw in their Eighth Amendment claims.  Many male inmates face an elevated risk of sexual or other assault in men's prisons based on their individual characteristics, such as their offense of conviction, sexual orientation, mental health, or status as a government informant.  *See* BJS Report 18 (higher rates of inmate-on-inmate sexual victimization among non-heterosexual inmates than heterosexual inmates); BJS Report 19-20 (higher rates among violent sex offenders than other offenders); BJS Report 24-26 (higher rates among inmates with severe psychological distress than inmates without mental health problems); *Irving v. Dormire*, 519 F.3d 441, 451 (8th Cir. 2008) (observing that "an inmate who is considered to be a snitch is in danger of being assaulted or killed by other inmates" and collecting relevant Eighth Amendment cases).  And the risks to such inmates would likely decrease, in

some case likely dramatically, if those men were transferred to women's prisons.  But even if there was no other way to eliminate the risk of violence to such inmates in men's prisons, no one would assert that it would violate the Eighth Amendment not to house them in women's prisons.  The same is true for the male inmates at issue here: the Constitution does not force BOP to privilege their interests by compromising the safety and infringing upon the privacy of female inmates in its custody.   Plaintiffs' sweeping understanding of the Eighth Amendment is thus plainly incorrect.

**c.**     The district court also suggested, citing only to the initial *Doe* complaint, that plaintiffs face a sufficiently serious risk of harm from being housed in a male facility because such housing "*by itself* will exacerbate the symptoms of their gender dysphoria."  JA165 (TRO Order 9) ("[T]he mere homogenous presence of men will cause uncomfortable dissonance."); *see* JA187 n.2.  Plaintiffs' transfer claim is not a medical-treatment claim but rather a failure-to-protect claim, so the district court's point is irrelevant.  Doubly so because the *Doe* plaintiffs did not even rely on any such harm in their original PI motion.  *See Doe*, Dkt. 13-1, at 14-18.  And for good reason. The court cited no case law, secondary source, or expert testimony to suggest that merely living in a male facility as a trans-identifying inmate with a

diagnosis of gender dysphoria[10] constitutes an "objectively intolerable risk" to the inmate's health as to amount to cruel and unusual punishment and require placement in a female facility.

Plaintiffs attempted to supply this missing support in a subsequent declaration. *See* JA182-83 (Meade *Doe* Supp. Decl. ¶ 8). But even assuming "resid[ing] in a men's facility" would "worsen [plaintiffs'] gender dysphoria," *id.*, that does not show that any change in the severity of symptoms would rise to the level of an Eighth Amendment violation, particularly considering the ways in which BOP could treat those symptoms. Nor can plaintiffs make that showing, in light of the vast number of inmates with gender dysphoria that can be adequately managed by BOP in male facilities.

**2.**    Nor have plaintiffs shown that BOP is deliberately indifferent to the potential risks of transferring plaintiffs to male facilities. This prong of the inquiry requires that prison officials "kno[w] that inmates face a substantial risk of serious harm and disregar[d] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Prison officials

---

[10] As noted, there are approximately 1,466 male trans-identifying inmates in BOP custody who live in male facilities, JA174 (Stover Second *Doe* Decl. ¶ 5), though not all trans-identifying individuals have gender dysphoria. And as of March 27, 2025, there were 1,028 inmates in BOP custody being treated for gender dysphoria or incongruence. Declaration of Chris A. Bina ¶ 7, *Kingdom v. Trump*, No. 1:25-cv-691 (D.D.C. Mar. 28, 2025), Dkt. 36-1.

are not deliberately indifferent "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. The requirement that officials ensure "reasonable safety" for inmates "incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Id.* at 844-45 (quotation marks omitted).

    **a.**    Here, BOP specifically considered the risks to plaintiffs of being housed in male facilities. *See* JA307-08, 747-48 (Stover First *Jones* Decl. ¶¶ 8-9); JA390-91, 824-25 (Stover Second *Jones* Decl. ¶¶ 12-16); JA100-01, 653-54 (Stover First *Doe* Decl. ¶ 12); JA175-77, 657-59 (Stover Second *Doe* Decl. ¶¶ 12-25); JA237, 710 (Associate Warden *Doe* Decl. ¶¶ 5-7); JA513, 910 (Stover *Moe* Decl. ¶ 11). "In determining the most appropriate placement for transgender inmates," BOP "takes into consideration the inmates' assigned security level, disciplinary record, medical record and psychology record." JA100, 653 (Stover First *Doe* Decl. ¶ 11). "Based on the [BOP decisionmakers'] experience and range of expertise," it determined that "placing [plaintiffs] at a low security institution with non-violent offenders would minimize the likelihood that they would be victimized." JA100-01, 653-54 (Stover First *Doe* Decl. ¶ 12). And once plaintiffs are in particular male facilities, BOP will further consider safety concerns and how to

minimize the risk of victimization "in making ... housing and programming assignments."  28 C.F.R. § 115.42(c).

Indeed, the record already contains an example of how BOP reasonably responds to concerns raised by trans-identifying inmates in male facilities. Plaintiffs Rachel and Ellen Doe were transferred to a male facility before being added to this litigation.  *See* JA240-41.  While there, "Rachel Doe reported receiving a note that was sexual in nature from an unknown inmate."  JA239, 710 (Associate Warden *Doe* Decl. ¶ 10).  As a result, BOP Special Investigative Services began an investigation into the incident.  *Id.* The investigation found "that Rachel did not feel threatened or concerned," and subsequently was "living in general population and attending recreation without issue," JA239, 710 (Associate Warden *Doe* Decl. ¶¶ 11-12), but if the investigation had revealed a serious threat, BOP would have taken appropriate steps to protect Doe from harm, such as by separating Doe from the aggressor or otherwise initiating protective custody.

BOP officials thus have responded reasonably to the risk at issue (even assuming it is an objectively substantial one), and plaintiffs provide no reason to doubt that BOP officials will continue to do so.  The requirement to ensure "reasonable safety" for male trans-identifying inmates—reflecting "due regard for prison officials' 'unenviable task of keeping dangerous men

43

in safe custody,'" *Farmer*, 511 U.S. at 844—does not force BOP to attempt to eliminate the risks to such inmates entirely by harming the security, dignity, and well-being of female inmates. Accordingly, plaintiffs cannot establish that BOP officials were subjectively aware of a substantial risk of harm to plaintiffs and failed to take reasonable steps to abate that risk.

**b.** The district court nonetheless concluded that BOP was deliberately indifferent to the purportedly serious risk of harm that plaintiffs would face from the transfer merely because BOP was aware of the cited "government resources and regulations." JA165 (TRO Order 9). But as discussed, those sources do not support that these plaintiffs would face an objectively intolerable risk in the specific male facilities to which they would be transferred. Nor is the mere knowledge that an inmate is trans-identifying and will be housed among males sufficient to show deliberate indifference. *See, e.g.*, *Farmer*, 511 U.S. at 848-49 (acknowledging the defendants' admission that the plaintiff was a "transsexual" in a high-security male facility, but remanding without suggesting that those facts alone established deliberate indifference); *Green*, 798 F. App'x at 423.

Plaintiffs assert to the contrary that "[c]ourts have consistently found this element satisfied when officials knowingly house transgender women"—*i.e.*, males—"in men's prisons." *Doe*, Dkt. 13-1, at 16 (citing cases); *Jones*,

Dkt. 21-1, at 17 (same); *Moe*, Dkt. 31-1, at 15 (same). That misstates the law, as even a cursory review of the cases cited by plaintiffs shows. In none of the cases cited by plaintiffs did a court find that the decision to house a male trans-identifying inmate in a men's prison was alone sufficient to establish that prison officials deliberately disregarded a substantial risk of harm to the inmate. In each case, the court found that additional, case-specific factors heightened the risk of assault, and that it was the officials' disregard of these additional factors that demonstrated their failure to take reasonable steps to protect the plaintiff from harm. *See, e.g.*, *Doe v. District of Columbia*, 215 F. Supp. 3d 62, 77-80 (D.D.C. 2016) (knowledge that the plaintiff was supposed to be housed alone, but unnecessarily placed male inmate in cell with plaintiff "unsupervised overnight" without performing security checks or following transfer protocols); *Stover v. Corrections Corp. of Am.*, No. 1:12-cv-393, 2015 WL 874288, at *6-10 (D. Idaho Feb. 27, 2015) (prior reporting of "generalized information about assaults by" gang-member assailants, plaintiff's requests to move for safety reasons, and open-dorm setting housing exclusively sex offenders); *Lojan v. Crumbsie*, No. 12-cv-320, 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013) (knowledge of vulnerability and allowing individual with history of violence "access to [the plaintiff] as a trustee"); *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 689-92, 696 (S.D.

45

Tex. 2016) (the plaintiff reported over a dozen incidents of assault to prison officials in facilities with documented issues involving sexual abuse of gay and trans-identifying inmates).  Plaintiffs point to no such factors here.

**3.**    The district court also concluded that BOP was likely deliberately indifferent to the risks to plaintiffs of being housed in male facilities because BOP had previously "determined that women's facilities are the *appropriate* facilities for Plaintiffs under the prevailing legal regime," but now seeks to "remov[e] Plaintiffs from their appropriate housing assignment" due "sole[ly]" to the implementation of EO 14168.  JA446-47; *see* JA186-87.  This fundamentally misunderstands the nature of BOP's designation authority and its exercise with respect to trans-identifying inmates.

Contrary to the district court's supposition, BOP's prior decisions to house plaintiffs in opposite-sex facilities were not based solely on safety considerations.  Rather, BOP considered a number of factors, including: "an inmate's security level, criminal and behavioral/disciplinary history, current gender expression, programming, medical, and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse," as well as "facility-specific factors, including inmate populations, staffing patterns, and physical layouts."  JA125.  In some circumstances, inmates were "placed in a women's facility due to court

46

orders," as part "of a settlement agreement," or "because they were already being housed with women prior to coming into [BOP] custody."  JA393 (Stover Second *Jones* Decl. ¶ 24).  And some inmates were transferred to an opposite-sex facility to "progres[s] the individual inmate's transition" to the opposite sex as required under the prior BOP policy for cross-sex surgeries. JA126; JA393 (Stover Second *Jones* Decl. ¶ 24) (noting that Zoe and Mary Doe fall into this category).  There is no reason to think that BOP's previous determinations to house plaintiffs in female facilities reflected a judgment on the part of BOP that it would be categorically, unconstitutionally unsafe to house them in any male facility.

In any event, even if plaintiffs had been housed in female facilities based purely on safety concerns, the Eighth Amendment does not bar BOP from revisiting those assignments and determining that different housing designations are appropriate.  "It is well settled that the decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002).  In making such decisions, the Constitution does not require prison administrators to prioritize the safety of an individual prisoner over all other considerations.  *See, e.g.*, *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (The Eighth Amendment is not violated where the action challenged was taken for "a legitimate penological purpose.").

BOP has a legitimate penological interest in the privacy, well-being, and security of female inmates. That BOP is now placing more weight on those interests when making housing assignments than it did in the recent past does not violate the Constitution.

## II. Plaintiffs Have Not Satisfied The Remaining Preliminary-Injunction Factors.

In seeking a preliminary injunction, plaintiffs also have "the burden to show ... that they are likely to suffer irreparable harm in the absence of preliminary relief, and that the balance of equities, including the public interest, tips in their favor." *Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017) (alterations and quotation marks omitted); *see MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021) ("If the government is the party sought to be enjoined, the public interest and balance of equities factors merge."). Plaintiffs have failed to establish those factors here.

**A.**  Plaintiffs have not demonstrated that they will likely suffer irreparable harm from the transfer to male facilities. This Court has "set a high standard for irreparable injury": to qualify, an injury must be "both certain and great," "actual and not theoretical," "imminen[t]," and "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006) (emphasis and quotation marks omitted)

48

(holding that "tangible injury" was too "hypothetical" where challenged practice merely "reduce[d the] Appellants' *opportunities* for promotion").

Here, plaintiffs fear that they will be the victims of violence and sexual abuse if transferred to male facilities. *See Doe*, Dkt. 13-1, at 22-23; *Doe*, Dkt. 50-1, at 23; *Jones*, Dkt. 38, at 9; *Jones*, Dkt. 21-1, at 21-22; *Moe*, Dkt. 4, at 19-20. But they have not shown that any such physical harm is likely, much less certain. Rather, plaintiffs allege only that the risk of such violence is increased in male facilities generally. *See supra* pp. 36-37. And the cases plaintiffs cite do not stand for the proposition that merely being housed in male facilities and exposed to the possibility of violence therein is *per se* an irreparable injury for preliminary injunction purposes.[11]

Nor can plaintiffs succeed in demonstrating that the tangible injury they fear is sufficiently imminent and certain, given that the vast majority of male trans-identifying inmates are currently housed in male facilities and BOP will take steps to minimize any risk to plaintiffs by, among other things,

---

[11] *Tay v. Dennison*, 457 F. Supp. 3d 657, 687 (S.D. Ill. 2020) (finding irreparable injury where the plaintiff was "forced to endure constant sexual abuse" and "sexually assaulted, harassed, and threatened" by "multiple prisoners"); *Hampton*, 2018 WL 5830730, at *15 (finding irreparable harm where the plaintiff "continues to be sexually assaulted and prison officials refuse to do anything to protect her"); *Greene v. Bowles*, 361 F.3d 290, 292 (6th Cir. 2004) (not involving PI motion or irreparable injury); *Becker v. Sherman*, No. 16-cv-828, 2017 WL 6316836, at *5 (E.D. Cal. Dec. 11, 2017) (same); *Lojan*, 2013 WL 411356, at *4 (same).

transferring them to low-security institutions with non-violent offenders.[12] The possibility that these specific plaintiffs will be victimized in the low-security facilities that BOP has identified for their housing thus "fail[s] to rise beyond the speculative level." *Citizens for Responsibility & Ethics in Washington v. Federal Election Comm'n*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam); *see Hanson v. District of Columbia*, 120 F.4th 223, 245 (D.C. Cir. 2024) (per curiam) ("'[S]imply showing some *possibility* of irreparable injury' is not sufficient to make the irreparable harm showing needed to obtain preliminary relief.").

The district court nonetheless concluded that plaintiffs had demonstrated irreparable harm related to transfer based on the "prospective violation of a constitutional right." JA166 (TRO Order 10) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). As discussed, *supra* Part I, plaintiffs are not likely to succeed in showing any such violation. Moreover, this Court has clarified that it does not "'axiomatically' find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its [constitutional] rights." *Hanson*, 120 F.4th at 244.

---

[12] Indeed, the two newest *Doe* plaintiffs—who were transferred to and briefly housed in a low-security male facility before joining this action—made no allegations that they had been subjected to any physical harm during that period. *See* JA229-30, 700-01 (Ellen Doe Decl.); JA232-34, 703-05 (Rachel Doe Decl.).

As to Rachel and Ellen Doe only, the district court also stated that "the fact that they have already been transferred and, allegedly, have been abused at their new facilities can only strengthen their claims of irreparable harm." JA241-42. The record, however, reveals only that the two allegedly had been subjected to unwanted attention and propositioned for sex at the new male facilities. *See* JA230, 701 (Ellen Doe Decl. ¶ 8); JA233-34, 704-05 (Rachel Doe Decl. ¶¶ 11-12). Those plaintiffs asserted that they were in "fear of sexual assault and other violence," *Doe,* Dkt. 61-1, at 9—not that they had actually experienced any since their recent transfer to low-security male facilities.[13] Although plaintiffs seem to suggest that experiencing fear of potential victimization alone is an irreparable injury, *id.*, such intangible and subjective allegations of harm are insufficient, *see Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *5 (4th Cir. Mar. 28, 2025) ("[S]ubjective fear that is remote and speculative is insufficient to show the required actual and imminent harm to establish irreparability.").

As the Supreme Court has explained with respect to the analogous standing inquiry, "[i]t is the *reality* of the threat of repeated injury that is

---

[13] Moreover, as a government declarant explained, one of these plaintiffs had "not made any complaints of sexual harassment," and the other indicated to BOP Special Investigative Services that the inmate "did not feel threatened or concerned" despite receiving a note "that was sexual in nature." JA239, 710 (Associate Warden *Doe* Decl. ¶¶ 9-12).

relevant … not the plaintiff's subjective apprehensions.  The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury … ."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983); *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) ("'subjective apprehensions' that … recurrence [of feared conduct] would even *take place* were not enough to support standing" in *Lyons*); *see also Hange v. City of Mansfield*, 257 F. App'x 887, 893 (6th Cir. 2007); *Finstuen v. Crutcher*, 496 F.3d 1139, 1144 (10th Cir. 2007).  Although plaintiffs might worry about violence if housed in male facilities, that subjective concern alone does not constitute irreparable injury.

Plaintiffs' failure to adequately establish that they will likely suffer irreparable injury is sufficient to require vacatur of the preliminary injunctions in these cases.  *See Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1336 (D.C. Cir. 2024) ("[A] movant's failure to show any irreparable harm is grounds for refusing to issue a preliminary injunction … ." (alteration and quotation marks omitted)).

**B.**    The district court further erred in concluding that the balance of the equities and public interest favor the issuance of these injunctions. JA166-67 (TRO Order 10-11).

52

The President, as the head of the Executive Branch with ultimate responsibility for the operation of its prisons, has deemed it important to protect the safety, well-being, and privacy of female inmates in intimate spaces when they are in federal custody.  EO 14168, §§ 1, 4, 90 Fed. Reg. at 8615-16.  And that determination is consistent with BOP's expert policy judgment.  *See* JA392-93, 826-27 (Stover Second *Jones* Decl. ¶¶ 20, 23) ("It is [B]OP's correctional judgment that housing inmates with inmates of their own biological sex ensures bodily privacy and safety and limits the risk of sexual abuse, disciplinary problems, and illicit intimate relationships."). Regardless of the public debate over these issues, there is a public interest in deferring to the Executive Branch's determination as to the operations of the federal prisons.  By contrast, forcing BOP to effectively "keep in place a [former housing policy] that no longer reflects its current … thinking … is not in the public interest."  *MediNatura*, 998 F.3d at 945.

The preliminary injunctions impermissibly interfere with the government's administration of its federal prisons and the execution of Executive Branch policy.  "[P]rison administrators, and not the courts, are to make the difficult judgments concerning institutional operations."  *Turner v. Safley*, 482 U.S. 78, 89 (1987) (alterations and quotation marks omitted). And "[i]t is well settled that the decision where to house inmates," in

particular, "is at the core of prison administrators' expertise." *McKune*, 536 U.S. at 39.  This Court has accordingly recognized the need to "accord prison administrators wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014) (alterations, emphasis, and quotation marks omitted).  The district court failed to do so here.

Instead, the court second-guessed the strength of Executive Branch policy interests, suggesting that any "deleterious effect on privacy and security" for female inmates was irrelevant because "there are only about sixteen" male trans-identifying inmates "housed in female penitentiaries," and that BOP could "manage[]" the "threat to the female inmates housed with them" "locally by prison staff."  JA166-67 (TRO Order 10-11).  It is not the prerogative of the district court to dictate the management of federal prisons or countermand the President's express judgment that the implementation of this housing policy is necessary to serve the public interest in protecting female inmates.  To the contrary, such policy judgments and governmental interests merit particularly strong consideration under the PLRA, which requires courts to "give substantial weight to any adverse impact on public safety or the operation of a criminal

54

justice system" that would be caused by the requested preliminary-injunctive relief. 18 U.S.C. §3626(a)(2).[14]

The Executive Branch interests at stake thus clearly outweigh plaintiffs' speculative assertions regarding the possible risks of being housed in low-security male facilities. In nevertheless granting these broad preliminary injunctions, the district court abused its discretion.

## III. The Preliminary Injunctions At Issue Violate The PLRA.

At a minimum, this Court should vacate the preliminary injunctions for failure to comply with the PLRA's relief provisions. The PLRA contains specific restrictions on the grant of "preliminary injunctive relief" "with respect to prison conditions." 18 U.S.C. § 3626(a)(2). Any such relief must be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means

---

[14] *See, e.g.*, *Baxter v. Wexford Healthcare*, No. 16-cv-291, 2017 WL 2772333, at *3 (W.D. Pa. June 27, 2017) (observing that "harm to the nonmoving party" and "public interest" factors are "especially important" in the correctional context given 18 U.S.C. § 3626(a)); *Bryant v. Johnson*, No. 7:11-cv-75, 2012 WL 4459930, at *3 (W.D. Va. June 15, 2012) ("Efficient and effective penal administration furthers the public's interest, and involving a federal court in the day-to-day administration of a prison is a course the judiciary generally disapproves of taking." (citing 18 U.S.C. § 3626(a)(2)); *Matheis v. CDCR*, No. 20-cv-2100, 2021 WL 718603, at *4 (S.D. Cal. Feb. 24, 2021) ("The Court cannot substitute CDCR's own judgment on what would best serve the public interest, such as calculating whether transferring an inmate during times of COVID-19 would be net beneficial." (citing 18 U.S.C. § 3626(a)(2)).

necessary to correct that harm." *Id.* The district court did not make any such findings in the first five PI orders that these requirements were satisfied. *Compare* JA242-43 (PLRA findings), *with* JA157-67 (TRO Order 1-11) (no findings); JA168-69 (same); JA185-88 (same); JA333-34 (same); JA445-49 (same); JA569-71 (same). That failure alone requires "immediate termination" of all but the final *Doe* PI order. 18 U.S.C. § 3626(b)(2).

And for the final *Doe* PI order, the district court engaged in only a brief and cursory analysis. JA242-43. But the PLRA requires much more. *See Hoffer v. Secretary, Fla. Dep't of Corr.*, 973 F.3d 1263, 1278-79 (11th Cir. 2020) (holding that a "one-sentence, boilerplate paragraph ... regarding PLRA compliance"—akin to "just append[ing] a rote, catch-all assertion that 'the permanent injunction satisfies the [PLRA]'"—was 'seriously deficient'"); *Cason v. Seckinger*, 231 F.3d 777, 785 (11th Cir. 2000) (explaining that analogous provision of PLRA requires not just a "summary conclusion," but rather "particularized findings, on a provision-by-provision basis, that each requirement imposed ... satisfies the need-narrowness-intrusiveness criteria, given the nature of the current and ongoing violation").

Moreover, with respect to all 20 plaintiffs, the district court determined that to remedy the risk of harm they might face in a male facility, plaintiffs must be kept in female facilities. It should be self-evident, however,

that there are better-tailored and less-intrusive means through which BOP can address the risk of harm to male trans-identifying inmates in male facilities. *See Farmer*, 511 U.S. at 831 (seeking injunction against confinement in *higher-security* male facility as relief for failure-to-protect claim). Indeed, the record reflects that BOP intends to pursue such means with respect to these plaintiffs, both regarding their initial transfer to and their experience in the new male facilities. *See, e.g.*, JA307-10, 747-50 (Stover First *Jones* Decl. ¶¶ 8-16); JA390-91, 94, 824-25, 828 (Stover Second *Jones* Decl. ¶¶ 11-16, 25-26). Vacatur of the preliminary-injunction orders as to the transfer of plaintiffs to male facilities is thus further warranted on this basis.

## CONCLUSION

For the foregoing reasons, the preliminary-injunction orders of the district court should be vacated insofar as they enjoin BOP from implementing Section 4(a) of EO 14168 and transferring plaintiffs to male facilities.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*
GERARD SINZDAK

 */s/McKaye L. Neumeister*
MCKAYE L. NEUMEISTER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7231*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8100*
  *McKaye.L.Neumeister@gmail.com*

May 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,538 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

 */s/ McKaye L. Neumeister*
McKaye L. Neumeister

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ McKaye L. Neumeister*
McKaye L. Neumeister

**ADDENDUM**

## TABLE OF CONTENTS

18 U.S.C. § 3621(b) ............................................................. A1

18 U.S.C. § 3626(a)-(b) ......................................................... A2

42 U.S.C. § 1997e(a) ............................................................ A5

28 C.F.R. § 115.41 .............................................................. A5

28 C.F.R. § 115.42 .............................................................. A7

28 C.F.R. § 542.13 .............................................................. A7

28 C.F.R. § 542.14 .............................................................. A8

28 C.F.R. § 542.15 ............................................................. A10

**18 U.S.C. § 3621**

**§ 3621. Imprisonment of a convicted person**

* * *

   **(b) Place of imprisonment.**--The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons, place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence. The Bureau shall, subject to consideration of the factors described in the preceding sentence and the prisoner's preference for staying at his or her current facility or being transferred, transfer prisoners to facilities that are closer to the prisoner's primary residence even if the prisoner is already in a facility within 500 driving miles of that residence. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering--

   **(1)** the resources of the facility contemplated;

   **(2)** the nature and circumstances of the offense;

   **(3)** the history and characteristics of the prisoner;

   **(4)** any statement by the court that imposed the sentence--

      **(A)** concerning the purposes for which the sentence to imprisonment was determined to be warranted; or

      **(B)** recommending a type of penal or correctional facility as appropriate; and

   **(5)** any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same

matters, direct the transfer of a prisoner from one penal or correctional facility to another. The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse. Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person. Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court.

* * * *


**18 U.S.C. § 3626**

**§ 3626. Appropriate remedies with respect to prison conditions**

**(a) Requirements for relief.--**

**(1) Prospective relief.--(A)** Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

**(B)** The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless--

**(i)** Federal law requires such relief to be ordered in violation of State or local law;

**(ii)** the relief is necessary to correct the violation of a Federal right; and

**(iii)** no other relief will correct the violation of the Federal right.

**(C)** Nothing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of

prisons or the raising of taxes, or to repeal or detract from otherwise applicable limitations on the remedial powers of the courts.

**(2) Preliminary injunctive relief.--**In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

**(3) Prisoner release order.--(A)** In any civil action with respect to prison conditions, no court shall enter a prisoner release order unless--

    **(i)** a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and

    **(ii)** the defendant has had a reasonable amount of time to comply with the previous court orders.

**(B)** In any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge court in accordance with section 2284 of title 28, if the requirements of subparagraph (E) have been met.

**(C)** A party seeking a prisoner release order in Federal court shall file with any request for such relief, a request for a three-judge court and materials sufficient to demonstrate that the requirements of subparagraph (A) have been met.

**(D)** If the requirements under subparagraph (A) have been met, a Federal judge before whom a civil action with respect to prison conditions is pending who believes that a prison release order should be considered may sua sponte request the convening of a three-judge court to determine whether a prisoner release order should be entered.

**(E)** The three-judge court shall enter a prisoner release order only if the court finds by clear and convincing evidence that--

**(i)** crowding is the primary cause of the violation of a Federal right; and

**(ii)** no other relief will remedy the violation of the Federal right.

**(F)** Any State or local official including a legislator or unit of government whose jurisdiction or function includes the appropriation of funds for the construction, operation, or maintenance of prison facilities, or the prosecution or custody of persons who may be released from, or not admitted to, a prison as a result of a prisoner release order shall have standing to oppose the imposition or continuation in effect of such relief and to seek termination of such relief, and shall have the right to intervene in any proceeding relating to such relief.

**(b) Termination of relief.--**

**(1) Termination of prospective relief.--(A)** In any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener--

**(i)** 2 years after the date the court granted or approved the prospective relief;

**(ii)** 1 year after the date the court has entered an order denying termination of prospective relief under this paragraph; or

**(iii)** in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, 2 years after such date of enactment.

**(B)** Nothing in this section shall prevent the parties from agreeing to terminate or modify relief before the relief is terminated under subparagraph (A).

**(2) Immediate termination of prospective relief.--**In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

**(3) Limitation.--**Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

**(4) Termination or modification of relief.--**Nothing in this section shall prevent any party or intervener from seeking modification or termination before the relief is terminable under paragraph (1) or (2), to the extent that modification or termination would otherwise be legally permissible.

\* \* \* \*


## 42 U.S.C. § 1997e

### § 1997e. Suits by prisoners

#### (a) Applicability of administrative remedies

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

\* \* \* \*


## 28 C.F.R. § 115.41

### § 115.41. Screening for risk of victimization and abusiveness

**(a)** All inmates shall be assessed during an intake screening and upon transfer to another facility for their risk of being sexually abused by other inmates or sexually abusive toward other inmates.

**(b)** Intake screening shall ordinarily take place within 72 hours of arrival at the facility.

**(c)** Such assessments shall be conducted using an objective screening instrument.

**(d)** The intake screening shall consider, at a minimum, the following criteria to assess inmates for risk of sexual victimization:

**(1)** Whether the inmate has a mental, physical, or developmental disability;

**(2)** The age of the inmate;

**(3)** The physical build of the inmate;

**(4)** Whether the inmate has previously been incarcerated;

**(5)** Whether the inmate's criminal history is exclusively nonviolent;

**(6)** Whether the inmate has prior convictions for sex offenses against an adult or child;

**(7)** Whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;

**(8)** Whether the inmate has previously experienced sexual victimization;

**(9)** The inmate's own perception of vulnerability; and

**(10)** Whether the inmate is detained solely for civil immigration purposes.

**(e)** The initial screening shall consider prior acts of sexual abuse, prior convictions for violent offenses, and history of prior institutional violence or sexual abuse, as known to the agency, in assessing inmates for risk of being sexually abusive.

**(f)** Within a set time period, not to exceed 30 days from the inmate's arrival at the facility, the facility will reassess the inmate's risk of victimization or abusiveness based upon any additional, relevant information received by the facility since the intake screening.

**(g)** An inmate's risk level shall be reassessed when warranted due to a referral, request, incident of sexual abuse, or receipt of additional information that bears on the inmate's risk of sexual victimization or abusiveness.

**(h)** Inmates may not be disciplined for refusing to answer, or for not disclosing complete information in response to, questions asked pursuant to paragraphs (d)(1), (d)(7), (d)(8), or (d)(9) of this section.

**(i)** The agency shall implement appropriate controls on the dissemination within the facility of responses to questions asked pursuant to this standard in order to ensure that sensitive information is not exploited to the inmate's detriment by staff or other inmates.

## 28 C.F.R. § 115.42

### § 115.42. Use of screening information

**(a)** The agency shall use information from the risk screening required by § 115.41 to inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive.

**(b)** The agency shall make individualized determinations about how to ensure the safety of each inmate.

**(c)** In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.

**(d)** Placement and programming assignments for each transgender or intersex inmate shall be reassessed at least twice each year to review any threats to safety experienced by the inmate.

**(e)** A transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration.

**(f)** Transgender and intersex inmates shall be given the opportunity to shower separately from other inmates.

**(g)** The agency shall not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates.

## 28 C.F.R. § 542.13

### § 542.13. Informal resolution

**(a) Informal resolution.** Except as provided in § 542.13(b), an inmate shall first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy. Each Warden shall establish procedures to allow for the informal resolution of inmate complaints.

**(b) Exceptions.** Inmates in CCCs are not required to attempt informal resolution. An informal resolution attempt is not required prior to

submission to the Regional or Central Office as provided for in § 542.14(d) of this part. An informal resolution attempt may be waived in individual cases at the Warden or institution Administrative Remedy Coordinator's discretion when the inmate demonstrates an acceptable reason for bypassing informal resolution.

## 28 C.F.R. § 542.14

### § 542.14. Initial filing

**(a) Submission.** The deadline for completion of informal resolution and submission of a formal written Administrative Remedy Request, on the appropriate form (BP–9), is 20 calendar days following the date on which the basis for the Request occurred.

**(b) Extension.** Where the inmate demonstrates a valid reason for delay, an extension in filing time may be allowed. In general, valid reason for delay means a situation which prevented the inmate from submitting the request within the established time frame. Valid reasons for delay include the following: an extended period in-transit during which the inmate was separated from documents needed to prepare the Request or Appeal; an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal; an unusually long period taken for informal resolution attempts; indication by an inmate, verified by staff, that a response to the inmate's request for copies of dispositions requested under § 542.19 of this part was delayed.

**(c) Form.**

**(1)** The inmate shall obtain the appropriate form from CCC staff or institution staff (ordinarily, the correctional counselor).

**(2)** The inmate shall place a single complaint or a reasonable number of closely related issues on the form. If the inmate includes on a single form multiple unrelated issues, the submission shall be rejected and returned without response, and the inmate shall be advised to use a separate form for each unrelated issue. For DHO and UDC appeals, each separate incident report number must be appealed on a separate form.

**(3)** The inmate shall complete the form with all requested identifying information and shall state the complaint in the space provided on the form. If more space is needed, the inmate may use up to one letter-size (8 ½ ″ by 11″) continuation page. The inmate must provide an additional

copy of any continuation page. The inmate must submit one copy of supporting exhibits. Exhibits will not be returned with the response. Because copies of exhibits must be filed for any appeal (see § 542.15(b)(3)), the inmate is encouraged to retain a copy of all exhibits for his or her personal records.

**(4)** The inmate shall date and sign the Request and submit it to the institution staff member designated to receive such Requests (ordinarily a correctional counselor). CCC inmates may mail their Requests to the CCM.

**(d) Exceptions to initial filing at institution—**

**(1) Sensitive issues.** If the inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director. The inmate shall clearly mark "Sensitive" upon the Request and explain, in writing, the reason for not submitting the Request at the institution. If the Regional Administrative Remedy Coordinator agrees that the Request is sensitive, the Request shall be accepted. Otherwise, the Request will not be accepted, and the inmate shall be advised in writing of that determination, without a return of the Request. The inmate may pursue the matter by submitting an Administrative Remedy Request locally to the Warden. The Warden shall allow a reasonable extension of time for such a resubmission.

**(2) DHO appeals.** DHO appeals shall be submitted initially to the Regional Director for the region where the inmate is currently located.

**(3) Control Unit appeals.** Appeals related to Executive Panel Reviews of Control Unit placement shall be submitted directly to the General Counsel.

**(4) Controlled housing status appeals.** Appeals related to the Regional Director's review of controlled housing status placement may be filed directly with the General Counsel.

**(5) Other requests for formal review of decisions not originating from the Warden.** Other than the exceptions listed above, formal administrative remedy requests regarding initial decisions that did not originate with the Warden, or his/her staff, may be initially filed with the Bureau office which made the original decision, and appealed directly to the General Counsel.

## 28 C.F.R. § 542.15

### § 542.15. Appeals

**(a) Submission.** An inmate who is not satisfied with the Warden's response may submit an Appeal on the appropriate form (BP–10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response. An inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate form (BP–11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response. When the inmate demonstrates a valid reason for delay, these time limits may be extended. Valid reasons for delay include those situations described in § 542.14(b) of this part. Appeal to the General Counsel is the final administrative appeal.

**(b) Form.**

(1) Appeals to the Regional Director shall be submitted on the form designed for regional Appeals (BP–10) and accompanied by one complete copy or duplicate original of the institution Request and response. Appeals to the General Counsel shall be submitted on the form designed for Central Office Appeals (BP–11) and accompanied by one complete copy or duplicate original of the institution and regional filings and their responses. Appeals shall state specifically the reason for appeal.

(2) An inmate may not raise in an Appeal issues not raised in the lower level filings. An inmate may not combine Appeals of separate lower level responses (different case numbers) into a single Appeal.

(3) An inmate shall complete the appropriate form with all requested identifying information and shall state the reasons for the Appeal in the space provided on the form. If more space is needed, the inmate may use up to one letter-size (8 ½ " x 11") continuation page. The inmate shall provide two additional copies of any continuation page and exhibits with the regional Appeal, and three additional copies with an Appeal to the Central Office (the inmate is also to provide copies of exhibits used at the prior level(s) of appeal). The inmate shall date and sign the Appeal and mail it to the appropriate Regional Director, if a Regional Appeal, or to the National Inmate Appeals Administrator, Office of General Counsel, if a Central Office Appeal (see 28 CFR part 503 for information on locating Bureau addresses).