[NOT YET SCHEDULED FOR ORAL ARGUMENT]
Nos. 25-5099, 25-5101, 25-5108 (consol.)

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

JANE DOE, et al.,

*Plaintiffs-Appellees*,

v.

PAMELA BONDI, in her official capacity as Attorney General
of the United States, et al.,

*Defendants-Appellants.*

JANE JONES, et al.,

*Plaintiffs-Appellees*,

v.

PAMELA BONDI, in her official capacity as Attorney General
of the United States, et al.,

*Defendants-Appellants.*

MARIA MOE,

*Plaintiff-Appellee*,

v.

DONALD J. TRUMP, in his official capacity as President
of the United States, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia

## AMICUS BRIEF OF IDAHO, INDIANA, 23 OTHER STATES, AND THE ARIZONA LEGISLATURE, IN SUPPORT OF APPELLANTS

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA

JAMES A. BARTA
Solicitor General

JENNA M. LORENCE
Deputy Solicitor General

RAÚL R. LABRADOR
ATTORNEY GENERAL OF IDAHO

ALAN M. HURST
Solicitor General

MICHAEL A. ZARIAN
Deputy Solicitor General

Office of Indiana Attorney General
IGC South, Fifth Floor
Indianapolis, IN 46204
Tel: (317) 232-0709
Fax: (317) 232-7979
Email: james.barta@atg.in.gov

Office of Idaho Attorney General
700 W. Jefferson St.
Suite 210
Boise, ID 83720
Tel: (208) 334-2400
Email: michael.zarian@ag.idaho.gov

*Counsel for Amici States*
*(additional counsel listed in addendum)*

**CERTIFICATE AS TO PARTIES, FILINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies the following:

**Parties, Intervenors, and Amici**

All parties, intervenors, and amici appearing before the district court and in this Court are listed in Appellants' opening brief, except for each of the amici submitting this brief.

**Rulings Under Review**

References to rulings at issue appear in the Appellants' opening brief.

**Related Cases**

This case has not previously been before this Court. Counsel is aware of one related case within the meaning of D.C. Circuit Rule 28(a)(1)(C): *Kingdom v. Trump*, No. 1:25-cv-691 (D.D.C.).

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, FILINGS, AND RELATED CASES.............................i

TABLE OF CONTENTS.........................................................................................ii

TABLE OF AUTHORITIES ..................................................................................iii

INTRODUCTION AND INTEREST OF AMICI CURIAE ............................................1

ARGUMENT ........................................................................................................2

   I.   Policymakers Are Entitled to Make Complex Administrative Prison Decisions Like Housing Assignments, and Courts Should Defer. ............................2

   II.  To the Extent the Question Is a Medical One, the Constitution Vests Responsibility in Politically Accountable Policymakers. ..........................6

   III. Cross-Sex Hormones Are Also Subject to Regulation by Politically Accountable Policymakers. ..............................................................11

CONCLUSION ....................................................................................................14

ADDITIONAL COUNSEL .....................................................................................16

CERTIFICATE OF COMPLIANCE ........................................................................18

CERTIFICATE OF SERVICE.................................................................................19

TABLE OF AUTHORITIES

## CASES

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach,*
495 F.3d 695 (D.C. Cir. 2007) ................................................................. 7, 8, 11

*Barr v. Pearson,*
909 F.3d 919 (8th Cir. 2018) ............................................................................. 9

*Barsky v. Bd. of Regents of Univ.,*
347 U.S. 442 (1954) ........................................................................................... 6

*Bell v. Wolfish,*
441 U.S. 520 (1979) ........................................................................................... 2

*Bernier v. Obama,*
201 F. Supp. 3d 87 (D.D.C. 2016) .................................................................... 9

*City of Grants Pass v. Johnson,*
603 U.S. 520 (2024) .................................................................................... 5, 10

*Dent v. West Virginia,*
129 U.S. 114 (1889) ........................................................................................... 7

*Dobbs v. Jackson Women's Health Org.,*
597 U.S. 215 (2022) ........................................................................................... 8

*Eknes-Tucker v. Governor of Ala.,*
114 F.4th 1241 (11th Cir. 2024) ...................................................................... 13

*Estelle v. Gamble,*
429 U.S. 97 (1976) ............................................................................................. 8

*Farmer v. Brennan,*
511 U.S. 825 (1994) ........................................................................................2, 5

*Gonzales v. Carhart,*
550 U.S. 124 (2007) .................................................................................... 7, 8, 9

*Hawker v. People of N.Y.,*
170 U.S. 189 (1898) ........................................................................................... 7

*Hoffer v. Sec'y, Fla. Dep't of Corr.,*
973 F.3d 1263 (11th Cir. 2020) ......................................................................... 9

*Hope v. Pelzer,*
536 U.S. 730 (2002) ........................................................................................... 4

*Hudson v. McMillian,*
503 U.S. 1 (1992) ...........................................................................................4, 9

*Johnson v. California*,
  543 U.S. 499 (2005) ................................................................................4

*Johnson v. Dominguez*,
  5 F.4th 818 (7th Cir. 2021) .....................................................................9

*Johnson v. Doughty*,
  433 F.3d 1001 (7th Cir. 2006) ...............................................................9

*K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*,
  121 F.4th 604 (7th Cir. 2024) ...................................................... 10, 14

*Kansas v. Hendricks*,
  521 U.S. 346 (1997) ................................................................................8

*Lambert v. Yellowley*,
  272 U.S. 581 (1926) ................................................................................7

*O'Lone v. Est. of Shabazz*,
  482 U.S. 342 (1987) ................................................................................2

*Pell v. Procunier*,
  417 U.S. 817 (1974) ................................................................................6

*Snipes v. DeTella*,
  95 F.3d 586 (7th Cir. 1996) ....................................................................8

*Turner v. Safley*,
  482 U.S. 78 (1987) ..................................................................................4

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ................................................................................7

*Washington v. Harper*,
  494 U.S. 210 (1990) .............................................................................3, 4

*Whalen v. Roe*,
  429 U.S. 589 (1977) ................................................................................7

*Wilson v. Seiter*,
  501 U.S. 294 (1991) ................................................................................9

## OTHER AUTHORITIES

90 Fed. Reg. 8615 ........................................................................................3

Alice A. White et al., *Potential Immunological Effects of Gender-Affirming Hormone Therapy in Transgender People—an Unexplored Area of Research*, 13 Therapeutic Advances in Endocrinology & Metabolism 1 (2022) .........................................................12

Amicus Brief of the State of Alabama, *United States v. Skrmetti*, No. 23-477 (Oct. 15, 2024) ...................................................................13

Claudia Haupt et al., *Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women*, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138 (2020) ..............................................................................11

Daniel Jackson, *Suicide-Related Outcomes Following Gender-Affirming Treatment: A Review*, 15 Cureus 9–13 (2023) ........................................................................12

Danyon Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments*, 10 Health Psych. Rsch. (2022) ...............................................................14

Darios Getahun et al., *Cross-Sex Hormones and Acute Cardiovascular Events in Transgender Persons: A Cohort Study*, 169 Annals of Internal Medicine 205 (2018) .........................13

Giovanni Corso et al., *Risk and Incidence of Breast Cancer Risk in Transgender Individuals: A Systematic Review and Meta-Analysis*, 32 European J. Cancer Prevention 207 (2023) ..13

H. Cass, *Independent Review of Gender Identity Services for Children and Young People: Final Report* (2024) ....................................................................................14

Jose O. Sanetellan-Hernandez et al., *Multifocal Glioblastoma and Hormone Replacement Therapy in a Transgender Female*, 14 Surgical Neurology Int'l 106 (2023) ......................12

Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc. 1 (2021) ...........................12

Kenny Rodriguez-Wallberg et al., *Reproductive Health in Transgender and Gender Diverse Individuals: A Narrative Review to Guide Clinical Care and International Guidelines*, 24 Int'l J. Transgender Health 7 (2023) ..........................................................13

Khobe Chandran et al., *A Transgender Patient with Prostate Cancer: Lessons Learnt*, 83 European Urology 379 (2023) .................................................................12

Naomi E. Gutkind et al., *Idiopathic Intracranial Hypertension in Female-to-Male Transgender Patients on Exogenous Testosterone Therapy*, 39 Ophthalmic Plastic & Reconstructive Surgery 449 (2023) .................................................................................13

Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals*, 90 Annals of Plastic Surgery 96 (2023) ............................12

*Resource Guide to Improve Safety in Carceral Housing for Transgender People*, The LGBTQ+ Bar .....................................................................................5

Talal Alzahrani et al., *Cardiovascular Disease Risk Factors and Myocardial Infarction in the Transgender Population*, 12 Circulation: Cardiovascular Quality & Outcomes (2019) ...12

Vianney Andzembe et al., *Branch Retinal Vein Occlusion Secondary to Hormone Replacement Therapy in a Transgender Woman*, 46 J. Fr. Ophtalmologie 148 (2023) ............................12

## INTRODUCTION AND INTEREST OF AMICI CURIAE

The federal government is charged with preserving the safety of *all* prisoners in its care, and it has determined that placing transgender-identifying male prisoners in female housing intolerably jeopardizes female prisoners' well-being. Whether this determination is correct and whether it outweighs any resulting risks for trans-identifying prisoners are questions subject to fierce debate—but not questions answered by the Eighth Amendment. So far as the Eighth Amendment is concerned, the federal government is free to decide, as it has, that the best and safest solution is to house trans-identifying male prisoners with non-violent male offenders.

Even if the Court views the question as one regarding the proper treatment of plaintiffs' medical needs, deference is owed to the political branches. Political branches exercising police power to regulate health and medicine are given great deference, particularly where there is medical uncertainty. Here, the lack of any shred of medical evidence suggesting that plaintiffs' gender dysphoria will be worsened by transferring them to male housing is all the Court needs to know to uphold the transfer decision. And the medical uncertainty regarding the efficacy of cross-sex hormones should have been enough to uphold the federal government's decision to deny those to prisoners too.

As sovereigns who have long regulated prisons and medicine to protect health and safety, *amici* States have an interest in protecting their authority. They urge the Court to reverse the injunction preventing the government from moving plaintiffs (males identifying as transgender) to male housing.

1

ARGUMENT

## I. Policymakers Are Entitled to Make Complex Administrative Prison Decisions Like Housing Assignments, and Courts Should Defer.

In the context of prison administration, policymakers require flexibility and judicial deference. "Prisons are necessarily dangerous places; they house society's most antisocial and violent people in close proximity with one another," *Farmer v. Brennan*, 511 U.S. 825, 858 (1994) (Thomas, J., concurring), and prison officials are the ones "actually charged with and trained in the running of" those hazardous environments. *Bell v. Wolfish*, 441 U.S. 520, 562 (1979). Review of prison administrative decisions must therefore utilize "a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer*, 511 U.S. at 845 (cleaned up).

The executive order's directive to house transgender-identifying males in male housing is such a decision requiring "appropriate deference." *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 349 (1987). Housing transgender-identifying individuals in prison can be an "intractable problem." *Bell*, 441 U.S. at 562. On the one hand, some claim that housing males identifying as transgender with other males elevates their risk of assault (sexual or physical) or "exacerbate[s] the symptoms of their gender dysphoria." J.A. 165. There is no meaningful evidence of those claims in the record, as the government explains. *See* Opening Br. at 36–41. (Although the government has taken steps to

2

minimize possible risks anyway. *See id.* at 42–44 (explaining that BOP plans to house plaintiffs in low-security facilities with non-violent offenders).)

On the other hand, housing transgender-identifying males with female prisoners presents its own set of risks. Those risks inure to the harm of female inmates, who (1) have their rights to privacy and dignity compromised by having to sleep and shower with men, (2) are exposed to elevated possibilities of violence or sexual assault, and (3) will be pressured or coerced into using speech reflecting a belief that conflicts with biological reality. Those directing the prison must take *these* risks into account when crafting policy as well, which is why the executive order promises to fight efforts to "depriv[e] [women] of their dignity, safety, and well-being," and the section on prison housing policy is entitled "Privacy in Intimate Spaces." Exec. Order No. 14,168, §§ 1, 4(a), (c), 90 Fed. Reg. 8615 (Jan. 20, 2025).

But the district court looked at only half of the picture. It asked only whether the housing policy was deliberately indifferent to the risks posed to *plaintiffs* without considering countervailing risks posed to the *women* that plaintiffs seek to be housed with. J.A. 164–65. Both are facets of prison housing management—the government has an obligation to consider not just plaintiffs' interests, but "the needs of the institution" as a whole and all those who reside therein, including female prisoners. *Washington v. Harper*, 494 U.S. 210, 225 (1990). In fact, Washington's Department of Corrections was recently sued by a female prisoner claiming deliberate indifference to *her* well-being when the Department forced her to share a cell with a transgender-identifying male

3

who "repeatedly sexually harassed and assaulted" her. *Clark v. Wash. Dep't of Corr.*, No. 3-24-cv-6058, Dkt. 32 at 2 (W.D. Wash.).

The district court's one-sided view of the government's housing policy is not dictated by Supreme Court precedent, as the court believed. *See* J.A. 164. "Deliberate indifference" is generally the "appropriate inquiry" when addressing claims that prison officials "failed to attend to serious medical needs" because the government's "responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns." *Hudson v. McMillian*, 503 U.S. 1, 5–6 (1992). But that's not the case here—these housing determinations entail "balanc[ing]" that repairing a broken arm does not. *Id.* at 6.

The Court's inquiry must therefore "var[y] according to the nature of the alleged constitutional violation," which here involves, at the very least, competing administrative concerns. *Id.* at 5. The Court can ask whether the executive order's directive is "reasonably related to legitimate penological interests," *Turner v. Safley*, 482 U.S. 78, 89 (1987), a test that the Supreme Court has previously stated "applies to *all* circumstances in which the needs of prison administration implicate constitutional rights." *Washington*, 494 U.S. at 224 (emphasis added).[1] Or the Court can account for

---

[1] In a later Equal Protection case, the Supreme Court noted that it had "not used *Turner* to evaluate Eighth Amendment claims." *Johnson v. California*, 543 U.S. 499, 511 (2005). But the only one of its precedents it cited involved a punishment by handcuffing to a hitching post—not a circumstance involving any competing administrative concerns. *See Hope v. Pelzer*, 536 U.S. 730 (2002).

the prison officials' reasonableness in assessing deliberate indifference, as the Supreme Court has done in a previous case related to housing transgender-identifying prisoners where the parties agreed that the deliberate-indifference standard should govern. *Farmer*, 511 U.S. at 835, 844–45. Either way, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause," *id.* at 845, and the BOP's actions here are eminently reasonable.[2]

Taking a holistic view of the prison officials' concerns and deferring to their reasonable resolution of problems will afford prison officials the breathing room they need to effectively carry out their responsibilities. Exacting judicial scrutiny in this context, though, risks "freezing" a particular policy approach "into a rigid constitutional mold." *City of Grants Pass v. Johnson*, 603 U.S. 520, 551 (2024) (cleaned up). As prisons continue to "experiment[]" with policies,[3] *id.*, new solutions to the delicate problem of housing prisoners identifying as transgender may emerge. Housing such individuals with non-dangerous prisoners, as BOP plans to do, may produce superior results to plaintiff's preferred approach—plaintiffs certainly do not present any research on prison policy suggesting otherwise.

---

[2] To be clear, plaintiffs have not satisfied the standard for deliberate indifference even accounting only for the risk of harm they say they will be subjected to. *See* Opening Br. at 33–48.

[3] *See Resource Guide to Improve Safety in Carceral Housing for Transgender People*, The LGBTQ+ Bar, https://tinyurl.com/h32bj6ms (last visited May 15, 2025) (listing housing policies for trans-identifying prisoners by state).

Leeway for reasonable action is necessary in this space, and constitutionalizing the question will only ensure that the courts—which "are ill equipped to deal with the increasingly urgent problems of prison administration and reform"—will be the final decisionmaker each time. *Thornburgh v. Abbott*, 490 U.S. 401, 422 n.5 (1989) (Stevens, J., concurring in part and dissenting in part). Rather than send the judiciary down that path, the Court should leave the issue to the "expert judgment" of the executive branch and uphold actions as long as they are reasonable. *Pell v. Procunier*, 417 U.S. 817, 827 (1974).

## II.    To the Extent the Question Is a Medical One, the Constitution Vests Responsibility in Politically Accountable Policymakers.

While focusing exclusively on the risks that could befall plaintiffs and not the potential risks to female prisoners, the district court credited plaintiffs' allegation that housing them with other male prisoners would "exacerbate[]" their gender dysphoria. J.A. 165, 191. There is no meaningful evidence in the record behind that assertion. But to the extent plaintiffs hope to frame their claim as whether the government's housing policy reflects deliberate indifference to their *medical* needs, their argument runs headlong into a wall of case law establishing that politically accountable policymakers are given extraordinary deference from the courts when it comes to regulating medical treatments, particularly in the Eighth Amendment context.

As decision after decision from the Supreme Court establishes, regulating matters "concerned with health" is "a vital part of a state's police power." *Barsky v. Bd. of Regents of Univ.*, 347 U.S. 442, 449 (1954). That power certainly allows for regulation

6

of the "right to practice medicine," *Lambert v. Yellowley*, 272 U.S. 581, 596 (1926), including by barring unlicensed persons from practicing medicine, *Dent v. West Virginia*, 129 U.S. 114, 122–23 (1889), requiring practitioners to possess the requisite "[c]haracter" and "knowledge of diseases" to apply remedies "safely," *Hawker v. People of N.Y.*, 170 U.S. 189, 193–94 (1898), and imposing measures designed to "protect[] the integrity and ethics of the medical profession." *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997). But the police power also captures the ability to prescribe particular treatments for specific conditions. *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703–04 (D.C. Cir. 2007) (en banc) (lawmakers have regulated drugs based on "the risks associated with both drug safety and efficacy" since colonial times); *Whalen v. Roe*, 429 U.S. 589, 603 n.30 (1977) ("It is, of course, well settled that the State has broad police powers in regulating the administration of drugs by the health professions.").

And since the Civil War era, Congress has layered federal regulations of drugs and procedures on top of state regulations. *See Abigail All.*, 495 F.3d at 704–05 ("States [were not] the only regulators of access to drugs"). To cite but a few examples, Congress has required that "drug manufacturers provide proof that their products were safe before they could be marketed" and that the Food and Drug Administration (FDA) "only approve drugs deemed effective for public use." *Id.* at 705. Congress has also prohibited physicians from using certain surgical procedures for abortions. *See Gonzales v. Carhart*, 550 U.S. 124, 140–43 (2007).

That some, or even many, medical professionals may disagree with policymakers' choices does not "tie [policymakers'] hands." *Kansas v. Hendricks*, 521 U.S. 346, 360 n.3 (1997). The Supreme Court "has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Carhart*, 550 U.S. at 163. In fact, "it is precisely where such disagreement exists that legislatures have been afforded the widest latitude." *Hendricks*, 521 U.S. at 360 n.3. As this Court has explained en banc, "[o]ur Nation's history and traditions have consistently demonstrated that the democratic branches are better suited [than the courts] to decide the proper balance between uncertain risks and benefits of medical technology, and are entitled to deference in doing so." *Abigail All.*, 495 F.3d at 713; *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 274 (2022) (cleaned up) (the "normal rule" is that federal courts must "defer" to the judgments of politically accountable policymakers "in areas fraught with medical and scientific uncertainties").

All of this is particularly true in the context of Eighth Amendment claims brought by prisoners. Although the Supreme Court has announced that the Eighth Amendment prevents prison officials from showing "deliberate indifference to serious medical needs of prisoners," the Court has made equally clear that this does not mean "that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 102–05 (1976). The "Constitution is not a medical code that mandates specific medical treatment." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Nor does the Eighth Amendment give prisoners "unqualified

access to health care," *Hudson*, 503 U.S. at 9, or empower them to "demand specific care." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

Instead, to demonstrate deliberate indifference, a prisoner must show that the deprivation is objectively serious and that prison officials "act[ed] with a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). "Prison officials are not . . . deliberately indifferent to an inmate's serious medical need when a physician prescribes a different method of treatment than that requested by the inmate." *Bernier v. Obama*, 201 F. Supp. 3d 87, 93 (D.D.C. 2016) (cleaned up). Instead, a "constitutional violation exists only if *no* minimally competent professional would have so responded under those circumstances." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (cleaned up) (emphasis added). Or as another court of appeals has put it, "[t]here is no intentional or wanton deprivation of care if a genuine debate exists within the medical community about the necessity or efficacy of that care." *Gibson*, 920 F.3d at 220; *see also Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1272–73 (11th Cir. 2020) (similar). A "difference of opinion over matters of expert medical judgment" simply "fails to rise to the level of a constitutional violation." *Barr v. Pearson*, 909 F.3d 919, 921–22 (8th Cir. 2018) (cleaned up).

In this case, the dearth of evidence on how housing assignment affects transgender-identifying male prisoners' gender dysphoria unmistakably distinguishes the issue as one of "medical and scientific uncertainty," placing it within the political branches' broad power to regulate. *Carhart*, 550 U.S. at 163. The most any of the sets of

9

plaintiffs can muster is a declaration by a single doctor opining in one short paragraph—without citing any medical evidence—that housing transgender-identifying prisoners with those of the same sex will "predictably worsen gender dysphoria and cause severe psychological distress," even for persons who "ha[ve] not had medications or surgery." J.A. 182–83. That absolutist position—that all who are diagnosed with gender dysphoria will experience distress unless they socially transition by living with the opposite sex—is not even adopted by the staunchest advocates of transgender ideology. *See* WPATH Standards of Care 8, Statement 5.4 (laying out different approaches to social transition). If true, it would mean that every prison in the country is subjecting transgender-identifying prisoners to "severe psychological distress," since none has a policy of housing all transgender-identifying prisoners with the opposite sex.[4]

The truth is that there is no significant scientific research on this issue. "[F]ederal courts do not mediate medical debates," *K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*, 121 F.4th 604, 634 (7th Cir. 2024), and they certainly shouldn't stamp out a medical debate before it even begins. *Grants Pass*, 603 U.S. at 556 (constitutionalizing questions and imposing standards by "fiat" short-circuits "productive dialogue" and "experimentation") (cleaned up). To the extent the housing issue is to be viewed as one concerning adequate medical treatment, the proper course is for the court to defer to the politically accountable policymakers.

---

[4] *See supra* note 3 (listing housing policies for trans-identifying prisoners by state).

## III. Cross-Sex Hormones Are Also Subject to Regulation by Politically Accountable Policymakers.

Although the government has not chosen to appeal the preliminary injunction's order to provide plaintiffs with cross-sex hormones, *amici* States would submit that the same principles should have applied to the government's regulation of those treatments. Politically accountable policy makers are better positioned and constitutionally empowered to decide if, when, and how those treatments should be administered, and the need for deference to the politically accountable branches is particularly high in light of the medical uncertainty regarding the treatments' efficacy. *Abigail All.*, 495 F.3d at 703–04, 713.

The evidence supporting the effectiveness of hormone therapy to treat gender dysphoria is weak. A 2020 systematic review of available studies "found insufficient evidence to determine the efficacy or safety of hormonal treatment approaches for transgender women in transition"—it concluded that "[t]he evidence is very incomplete, demonstrating a gap between current clinical practice and clinical research." Claudia Haupt et al., *Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women*, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, at 2, 11 (2020) ("well-designed, sufficiently robust randomised controlled trials (RCTs) and controlled-cohort studies do not exist"). Another systematic review of studies concluded that it was "impossible to draw conclusions about the effects of hormone therapy on death by suicide" and the "strength of evidence" for other positive effects of hormone

11

therapy reported by the literature was "low." Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc. 1, 12–13 (2021). A third review included studies "that showed an *increase* in suicidality for those who received gender-affirming treatment," including cross-sex hormones, and concluded that all existing studies on the effect of hormone therapy on suicidality suffered from methodological errors. Daniel Jackson, *Suicide-Related Outcomes Following Gender-Affirming Treatment: A Review*, 15 Cureus 9–13 (2023) (emphasis added).

This lack of proven benefits is accompanied by significant risks associated with hormones therapy. Evidence shows that males who are treated with estrogen have twenty-two times the likelihood to develop breast cancer,[5] an increased risk of prostate[6] and other cancers,[7] an increased risk of retinal vein occlusion,[8] a higher risk of strokes,[9] and a potential risk of autoimmune disorders.[10] Females treated with testosterone may

---

[5] *See* Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals*, 90 Annals of Plastic Surgery 96 (2023).

[6] *See* Khobe Chandran et al., *A Transgender Patient with Prostate Cancer: Lessons Learnt*, 83 European Urology 379 (2023).

[7] *See* Jose O. Sanetellan-Hernandez et al., *Multifocal Glioblastoma and Hormone Replacement Therapy in a Transgender Female*, 14 Surgical Neurology Int'l 106 (2023).

[8] *See* Vianney Andzembe et al., *Branch Retinal Vein Occlusion Secondary to Hormone Replacement Therapy in a Transgender Woman*, 46 J. Fr. Ophtalmologie 148 (2023).

[9] *See* Talal Alzahrani et al., *Cardiovascular Disease Risk Factors and Myocardial Infarction in the Transgender Population*, 12 Circulation: Cardiovascular Quality & Outcomes (2019).

[10] *See* Alice A. White et al., *Potential Immunological Effects of Gender-Affirming Hormone Therapy in Transgender People—an Unexplored Area of Research*, 13 Therapeutic Advances in Endocrinology & Metabolism 1 (2022).

experience infertility,[11] pseudotumor cerebri,[12] an earlier onset of breast cancer,[13] and

an increased risk of heart attacks.[14]

Of course, there are some interest groups like WPATH—the group on whose

recommendations plaintiffs and their experts rely, *see* J.A. 17—that promote cross-sex

hormones to treat gender dysphoria. "But recent revelations indicate that WPATH's

lodestar is ideology, not science." *Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1261

(11th Cir. 2024) (Lagoa, J., concurring in denial of rehearing en banc). A "contributor

to WPATH's most recent Standards of Care frankly stated, '[o]ur concerns, echoed by

the social justice lawyers we spoke with, is that evidence-based review reveals little or

no evidence and puts us in an untenable position in terms of affecting policy or winning

lawsuits.'" *Id.*; *see* Amicus Brief of the State of Alabama, *United States v. Skrmetti*, No. 23-

477 (Oct. 15, 2024) (cataloguing internal documents showing that WPATH routinely

ignored the evidence, silenced scholars who questioned its guidelines, and censured

members who go public with their concerns). Simply put, WPATH's guidelines

---

[11] *See* Kenny Rodriguez-Wallberg et al., *Reproductive Health in Transgender and Gender Diverse Individuals: A Narrative Review to Guide Clinical Care and International Guidelines*, 24 Int'l J. Transgender Health 7 (2023).

[12] *See* Naomi E. Gutkind et al., *Idiopathic Intracranial Hypertension in Female-to-Male Transgender Patients on Exogenous Testosterone Therapy*, 39 Ophthalmic Plastic & Reconstructive Surgery 449 (2023).

[13] *See* Giovanni Corso et al., *Risk and Incidence of Breast Cancer Risk in Transgender Individuals: A Systematic Review and Meta-Analysis*, 32 European J. Cancer Prevention 207 (2023).

[14] *See* Darios Getahun et al., *Cross-Sex Hormones and Acute Cardiovascular Events in Transgender Persons: A Cohort Study*, 169 Annals of Internal Medicine 205 (2018).

"overstate[] the strength of the evidence." H. Cass, *Independent Review of Gender Identity Services for Children and Young People: Final Report* 133 (2024), https://tinyurl.com/346ufbw6.

So hormone-based interventions for gender dysphoria are fraught with serious risks and uncertain to deliver any benefits. Meanwhile, there are non-surgical, non-hormone related interventions that have been shown to address gender dysphoria effectively—specifically, "[s]ocial support and psychotherapy are widely recognized approaches." *K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*, 121 F.4th 604, 610–11 (7th Cir. 2024) (citing Danyon Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments*, 10 Health Psych. Rsch., at 4 (2022)). This is precisely the sort of situation where policymakers should have the greatest latitude to regulate in the interest of public health and safety, especially where medical organizations have continued to misrepresent the true risk profile of these treatments.

## CONCLUSION

The district court's grant of a preliminary injunction should be reversed.

Dated: May 16, 2025                    Respectfully submitted,


THEODORE E. ROKITA                RAÚL R. LABRADOR
ATTORNEY GENERAL OF INDIANA       ATTORNEY GENERAL OF IDAHO

JAMES A. BARTA                    ALAN M. HURST
Solicitor General                 Solicitor General

                                  /s/ Michael A. Zarian
JENNA M. LORENCE                  MICHAEL A. ZARIAN
Deputy Solicitor General          Deputy Solicitor General


Office of Indiana Attorney General    Office of Idaho Attorney General
IGC South, Fifth Floor                700 W. Jefferson St.
Indianapolis, IN 46204                Suite 210
Tel: (317) 232-0709                   Boise, ID 83720
Fax: (317) 232-7979                   Tel: (208) 334-2400
Email: james.barta@atg.in.gov         Email: michael.zarian@ag.idaho.gov

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

TREG TAYLOR
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

RUSSELL COLEMAN
Attorney General
State of Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

GENTNER DRUMMUND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

JASON S. MIYARES
Attorney General
State of Virginia

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

BRIDGET HILL
Attorney General
State of Wyoming

WARREN PETERSON
President of the Senate,
State of Arizona

By counsel:
Rusty D. Crandell
Majority General Counsel
Arizona State Senate
1700 W. Washington St.
Phoenix, Arizona 85007
rcrandell@azleg.gov
(602) 926-3137

STEVE MONTENEGRO
Speaker of the House of
Representatives,
State of Arizona

By counsel:
Linley Wilson
Majority General Counsel
Arizona House of Representatives
1700 W. Washington St.
Phoenix, Arizona 85007
lwilson@azleg.gov
(602) 926-5418

**CERTIFICATE OF COMPLIANCE**

This amicus brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,566 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in 14-point Garamond, a proportionally spaced typeface.

*/s/ Michael A. Zarian*

MICHAEL A. ZARIAN
Deputy Solicitor General

**CERTIFICATE OF SERVICE**

I certify that on May 16, 2025, I caused this document to be electronically filed with the Clerk of Court using this Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ *Michael A. Zarian*
MICHAEL A. ZARIAN
Deputy Solicitor General