# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 5, 2025        Decided April 17, 2026

No. 25-5099

JANE DOE, ET AL.,
APPELLEES

v.

TODD BLANCHE, IN HIS OFFICIAL CAPACITY AS ACTING
ATTORNEY GENERAL OF THE UNITED STATES AND WILLIAM K.
MARSHALL, III, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
THE FEDERAL BUREAU OF PRISONS,
APPELLANTS

———

Consolidated with 25-5101, 25-5108, 25-5210, 25-5213,
25-5215, 25-5304, 25-5305, 25-5306, 25-5419, 25-5420, 25-
5427, 26-5066, 26-5067, 26-5069

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:25-cv-00286)
(No. 1:25-cv-00401)
(No. 1:25-cv-00653)

———

*Benjamin Hayes*, Attorney, U.S. Department of Justice,
argued the cause for appellants. On the briefs were *Brett A.*

2

*Shumate*, Assistant Attorney General, *Yaakov M. Roth*, Acting Assistant Attorney General, at the time the brief was filed, *Eric D. McArthur*, Deputy Assistant Attorney General, and *Gerard Sinzdak*, *Charles W. Scarborough*, and *McKaye L. Neumeister*, Attorneys.

*Theodore E. Rokita*, Attorney General, Office of the Attorney General for the State of Indiana, *James A. Barta*, Solicitor General, *Jenna M. Lorence,* Deputy Solicitor General, *Raul R. Labrador*, Attorney General, Office of the Attorney General for the State of Idaho, *Alan M. Hurst*, Solicitor General, *Michael A. Zarian*, Deputy Solicitor General, *Steve Marshall*, Attorney General, Office of the Attorney General for the State of Alabama, *Treg Taylor*, Attorney General, Office of the Attorney General for the State of Alaska, *Tim Griffin*, Attorney General, Office of the Attorney General for the State of Arkansas, *James Uthmeier*, Attorney General, Office of the Attorney General for the State of Florida, *Chris Carr*, Attorney General, Office of the Attorney General for the State of Georgia, *Brenna Bird*, Attorney General, Office of the Attorney General for the State of Iowa, *Kris Kobach*, Attorney General, Office of the Attorney General for the State of Kansas, *Russell Coleman*, Attorney General, Office of the Attorney General for the Commonwealth of Kentucky, *Liz Murrill*, Attorney General, Office of the Attorney General for the State of Louisiana, *Lynn Fitch*, Attorney General, Office of the Attorney General for the State of Mississippi, *Andrew Bailey*, Attorney General, Office of the Attorney General for the State of Missouri, *Austin Knudsen*, Attorney General, Office of the Attorney General for the State of Montana, *Michael T. Hilgers*, Attorney General, Office of the Attorney General for the State of Nebraska, *Drew Wrigley*, Attorney General, Office of the Attorney General for the State of North Dakota, *Dave Yost*, Attorney General, Office of the Attorney General for the State of Ohio, *Gentner Drummund*, Attorney General, Office of the

3

Attorney General for the State of Oklahoma, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *Marty Jackley*, Attorney General, Office of the Attorney General for the State of South Dakota, *Ken Paxton*, Attorney General, Office of the Attorney General for the State of Texas, *Derek Brown*, Attorney General, Office of the Attorney General for the State of Utah, *Jason S. Miyares*, Attorney General, Office of the Attorney General for the Commonwealth of Virginia, *John B. McCuskey,* Attorney General, Office of the Attorney General for the State of West Virginia*, Bridget Hill*, Attorney General, Office of the Attorney General for the State of Wyoming, *Rusty D. Crandell*, and *Linley Wilson* were on the brief for *amici curiae* Idaho, Indiana, 23 Other States, and the Arizona Legislature, in support of appellants.

*Jennifer L. Levi* argued the cause for appellees. With her on the brief were *Ernest Galvan*, *Kara J. Janssen*, *Adrienne Spiegel*, *Ben Hattem*, *Alexander Shalom*, *Natalie J. Kraner*, *Shannon Minter*, *Amy Whelan*, *Sarah Austin*, and *Eve L. Hill*. *Christopher Stoll* entered an appearance.

*Carolyn F. Corwin* was on the brief for *amici curiae* Law Professors in support of appellees.

*Andrew Joy Campbell*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Elizabeth Matos*, Chief, Civil Rights Division, *Helle Sachse*, Deputy Director, Police Accountability Unit, *Rob Bonta*, Attorney General, Office of the Attorney General for the State of California, *Brian L. Schwalb*, Attorney General, Office of the Attorney General for the District of Columbia, *Kathleen Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Anne E. Lopez*, Attorney General, Office of the Attorney General for the State of Hawai'i, *Kwame Raoul*,

4

Attorney General, Office of the Attorney General for the State of Illinois, *Aaron M. Frey*, Attorney General, Office of the Attorney General for the State of Maine, *Anthony G. Brown*, Attorney General, Office of the Attorney General for the State of Maryland, *Keith Ellison*, Attorney General, Office of the Attorney General for the State of Minnesota, *Leticia James,* Attorney General, Office of the Attorney General for the State of New York, *Dan Reyfield*, Attorney General, Office of the Attorney General for the State of Oregon, *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, and *Charity R. Clark*, Attorney General, Office of the Attorney General for the State of Vermont, were on the brief for *amici curiae* Massachusetts and 12 Other States in support of appellees.

*Richard Saenz* and *Michael J. Mestitz* was on the brief *amici curiae* Dee Deidre Farmer, et al., in support of appellees.

*Lawrence S. Lustberg* was on the brief for *amici curiae* Former Corrections Officials in support of appellees.

Before: SRINIVASAN, *Chief Judge*, PILLARD, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Dissenting Opinion filed by *Senior Circuit Judge* RANDOLPH.

PILLARD, *Circuit Judge*:

On January 20, 2025, the President issued an Executive Order directing the Attorney General to "ensure that males"—defined as "person[s] belonging, at conception, to the sex that produces the small reproductive cell"—"are not detained in

5

women's prisons or housed in women's detention centers." Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615, 8615-16 (Jan. 30, 2025). Pursuant to the Executive Order, the Federal Bureau of Prisons prepared to transfer the eighteen transgender women who are plaintiffs in this case to men's facilities. Plaintiffs are a very small subset of the thousands of transgender women in the Bureau's custody: those few who the Bureau itself had previously decided should be housed in women's facilities.

Plaintiffs sued to block their transfers, claiming in relevant part that incarceration in men's facilities will expose them to substantial risk of grave harm in violation of the Eighth Amendment to the U.S. Constitution. The district court granted plaintiffs preliminary injunctive relief on the ground that transgender women face an unconstitutional risk of harm in men's prisons. To the extent the court's reasoning categorically forbids placing any transgender woman in a men's prison, plaintiffs do not defend it on appeal. They instead urge us to sustain the preliminary injunctions on the narrower ground that the individual plaintiffs before the court all have characteristics that make them particularly vulnerable to violence, abuse, and psychiatric harm in men's prisons.

The existing record does not include findings of fact about the individual plaintiffs' vulnerabilities, or about the reasons on which the Bureau relied in placing plaintiffs in women's facilities in the first place, to enable us to sustain the district court's preliminary injunctions on either of the narrower, plaintiff-specific grounds urged on appeal. We thus vacate the operative preliminary injunctions and remand for further proceedings. The district court remains free to consider, as it deems appropriate, whether plaintiffs may be entitled to relief

6

on those or other available grounds that may be supported by further findings of fact and analysis.

**I.**

**A.**

The Eighth Amendment's prohibition on cruel and unusual punishment imposes constraints on "the treatment a prisoner receives in prison and the conditions under which he is confined." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks omitted). In particular, the Supreme Court has long held that "[a] prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id*. at 828 (internal quotation marks omitted). To prove an Eighth Amendment violation based on "deliberate indifference," a prisoner must establish that (1) the conditions in which the prisoner is incarcerated "pos[ed] a substantial risk of serious harm"; and (2) prison officials "kn[ew] of and disregard[ed] an excessive risk" to the prisoner's health or safety. *Id.* at 834, 837. A prison official may violate the Eighth Amendment by, *inter alia*, failing to "protect prisoners from violence at the hands of other prisoners" or "ensure that inmates receive adequate . . . medical care." *Id.* at 832-33 (internal quotation marks omitted).

The Prison Litigation Reform Act of 1995 (PLRA) imposes various requirements on claims challenging prison conditions. *See Jones v. Bock*, 549 U.S. 199, 203-04 (2007). As relevant here, the PLRA requires prisoners to exhaust prison grievance procedures before filing suit. *Id.* at 204. It provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are

7

exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," which means "unexhausted claims cannot be brought in court," *Jones*, 549 U.S. at 211, and "a court may not excuse a failure to exhaust, even to take [special] circumstances into account," *Ross v. Blake*, 578 U.S. 632, 639 (2016). But the statute has a "built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not 'available.'" *Id.* at 635-36 (quoting 42 U.S.C. § 1997e(a)). Because "failure to exhaust is an affirmative defense under the PLRA," *Jones*, 549 U.S. at 216, the defendant bears the burden of showing that an administrative remedy was available for the plaintiff to exhaust, *see Kaemmerling v. Lapin*, 553 F.3d 669, 675-76 (D.C. Cir. 2008).

The PLRA also cabins courts' power to grant remedies with respect to prison conditions. *See* 18 U.S.C. § 3626 ("Appropriate remedies with respect to prison conditions"). Specifically, the PLRA instructs courts not to "grant or approve any prospective relief" in "any civil action with respect to prison conditions" unless "the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* § 3626(a)(1)(A). The PLRA further provides that "[p]reliminary injunctive relief" with respect to prison conditions "shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." *Id.* § 3626(a)(2).

When a person is sentenced to a term of imprisonment in federal prison, the Federal Bureau of Prisons (BOP or Bureau) designates the place of imprisonment. The governing statute directs the Bureau to designate for each prisoner "any available

8

penal or correctional facility . . . that [BOP] determines to be appropriate and suitable" after it considers a list of factors, including "the resources of the facility contemplated," "the nature and circumstances of the offense," and "the history and characteristics of the prisoner." 18 U.S.C. § 3621(b). The same provision states that, "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court." *Id.* It further authorizes BOP, "at any time, having regard for the same matters, [to] direct the transfer of a prisoner from one penal or correctional facility to another." *Id.*

In making designation and transfer decisions, the Bureau is required to follow applicable regulations under the Prison Rape Elimination Act (PREA). 34 U.S.C. § 30301 *et seq*. As relevant here, those regulations require BOP to screen inmates for "their risk of being sexually abused by other inmates," considering, among other things, "[w]hether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming." 28 C.F.R. § 115.41(a), (d)(7). The regulations further require BOP to use that information to "inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." *Id.* § 115.42(a). Regarding the housing assignment of transgender inmates in particular, the regulations require BOP to "consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." *Id.* § 115.42(c).

**B.**

Plaintiffs are eighteen transgender women in BOP custody. *See* Appellees' Br. i & n.1; Appellees' Notice of

9

Death of Appellee Susan Doe, Doc. No. 2167503. Each plaintiff has been diagnosed with gender dysphoria, "a condition marked by significant distress and a host of physiological and psychological symptoms when a person lives in a manner conforming to their biological sex." *Doe v. McHenry*, 763 F. Supp. 3d 81, 84 (D.D.C. 2025). To treat their gender dysphoria, all plaintiffs have received long-term hormone therapy, *id.*, which has led some plaintiffs to "grow breasts" or develop "more feminine" features, Zoe Doe Decl. ¶ 5 (J.A. 915-16); *see, e.g.*, Mary Doe Decl. ¶ 5 (J.A. 942-43). Several plaintiffs have also had surgeries such as vaginoplasty, breast augmentation, and facial feminization. *See, e.g.*, [Name Redacted] Decl. ¶ 5 (J.A. 286); *Doe* Second Am. Compl. ¶ 10 (J.A. 192).

On January 20, 2025, President Trump issued Executive Order No. 14,168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." 90 Fed. Reg. at 8615. Section 4(a) of the Executive Order directs the Attorney General and the Secretary of the Department of Homeland Security to "ensure that males are not detained in women's prisons or housed in women's detention centers." *Id.* at 8616.[1]

When the Executive Order issued, each plaintiff was in the Bureau's custody at a women's facility. Plaintiffs represented a very small subset—about one percent—of transgender women in BOP custody, the remainder of whom were in men's facilities. *Doe v. Bondi*, 2025 WL 596653, at *1 (D.D.C.

---

[1] Section 4(c) of the Executive Order separately directs the Attorney General to "ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." 90 Fed. Reg. at 8617. Section 4(c), and BOP's actions implementing that directive, are not before us. *See* Appellants' Br. 7 n.2.

10

Feb. 24, 2025); *see* Rick Stover Second *Jones* Decl. ¶ 22-2 (J.A. 393).    BOP had decided, after an individualized assessment of various statutory and regulatory factors, to house each plaintiff in a women's facility.  *See Jones v. Bondi*, 2025 WL 923755, at *1 (D.D.C. Mar. 3, 2025); Stover Second *Jones* Decl. ¶ 24 (J.A. 393).  Five plaintiffs had never been housed in a men's facility.  *See* Rachel Doe Decl. ¶ 7 (J.A. 233); Jane Jones Decl. ¶ 8 (J.A. 286), *Moe* Compl. (J.A. 466), Sara Doe Decl. ¶ 3 (J.A. 951), Wendy Doe Decl. ¶ 6 (J.A. 946-47).  Other plaintiffs had previously been housed in men's facilities while in BOP or state custody.  *See, e.g.*, Zoe Doe Decl. ¶ 6 (J.A. 916); Olivia Doe Decl. ¶ 3 (J.A. 920).  Those plaintiffs who had been housed in men's facilities reported that they were sexually harassed, threatened, raped, and assaulted by male inmates in those facilities.  *See, e.g.*, Emily Doe Decl. ¶ 4 (J.A. 924) (rape); Zoe Doe Decl. ¶ 5 (J.A. 916) (stalking); Sally Doe Decl. ¶ 6 (J.A. 930) (threats); Donna Jones Decl. ¶ 6 (J.A. 385) (sexual assault).  Others had attempted suicide, engaged in self-harm, or experienced suicidal ideation while housed in men's facilities.  *See, e.g.*, Olivia Doe Decl. ¶ 5 (J.A. 921) (attempted suicide).

In response to the Executive Order, however, BOP officials began taking steps to transfer plaintiffs to men's facilities.  *See Doe*, 763 F. Supp. 3d at 84.  Three plaintiffs— Ellen Doe, Rachel Doe, and Jane Jones—were transferred before joining this litigation.  *See* Ellen Doe Decl. ¶ 7 (J.A. 230); Rachel Doe Decl. ¶ 11 (J.A. 233); Jane Jones Decl. ¶ 14 (J.A. 287).    The district court's March 19 preliminary injunction rescinded the transfers and enjoined any other such transfers pending final judgment.  *See Doe* March 19 PI Order (J.A. 240); *Jones* February 24 PI Order (J.A. 334).

11

## C.

Plaintiffs brought three separate actions challenging their transfers (or impending transfers) from women's to men's facilities pursuant to the Executive Order. *See Doe*, 763 F. Supp. 3d at 84; *Jones v. Bondi*, 2025 WL 923117, at *1 (D.D.C. Feb. 24, 2025); *Moe* March 10 PI Order (J.A. 569-71). As the district court noted, each complaint contained "substantially similar" allegations. *Jones*, 2025 WL 923117, at *1. For simplicity, we cite to the *Doe* complaint. Naming as defendants the Attorney General and the Director of BOP in their official capacities, plaintiffs sued for declaratory, injunctive, and compensatory relief. They claimed that Section 4(a) of the Executive Order, as applied to them, violated the Eighth Amendment to the United States Constitution, the equal protection component of the Due Process Clause of the Fifth Amendment, the Rehabilitation Act, and the Administrative Procedure Act (APA). *Doe v. Bondi*, No. 25-286, ECF No. 1 (Compl.) ¶ 14 (D.D.C. filed Feb. 3, 2025). Plaintiffs sought preliminary injunctive relief to prohibit defendants from implementing Section 4(a) of the Executive Order against them and require defendants to maintain plaintiffs' housing as it was before January 20, 2025. *Doe v. Bondi*, No. 25-286, ECF No. 13-1 (Mot. for TRO & PI) at 26 (D.D.C. filed Feb. 3, 2025).

In a February 4 Temporary Restraining Order and in six ensuing preliminary-injunction orders, the district court granted preliminary relief to all eighteen plaintiffs. *Doe* February 4 TRO (J.A. 157); *Doe* February 18 PI Order (J.A. 168); *Doe* February 24 PI Order (J.A. 185); *Doe* March 19 PI Order (J.A. 240); *Jones* February 24 PI Order (J.A. 333); *Jones* March 3 PI Order (J.A. 445); *Moe* March 10 PI Order (J.A. 569). The court incorporated the reasoning of its February 4 TRO in its subsequent preliminary injunction

12

orders, *see, e.g.*, *Doe* February 24 PI Order at 2 (J.A. 186); *Jones* February 24 PI Order at 1 (J.A. 333); *Moe* March 10 PI Order at 1 (J.A. 569), and both parties treat the February 4 TRO as containing the court's reasoning for purposes of the preliminary injunctions on appeal. *See* Reply Br. 11; Appellees' Br. 20. So again, for simplicity, we describe the rationales as set forth in the February 4 TRO.

The district court first rejected defendants' threshold defenses that (1) the PLRA forecloses judicial review of plaintiffs' challenge to defendants' decision to transfer them to men's facilities and (2) plaintiffs failed to exhaust available administrative remedies as required by the PLRA. *Doe*, 763 F. Supp. 3d at 85-87. As to jurisdiction stripping, the court declined to address whether the PLRA prohibits judicial review of "*APA* challenges to facility designations and transfer decisions," because, in any event, the PLRA was "not sufficiently explicit to bar consideration of [plaintiffs'] *constitutional* claims." *Id.* (emphases added) (citing *Webster v. Doe*, 486 U.S. 592, 603 (1988)). As to exhaustion, the district court reasoned that the PLRA requires exhaustion of only "available" remedies, 42 U.S.C. § 1997e(a), and that no remedy was "available" to plaintiffs because "there [was] no form of relief that is within BOP's discretion to provide and that would remedy [plaintiffs'] supposed constitutional violations." *Doe*, 763 F. Supp. 3d at 87 (citing *Kaemmerling*, 553 F.3d at 675-76, and *Ross*, 578 U.S. at 643). Thus, the court concluded that the PLRA does not bar consideration of plaintiffs' request for relief insofar as plaintiffs allege a violation of their constitutional rights. *Id.*

The district court then turned to the likelihood of success on the merits and concluded that plaintiffs had established such a likelihood on their Eighth Amendment claim. Plaintiffs had shown a likelihood of proving an "objectively intolerable risk

13

of harm" on the basis of two distinct harms: (1) transgender women's "significantly elevated risk of physical and sexual violence relative to other inmates when housed in a facility corresponding to their biological sex"; and (2) the risk that "placement in a male penitentiary *by itself* will exacerbate the symptoms of [plaintiffs'] gender dysphoria," regardless of whether plaintiffs face a substantial risk of violence in the new facility. *Id.* at 88.

The court further concluded that plaintiffs likely could prove that BOP knowingly or recklessly subjected them to such risks because "the government resources and regulations to which plaintiffs gesture in their complaint strongly suggest" that "BOP is subjectively aware that transferring the plaintiffs to a male penitentiary would substantially increase the likelihood of them experiencing this parade of harms." *Id.* at 89; *see* 28 C.F.R. § 115.41(d)(7) (listing whether an inmate is or is perceived to be transgender as a risk factor for "sexual victimization"); *Doe v. Bondi*, No. 25-286, ECF No. 1 (Compl.) ¶ 43 (D.D.C. filed Feb. 3, 2025) (citing a 2013 U.S. Department of Justice report that estimated nearly 35% of transgender people in state and federal prisons were sexually assaulted between 2007 and 2012).

For those reasons, the court concluded that plaintiffs had met their burden to show a likelihood of success on the merits of their Eighth Amendment claim. The court did not consider the merits of plaintiffs' other claims for relief, including their APA claims. *See Doe*, 763 F. Supp. 3d at 87-89.

Importantly, however, the court's analysis of plaintiffs' Eighth Amendment claims did not make individualized findings that characteristics the court generally identified as likely posing substantial risks of serious harm were applicable to each plaintiff. In particular, the court did not identify

14

characteristics of each individual, such as effects of sex reassignment medical treatment or prior experience of assault or self-harm in men's prisons, and make a corresponding finding that the plaintiff therefore likely faces a risk of harm rising to the level of an Eighth Amendment violation. *See id.* at 88-89.

In evaluating the remaining factors for preliminary injunctive relief, the district court reasoned that plaintiffs had "straightforwardly" demonstrated irreparable harm because "a prospective violation of a constitutional right constitutes irreparable injury." *Id.* at 89 (quoting *Davis v. Dist. of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). The court concluded that the harms it had identified in its Eighth Amendment analysis were irreparable. *See id.* As to the balance of equities and the public interest, the court rejected defendants' representation that housing these few "biological males" in women's facilities had deleterious effects on the privacy and security of other "female inmates," because "defendants have not so much as alleged that the plaintiffs in this particular suit present any threat to the female inmates housed with them." *Id.* at 89-90. The district court thus concluded that the balance of equities and the public interest favored plaintiffs. *Id.* at 90-91.

For those reasons, the court preliminarily "enjoined and restrained" defendants from "implementing Section[] 4(a) . . . of [the Executive Order]" and further ordered defendants to "maintain and continue . . . plaintiffs' housing status . . . as [it] existed immediately prior to January 20, 2025." *Id.* at 90.

Within ninety days of each preliminary injunction, plaintiffs filed in the district court motions for "renewed preliminary injunction[s]." *Doe v. Bondi*, No. 25-286, ECF

15

No. 81-1 (*Doe* Renewed PI Mot.) at 1 (D.D.C. filed May 12, 2025).    Plaintiffs explained that, pursuant to 18 U.S.C. § 3626(a)(1)(A) and (a)(2), the preliminary injunctions would expire after ninety days.    Preliminary relief remained necessary, plaintiffs argued, and "[n]othing in the statute limits the number of times a court may enter preliminary relief" upon such a showing.    *Doe* Renewed PI Mot. 5 (quoting *Mayweathers v. Newland*, 258 F.3d 930, 935 (9th Cir. 2001)). Plaintiffs accordingly asked the district court to "enter a new preliminary injunction renewing the relief in the current injunctions for an additional ninety (90) days."    *Id.* at 10. Defendants did not oppose plaintiffs' motions, *id.* at 1, and the district court renewed each of the preliminary injunctions as requested.    *See, e.g.*, *Doe* May 15 PI Order (J.A. 954-56).

Defendants timely appealed the preliminary injunctions (both original and renewed).    We consolidated the appeals for briefing and argument.

## II.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."    *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).    "We review the district court's decision whether to grant the Plaintiffs' request for a preliminary injunction for abuse of discretion, its legal conclusions de novo, and its findings of fact for clear error." *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (internal quotation marks omitted).

Defendants contend that the district court erred in granting preliminary injunctive relief based on plaintiffs' Eighth Amendment claim.    They first argue that the district court

16

should not have considered plaintiffs' Eighth Amendment claim because 18 U.S.C. § 3621(b) prohibits judicial review of BOP's designation of a place of imprisonment and because plaintiffs failed to exhaust available administrative remedies. Defendants separately argue that, even if the district court could consider plaintiffs' Eighth Amendment claim, plaintiffs have failed to show a likelihood of success on the merits of that claim because they do not face an "objectively intolerable" risk of harm from their transfer to men's facilities and because the Bureau did not exhibit deliberate indifference to any such risk. Lastly, defendants contend that the preliminary injunctions should be vacated because plaintiffs failed to establish the remaining *Winter* factors and the district court failed to make the requisite findings under the PLRA before granting injunctive relief. *See* 18 U.S.C. § 3626(a)(2).

We hold that 18 U.S.C. § 3621(b) does not bar judicial review of constitutional claims challenging BOP's designation of a place of imprisonment. We also hold that defendants have failed to carry their burden to show plaintiffs' failure to exhaust available administrative remedies. Turning to the merits, we conclude that we cannot sustain the preliminary injunctions because plaintiffs expressly disclaim the district court's rationale for granting relief and instead advance a narrower ground for upholding the injunctions—namely, that they are entitled to relief based on their specific characteristics—that we cannot adopt on the existing record. We thus vacate the preliminary injunctions and remand for further proceedings.

## A.

### 1.

Before turning to the parties' arguments, we address a threshold issue raised by our dissenting colleague. We have before us a set of preliminary injunctions, some of which were

17

entered more than ninety days ago and have accordingly since expired under 8 U.S.C. § 3626(a)(2) and others newly entered in the last ninety days and thus still in effect. Our colleague argues that the injunctions should be vacated because the PLRA provides that civil orders granting preliminary relief from unlawful prison conditions "shall automatically expire" within ninety days. 18 U.S.C. § 3626(a)(2). In his view, that means the preliminary injunctions on appeal are either moot (because they are no longer in effect) or invalid (because the district court lacked authority to issue them once the original injunction in each case expired).

We agree that the challenges to preliminary injunctions that have expired are moot. *See Banks v. Booth*, 3 F.4th 445, 447-49 (D.C. Cir. 2021) (dismissing as moot appeal from preliminary injunction that expired after ninety-day window). But we do not resolve whether section 3626(a)(2) prohibited the district court from entering the new injunctions. Even assuming section 3626(a)(2) limits a district court's ability to issue a new preliminary injunction at the end of the ninety-day period set forth in that statute, *but see Mayweathers*, 258 F.3d at 936, we conclude that any implicit restriction to that effect can be and has been waived by the defendants.

"In our adversarial system of adjudication, we follow the principle of party presentation." *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)). As the "neutral arbiter of matters the parties present," we "rely on the parties to frame the issues for decision." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). Here, both parties agree that section 3626(a)(2) does not limit a district court's ability to issue a new preliminary injunction at the end of the ninety-day period set forth in that statute. *See* Appellants' Supp. Br. 3-8; Appellees' Supp. Br. 1-6. The Bureau explains that the parties' shared reading of

18

section 3626(a)(2) "avoids the heightened litigation burdens that would be imposed on the parties and the courts if prison-condition disputes regularly had to be litigated on a highly expedited basis in order to achieve final judgment before the initial [preliminary injunction] expired." Appellants' Supp. Br. 4. And plaintiffs note that "every court of appeals that has reached the issue" agrees. Appellees' Supp. Br. 3 (citing cases).

The party-presentation principle does not apply to questions of subject-matter jurisdiction, which federal courts have an "independent obligation" to raise and decide even when "the parties either overlook or elect not to press" them. *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). But no one contends that any implicit limitation section 3626(a)(2) imposes on a district court's ability to issue a successive preliminary injunction is jurisdictional. Appellants' Supp. Br. 9-11; Appellees' Supp. Br. 6-7; Dissenting Op. at 21. After all, we only "brand[] a rule as going to a court's subject matter jurisdiction" if Congress has clearly stated as much. *Henderson*, 562 U.S. at 434; *see Sebelius v. Auburn Reg. Med. Ctr.*, 568 U.S. 145, 153 (2013). Section 3626(a)(2) is silent on this point.

Seeing no justification for departing from the principle of party presentation, we do not address whether the injunctions before us would be subject to vacatur under section 3626(a)(2) if the point had been preserved and pressed.

Next, we address the two threshold obstacles that the Bureau asserts prevent us from reaching the merits of plaintiffs' Eighth Amendment claim. We hold that neither applies to bar our review.

19

**2.**

Defendants first contend that 8 U.S.C. § 3621(b) prevents this court from hearing plaintiffs' Eighth Amendment claim challenging their transfer to men's facilities. In relevant part, section 3621(b) states: "Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court." *Id.*

"[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). The Supreme Court "require[s] this heightened showing . . . to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* (internal quotation marks omitted). Thus, we have held that a statute precludes judicial review of constitutional challenges "only if the evidence of congressional intent to preclude is 'clear and convincing.'" *McBryde v. Comm. to Review Cir. Council Conduct & Disability Orders of the Jud. Conf. of the U.S.*, 264 F.3d 52, 59 (D.C. Cir. 2001) (collecting cases).

Even assuming that what plaintiffs challenge is "a designation of a place of imprisonment under this subsection," 8 U.S.C. § 3621(b), defendants fail to identify "clear and convincing" evidence that Congress intended to preclude judicial review of constitutional challenges to such a designation. Defendants hang their hat on statutory text that they say uses "clear, categorical language" demonstrating preclusive intent. Appellants' Br. 28. But our cases treat even such "broad and seemingly comprehensive statutory language" as alone insufficient to "supply[] the necessary clarity to bar as applied constitutional claims." *McBryde*, 264 F.3d at 59; *see Griffith v. FLRA*, 842 F.2d 487, 494-95 (D.C. Cir. 1988); *Ungar*

20

*v. Smith*, 667 F.2d 188, 193 (D.C. Cir. 1981); *Ralpho v. Bell*, 569 F.2d 607, 620-21 (D.C. Cir. 1977). In *McBryde*, we confronted a statute stating that certain decisions of entities of the federal courts—a regional Circuit Judicial Council and the nationwide Judicial Conference Review Committee—"shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." *Id.* at 58 (quoting 28 U.S.C. § 372(c)(10)). That text fell short of "clear and convincing" evidence of preclusive intent. *Id.* at 59. We found the requisite clarity only after examining legislative history that emphasized the quasi-judicial nature of the form of "agency" review that the statute left available to aggrieved persons. *Id.* at 62; *see also id.* at 58-63. The statutory text here is quite like that of the statute at issue in *McBryde*, as defendants themselves acknowledge. Appellants' Br. 28. But defendants fail to point to any further indicia of "clear and convincing" preclusive intent, which *McBryde* deemed necessary. And none of the non-precedential, out-of-circuit cases defendants cite in support of section 3621(b) preclusion for constitutional claims addresses *Webster v. Doe*—let alone our precedent described above. *See* Appellants' Br. 28-29 (citing *Wills v. Barnhardt*, 2022 WL 4481492, at *1-*2, *4 (10th Cir. Sept. 27, 2022); *Touizer v. U.S. Att'y Gen.*, 2021 WL 3829618, at *1-*2 (11th Cir. Aug. 27, 2021) (per curiam); *Jiau v. Tews*, 812 F. App'x 638, 639 (9th Cir. 2020)).

We are thus unpersuaded that section 3621(b) precludes judicial review of plaintiffs' Eighth Amendment claim.

**3.**

We turn next to defendants' argument that plaintiffs' challenge is barred by their failure to exhaust administrative remedies. Plaintiffs do not deny that they sought no administrative relief before filing suit. Rather, they note that

21

the PLRA requires the exhaustion of only "available" remedies, 42 U.S.C. § 1997e(a), *see Ross*, 578 U.S. at 635-36, and contend that there were no administrative remedies available to them, Appellees' Br. 42-45.  The point thus turns on whether plaintiffs are right about that.

An administrative remedy is "available" if it is "capable of use to obtain some relief for the action complained of."  *Ross*, 578 U.S. at 642 (internal quotation marks omitted). Conversely, an administrative remedy is not available "where the relevant administrative procedure lacks authority to provide any relief" such that it operates as "a simple dead end."  *Id.* at 643 (quoting *Booth v. Churner*, 532 U.S. 731, 736 (2001)).

Defendants have failed to carry their burden to show that administrative remedies were available to plaintiffs.  *See Kaemmerling*, 553 F.3d at 675 (citing *Jones*, 549 U.S. at 215-16).  No one disputes that BOP has a grievance procedure open to inmates.  *See* 28 C.F.R. §§ 542.13-.15.  But defendants have failed to show that, for plaintiffs, the grievance procedure is "capable of use to obtain some relief for the action complained of."  *Ross*, 578 U.S. at 642 (internal quotation marks omitted).  Part of the injury plaintiffs claim is that the mere fact of their transfer to a men's facility would subject them to an intolerable risk of harm by exacerbating their gender dysphoria.  And defendants acknowledge that BOP's grievance procedure cannot stop or reverse the challenged transfers because they are mandated by the Executive Order.  Appellants' Br. 32.  The "action complained of" is not an Eighth Amendment violation in the abstract, but the concrete action the plaintiffs challenge—here, the transfers and their attendant risks.  And *Ross* asks whether the grievance process can provide "some relief for the action complained of."  578 U.S. at 642 (quoting *Booth*, 532 U.S. at 738).

22

In that respect, this case is on all fours with *Kaemmerling*, where an inmate challenged BOP's collection of his DNA information as contrary to his sincerely held religious beliefs. 553 F.3d at 675. In assessing the availability of an administrative remedy, we accepted the plaintiff's claim that the collection of his DNA would complete the asserted religious injury. *Id.* We held that he had "no administrative process to exhaust" because "BOP ha[d] no discretion not to collect his DNA, as the [DNA Act's] mandatory language indicates and as BOP conceded." *Id.*

Plaintiffs also claim Eighth Amendment injury from the substantially elevated risk of physical or sexual violence they would face in men's facilities. With respect to that asserted injury, too, defendants have failed to carry their burden to identify an administrative remedy "capable" of providing plaintiffs "some relief." *Ross*, 578 U.S. at 642 (internal quotation marks omitted). In support of their assertion that BOP can take "additional safety measures" in response to any personal safety concerns plaintiffs may raise through BOP's grievance procedure, defendants point to a single declaration from a BOP official. *See* Appellants' Br. 32 (citing Rick Stover First *Jones* Decl. ¶¶ 11-15 (J.A. 308-10)). That declaration discusses general BOP policies and procedures designed to ensure the safety of inmates, and the only form of administrative relief it identifies as an additional safety measure is the possibility of housing an inmate "as a protective custody case in the Special Housing Unit." Stover First *Jones* Decl. ¶ 15 (J.A. 309-10).

As the Bureau acknowledges, transferring plaintiffs into segregated housing in men's prisons is no solution. The same BOP official who identified placement in the Special Housing Unit (SHU) as a possible administrative remedy explained it would involve "more restrictive conditions" than being housed

23

in the general prison population. *Id.* *See* BOP Program Statement 5270.12 § 541.21 (noting "inability to leave the room or cell for the majority of the day" as "element" of "[r]estrictive housing"). He clarified in a further declaration that the Bureau planned to use segregated housing only as a short-term measure. *See* Stover Second *Jones* Decl. ¶ 25 (J.A. 394) ("BOP does not intend to house any plaintiff in the SHU . . . for an extended period of time."). Thus, defendants' only proffered administrative relief is by their own lights not an appropriate, sustainable form of relief from plaintiffs' claimed harms. A temporary, stop-gap measure that lacks any capacity to relieve plaintiffs from the ongoing risk of harm in men's prisons that plaintiffs allege is not "capable of use to obtain some relief for the action complained of." *Ross,* 578 U.S. at 642 (quoting *Booth*, 532 U.S. at 738).

The dissent posits that exhausting administrative remedies —even through a process incapable of reducing objective risk—can still provide plaintiffs "some relief" from Eighth Amendment injury by mitigating prison officials' deliberate indifference. *See* Dissenting Op. at 5-6. We are not persuaded.

First, the suggestion cannot be squared with *Ross*. It would mean no plaintiff with a failure-to-protect claim could benefit from *Ross*'s rule that "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable . . . to provide any relief to aggrieved inmates." 578 U.S. at 643. But *Ross* itself (and *Booth*, from which *Ross* derived this rule) involved a failure-to-protect claim. *See Ross*, 578 U.S. at 636, 643; *Booth*, 532 U.S. at 734.

Second, the suggestion that grievance procedures inherently mitigate deliberate indifference fails as a practical matter. The bare fact of prompting prison officials to consider

24

an inmate's grievance does not somehow mitigate the officials' indifference if they have no response to the inmate's plight. *Cf. Farmer*, 511 U.S. at 844 (explaining that prison officials do not act with deliberate indifference "if they responded reasonably to the risk, even if the harm ultimately was not averted"). If anything, requiring an inmate to exhaust an administrative procedure incapable of providing any identified, concrete relief from a substantial risk of serious harm makes official indifference more deliberate, not less. The burden is on the Bureau. With no evidence in the record even suggesting that there is any sustainable way in which BOP's grievance procedure could provide plaintiffs' "some relief" from the severe risks they claim they will face if housed in men's prisons, defendants have failed to carry their burden to show an "available" administrative remedy for plaintiffs to exhaust.

With defendants' threshold objections cleared, we turn to the merits of plaintiffs' Eighth Amendment claim.

**B.**

The district court concluded that plaintiffs were entitled to preliminary injunctive relief because they are likely to succeed on the merits of their claim that their transfer to men's facilities would violate the Eighth Amendment. As noted above, the district court set forth its rationale for so concluding in the February 4 TRO in *Doe*. There, the district court found that plaintiffs had shown that "transgender persons are at a significantly elevated risk of physical and sexual violence relative to other inmates when housed in a facility corresponding to their biological sex." 763 F. Supp. 3d at 88. The district court also credited plaintiffs' claim that "placement in a male penitentiary *by itself* will exacerbate the symptoms of their gender dysphoria, *even if* they [plaintiffs] are not subject to physical or sexual violence in their new facility." *Id.*

25

Notably, in making those findings, the district court did not identify each individual plaintiffs' risk-elevating characteristics, such as their having undergone sex reassignment treatment or their experiences of assault or self-harm in men's prisons. *Id.* Rather, the court cited to "various government reports and regulations" that recognized the generally heightened risks faced by transgender women housed in men's facilities. *Id.*

On the basis of those findings, the district court concluded that plaintiffs were likely to succeed in showing (1) that they faced an "objectively intolerable" risk of violence (as transgender women housed in men's facilities) and of exacerbated gender dysphoria (as transgender women with gender dysphoria housed in men's facilities); and (2) that BOP was actually aware of those risks. *Id.* at 88-89. The district court thus concluded that plaintiffs had shown a likelihood of success on their Eighth Amendment claim, *id.* at 88 (citing *Farmer*, 511 U.S. at 839-40), and further concluded that plaintiffs would be irreparably harmed absent preliminary injunctive relief, *id.* at 89.

Plaintiffs, however, expressly disclaim the categorical argument "that the Eighth Amendment requires every transgender woman to be housed in a women's prison." Appellees' Br. 19-20. They also make clear that they do not contend that every transgender woman diagnosed with gender dysphoria has an Eighth Amendment entitlement to be housed in a women's prison. *See* Appellees' Br. 25 (arguing that worsening gender dysphoria will put these plaintiffs at "significant risk of harm" because they have lived as women for extended periods, transitioned through use of medications and surgeries, and because they have histories of self-injury and suicidal ideation). We generally do not consider arguments that parties do not make—or, as here, arguments that they

26

disclaim. *See Greenlaw v. United States,* 554 U.S. 237, 243-44 (2008). Thus, we cannot sustain the district court's preliminary injunctions on the ground that every transgender woman (or every transgender woman diagnosed with gender dysphoria) in BOP custody has an Eighth Amendment entitlement to not be housed in men's facilities.

Plaintiffs urge us to affirm the district court's preliminary injunctions on a different—narrower—ground. They contend that they all have "particular vulnerabilities" that expose them to a greater risk of harm than transgender women in BOP custody generally. Appellees' Br. 19-25. Plaintiffs argue that their characteristics make them "an especially at-risk group" even among transgender women inmates, which is why plaintiffs "are part of the small, unique group of transgender women whom BOP placed in women's facilities." *Id*. at 20. In explaining what distinguishes them, plaintiffs point to long-term hormone therapy and surgeries effecting gendered physical alterations, prior history of sexual assault or self-harm in men's facilities, or a combination of such factors. *See id.* at 20-21. They further contend that BOP is aware of their individual characteristics—an awareness that defendants do not dispute. Appellees' Br. 26; *see* Appellants' Br. 42-44. According to plaintiffs, such characteristics render their housing in men's facilities unconstitutional under the Eighth Amendment regardless of whether other transgender women could constitutionally be housed in men's facilities. *See* Appellees' Br. 28-29.

The record indeed contains ample, uncontested evidence of plaintiffs' characteristics that, according to plaintiffs, make them distinctively vulnerable to harm in men's facilities. *See, e.g.*, [Name Redacted] Decl. ¶ 5 (J.A. 286) (facial reconstructive surgery, breast augmentation surgery, and vaginoplasty); Donna Jones Decl. ¶ 6 (J.A. 385) (prior history

27

of sexual assault in men's prison); Olivia Doe Decl. ¶ 5 (J.A. 921) (prior history of attempting suicide in men's prison). But the district court did not make findings that each of the plaintiffs would be subject to a "significantly elevated risk" of harm in men's facilities, *Doe*, 763 F. Supp. 3d at 88, and we cannot "take [its] place" to make such factual findings ourselves, *United States v. Hill*, 131 F.3d 1056, 1061 (D.C. Cir. 1997) (internal quotation marks omitted). Instead, it is the province of the district court to elicit and assess evidence and find facts. We accordingly remand to allow the district court to exercise its judgment whether to make the factual determinations needed to hold, as plaintiffs urge, that the distinctive characteristics of these individuals in particular render their transfer to men's facilities unconstitutional under the Eighth Amendment.

In two of its preliminary injunction orders, the district court relied on a different ground that is particularized to the specific group of plaintiffs in this case: Before the President issued his Executive Order barring any such assignments, "BOP determined that women's facilities are the *appropriate* facilities for plaintiffs under the prevailing legal regime considering all statutorily and constitutionally required factors." *Doe*, 2025 WL 596653, at *1; *Jones*, 2025 WL 923755, at *1 (internal quotation marks omitted); *see also* Appellees' Br. 20 (emphasizing BOP's initial placement of plaintiffs in women's facilities). Specifically, the district court relied on the Bureau's initial determinations that women's facilities were the appropriate facilities for plaintiffs and the fact that "housing inmates with inmates of the opposite biological sex is a statistical anomaly" to infer that plaintiffs faced risks cognizable under the Eighth Amendment. *Id.* at *1 (internal quotation marks omitted). Simply put, the Bureau itself decided that, among the thousands of transgender women

28

in its custody, this small subgroup should be placed in women's facilities, not men's.

But the referenced "statutorily and constitutionally required factors" applicable to such assignments encompass considerations outside the concerns of the Eighth Amendment. *See, e.g.*, 18 U.S.C. § 3621(b) (requiring BOP to place inmates "as close as practicable to the prisoner's primary residence" and to consider many factors in designating a place of imprisonment, *inter alia*, "the resources of the facility contemplated," "the nature and circumstances of the offense," any "faith-based" or health needs, and available special services such as substance abuse treatment). The Bureau, relying on an affidavit from a BOP official, asserted that the "decision to place each Plaintiff in a women's facility was made for a 'variety of reasons,' and not simply because of a finding that the plaintiffs could not be safely housed in a men's facility"—*i.e.*, for reasons "beyond just safety concerns." *Jones*, 2025 WL 923755, at *1. BOP's supporting affidavit stated that plaintiffs were initially placed in women's facilities because of court orders or settlement agreements, because they were waiting for sex reassignment surgery, or because they were "already being housed with women prior to coming into [BOP] custody." Stover Second *Jones* Decl. ¶ 24 (J.A. 393).

Given the rarity of such placements within the federal system, it is reasonable to infer that BOP's decisions to house plaintiffs in women's facilities are the product of deliberate, individualized determinations rather than happenstance. And the Bureau denies only that its placements of transgender women in women's institutions were "all" made based on risks they would face if housed in men's facilities. *Id.*

29

That said, the record does not definitively establish whether safety concerns motivated each plaintiff's placement. The district court made no findings that the Bureau's prior assignments of plaintiffs rested on the Bureau's assessment that they would face constitutionally germane risks of harm if housed with men. Without such findings, we cannot confirm the district court's inference that BOP previously placed plaintiffs in women's facilities because they could not be safely housed in men's facilities.

Because the district court did not otherwise explain why these individual plaintiffs—as opposed to transgender women in BOP custody more broadly—are likely to succeed on an Eighth Amendment challenge to their placement in men's facilities, and because plaintiffs disclaim broader theories that the Eighth Amendment requires all transgender women—or all those with gender dysphoria—to be housed in women's facilities, plaintiffs have not shown a likelihood of success on their Eighth Amendment claim.

**C.**

Our conclusion that plaintiffs have not shown a likelihood of success on their Eighth Amendment claim means that we cannot sustain the district court's preliminary injunctions. For largely the same reasons that plaintiffs have failed to show a likelihood of success, we lack grounds to hold that they "will likely suffer irreparable harm before the district court can resolve the merits of the case." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022). The district court reasoned that plaintiffs demonstrated irreparable harm from their transfer because "a prospective violation of a constitutional right constitutes irreparable injury." *Doe*, 763 F. Supp. 3d at 89 (quoting *Davis v. Dist. of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). But, as explained above, plaintiffs have disclaimed the basis on

30

which the district court rested its likelihood-of-success conclusion and advanced only their more individuated claim as to which the district court has not made the necessary findings. We cannot affirm a finding of irreparable harm to all plaintiffs that was predicated on a categorial, since-disclaimed theory of constitutional injury.

We recognize that plaintiffs separately contend that they each face a substantial risk of irreparable harm from physical and sexual violence as well as the worsening of their gender dysphoria. But, again, that argument expressly relies on plaintiff-specific characteristics that plaintiffs say make them particularly at risk of harm. *See* Appellees' Br. 47-48. The district court did not rely on plaintiff-specific factfinding in concluding that plaintiffs would be irreparably harmed absent an injunction, leaving unexpressed the specific factual support for a holding that plaintiffs' distinct characteristics would subject them to irreparable harm. For these reasons, we cannot conclude that plaintiffs "will likely suffer irreparable harm before the district court can resolve the merits of the case." *Singh v. Berger*, 56 F.4th at 95. That conclusion obviates the need for us to consider the other *Winter* factors. *See Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) (even under sliding-scale approach to preliminary injunction factors, failure to establish first two obviates need to consider other two). Because we cannot affirm the district court's conclusion that plaintiffs have shown a likelihood of success on the merits of their Eighth Amendment claim and irreparable harm, we must vacate the preliminary injunctions and remand for further consideration. *Id.*

Apart from their Eighth Amendment claim, plaintiffs seek to defend the preliminary injunctions based on their claims under the Administrative Procedure Act. Appellees' Br. 29-38. But the district court did not reach those claims. *See Doe*, 763

31

F. Supp. 3d at 87-90.  And "we are a court of review, not of first view, so where the merits went unaddressed below, it is our general practice to remand to the district court."  *Bauer v. FDIC*, 38 F.4th 1114, 1126 (D.C. Cir. 2022) (formatting modified).  We thus decline to reach plaintiffs' APA claims in the first instance and remand to the district court to consider those claims as appropriate.

Because we vacate the preliminary injunctions on the merits, we need not address defendants' contention that the preliminary injunctions fail to comply with the PLRA's provisions limiting relief to that which the district court finds is "narrowly drawn" and extends "no further than necessary to correct the harm" supporting preliminary relief.  18 U.S.C. § 3626(a)(2).

## III.

For the foregoing reasons, we vacate the preliminary injunctions still in effect and remand for further proceedings.  As to the preliminary injunctions that everyone agrees have since expired pursuant to section 3626(a)(2)'s ninety-day time limit, we dismiss the appeals as moot insofar as they speak to those superseded injunctions.  *See Banks*, 3 F.4th at 447-49.  Nothing in this opinion limits the district court's ability on remand to elicit further information, make additional findings of fact, or consider additional or alternative legal bases for relief, as it deems appropriate.

*So ordered*.

RANDOLPH, *Senior Circuit Judge*, dissenting:

Thirty years ago Congress addressed the burgeoning number of lawsuits dealing with prison conditions and the regulatory injunctions federal judges were issuing in response. In order to identify and channel those prisoner cases worthy of concern and to cabin the injunctive authority of federal judges, Congress passed the Prison Litigation Reform Act of 1995. Two of the major reforms of that legislation are at issue in this case. The majority opinion defies both.

**I**

**A**

Although I agree that the outstanding preliminary injunctions must be vacated, I dissent because the Prison Litigation Reform Act compels an end to these consolidated cases, not a remand that encourages the district court to repackage relief under alternative theories. The PLRA speaks in unmistakable terms: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

Requiring exhaustion "afford[s] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 525 (2002). It is, at its core, a rule grounded in respect for the institutional competence of those who daily contend with the complex realities of incarceration. *See Shaw v. Murphy*, 532 U.S. 223, 229 (2001).

That respect is absent from the majority's opinion. None of the plaintiffs took advantage of the administrative remedies available to them. Under the PLRA's unambiguous command,

2

that failure should have ended these consolidated cases. As the Supreme Court has cautioned, "a court may not excuse a failure to exhaust, even to take [special] circumstances into account." *Ross v. Blake*, 578 U.S. 632, 639 (2016).

The majority does precisely what the Supreme Court has forbidden, masking its departure from the statute by distending the "unavailability" exception articulated in *Ross* beyond its limits. *See* Maj. Op. at 20-21. They assert that the administrative process here was a "dead end" because officers purportedly lacked power to grant any form of relief, and so administrative procedures are unavailable and need not be exhausted. *Id.* at 21 (quoting *Ross*, 578 U.S. at 643). That conclusion cannot survive even cursory examination. Prison officials retained broad discretion to ameliorate plaintiffs' alleged harms through an array of ordinary interventions, including modified housing assignments, accommodations, or alternative treatment measures. *See* 28 C.F.R. § 115.42(c); JA308-10 (Stover First *Jones* Decl. ¶ 11-15).

To prop up its contrary conclusion, the majority leans heavily—indeed, nearly exclusively—on *Kaemmerling v. Lapin*, 553 F.3d 669 (D.C. Cir. 2008). *See* Maj. Op. at 22. But *Kaemmerling* cannot bear the load they place upon it. The plaintiff there sought to enjoin the statutorily mandated collection of his DNA, asserting that the procedure violated his religious beliefs and thus infringed upon his rights under the Religious Freedom Restoration Act and the Constitution. *Kaemmerling*, 553 F.3d at 674. This court concluded that, because the prison officials had no discretion over the DNA collection and no grievance procedure could offer any relief, no administrative remedy remained "available." *Id.* at 675-76. Only striking down a federal statute—which the Bureau of Prisons could not do—would provide any relief. *Id.* at 676.

3

To transform that limited holding—rendered outside the context of any Eighth Amendment claim—into an endorsement of the majority's position is irreconcilable with the Supreme Court's unequivocal instruction that a remedy need not be "effective" to be "available." *Booth v. Churner*, 532 U.S. 731, 740-41 (2001). "Even when the prisoner seeks relief not available in grievance proceedings . . . exhaustion is a prerequisite to suit." *Porter*, 534 U.S. at 524. *Kaemmerling*, by its own terms, did nothing more than acknowledge the unremarkable proposition that a remedy is not "available" when it is incapable of altering the contours of the dispute before the court: "This case is the rare one in which there is no administrative process to exhaust because the BOP lacks authority to provide Kaemmerling *any relief or to take any action whatsoever* in response to his complaint challenging enforcement of the DNA Act." 553 F.3d at 675 (emphasis added).

Not so here. These cases do not give rise to a purely legal question, insulated from factual development and agency judgment. As already noted, prison officials retained broad discretion to ameliorate the plaintiffs' alleged harms. The majority attempts to manufacture parity with *Kaemmerling* by asserting a tight nexus between the plaintiffs' transfer to male facilities and the exacerbation of their gender dysphoria—the implication being that, because exacerbation is inevitable, no factual development or application of agency expertise could meaningfully inform the court's analysis. *See* Maj. Op. at 22. They contend that this nexus "is on all fours with" the connection identified in *Kaemmerling* between the statutorily mandated DNA collection and the asserted religious injury. *Id.*

But that analogy falters at the threshold. Unlike *Kaemmerling*, this case does not involve an alleged legal injury flowing inexorably from a mandatory government act. Plaintiffs

4

assert that their transfer to male facilities will inevitably intensify their feeling of gender dysphoria. But such distress, without more, is *damnum absque injuria*, for which federal courts themselves afford no relief. The relevant inquiry is not whether administrative remedies are available to address such non-cognizable harm, but whether remedies are available to address the alleged legal injury—here, an Eighth Amendment violation. *See Alabama Power Co. v. Ickes*, 302 U.S. 464, 478-79 (1938) (noting that remedies attach only to legal injuries; harm alone does not suffice); *Abdelfattah v. Dep't of Homeland Sec.*, 787 F.3d 524, 536 (D.C. Cir. 2015) (recognizing that remedies are defined as relief intended to redress "a violation of *an established legal right* [that] has occurred or is imminent" (emphasis added)).

Once framed correctly, the analogy to *Kaemmerling* collapses. The PLRA demands exhaustion whenever grievance mechanisms "are 'capable of use' to obtain '*some* relief for the action complained of.'" *Ross*, 578 U.S. at 642 (emphasis added) (quoting *Booth*, 532 U.S. at 738). "Some relief" is a modest threshold—and a fatal obstacle to the majority's reasoning. That principle had no purchase in *Kaemmerling*, where the claim admitted no possibility of any mitigation whatsoever and therefore no prospect of "some relief." Either the Bureau of Prisons would collect the plaintiff's DNA and thereby fully consummate the asserted religious injury, or it would refrain and cause no injury at all.

Unlike the alleged harm in *Kaemmerling*, the Eighth Amendment injury the plaintiffs here assert is necessarily one of degree. Failure-to-protect claims comprise two inquiries: whether the inmate "is incarcerated under conditions posing a substantial risk of serious harm," and whether the authorities are deliberately indifferent to that risk. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Both concepts operate along a

5

continuum. Risk presents gradations. So does indifference. Accordingly, the possibility of "some relief" carries significance here that it lacked in *Kaemmerling*. If grievance procedures could diminish the level of risk or mitigate official indifference even marginally, then administrative remedies remain available and the PLRA demands that they be pursued before judicial intervention may be sought.

With respect to deliberate indifference, it borders on paradoxical to conclude that there is no possibility of "some relief" here. Grievance procedures exist precisely to confront alleged indifference and, when warranted, to secure institutional response. *Cf. Jones v. N. Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 130 n.6 (1977). Short of circumstances in which prison officials categorically refuse to act upon grievances or obstruct access to grievance procedures, it is difficult to conceive how a failure-to-protect claim could ever admit of no possible relief on this element. Administrative consideration of an inmate's grievance is the antithesis of disregarding it. And given the range of interventions ordinarily available in correctional settings, it is not apparent how officials willing to engage with an inmate could ever be incapable of "respond[ing] reasonably" in a failure-to-protect context.[1] *Farmer*, 511 U.S. at 844. One plaintiff's experience before joining this litigation makes the point. After transferring to a male facility, Rachel Doe reported receiving a sexually explicit note from an unidentified inmate, and prison officials promptly opened an

---

[1] Contrary to the majority's suggestion, this does not foreclose application of *Ross*'s "dead end" exception to all failure-to-protect claims. *See* Maj. Op. at 23. The examples *Ross* itself offers—where grievances must be directed to an office that "disclaims the capacity" to consider them or officials with apparent authority "decline ever to exercise it"—reflect circumstances of categorical refusal in which the exception remains available. *Ross*, 578 U.S. at 643.

6

investigation to address the matter. Nothing in the record supports the conclusion that prison officials would abandon the vigilance reflected in Rachel Doe's experience or prove indifferent to the risks the plaintiffs assert.

Accordingly, because deliberate indifference is an indispensable element of failure-to-protect claims, plaintiffs cannot establish that administrative remedies are unavailable irrespective of the asserted risks attendant to their transfers. *See id.* ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). But even if plaintiffs' claims depended solely on their asserted risks following transfer, that would not excuse their failure to exhaust.[2] Intensified gender dysphoria does not inevitably ripen into a substantial risk of serious harm. The condition exists along a continuum with its severity neither fixed nor immutable, but contingent on a range of influences—some aggravating, others ameliorating. Transfer to male facilities may push the trajectory of plaintiffs' dysphoria in an unfavorable direction. It does not, however, dictate the ultimate severity of their condition, particularly in light of the range of treatment measures prison officials could implement. Administrative relief therefore remains available

---

[2] The majority's contention that mitigation of officials' deliberate indifference does not constitute "some relief" is incorrect for the reasons already explained. *See* Maj. Op. at 23. Tellingly absent, however, is any response to the separate and sufficient point that remedies would also have mitigated the substantial risk of serious harm plaintiffs allege. Because a failure-to-protect claim requires both deliberate indifference and substantial risk of serious harm, plaintiffs must demonstrate that relief was unavailable with respect to both elements in order to establish the absence of any possibility of "some relief."

7

with respect to the risks plaintiffs attribute to their gender dysphoria after transfer.

That conclusion follows even more self-evidently with respect to the portion of plaintiffs' claims alleging a heightened risk of physical and sexual violence. Managing and reducing such risks is among the most fundamental responsibilities of prison administration. *See Hewitt v. Helms*, 459 U.S. 460, 473 (1983) ("The safety of the institution's . . . inmates is perhaps the most fundamental responsibility of the prison administration."); *Pell v. Procunier*, 417 U.S. 817, 823 (1974) ("[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."). It would be a remarkable proposition to conclude that prison officials are categorically incapable of reducing, to any extent, the risk of physical or sexual assault within their institutions.

Nor is it a sufficient rejoinder to assert that any available administrative remedy would fail to mitigate the harms associated with transfer to male facilities to an adequate degree. It may ultimately prove that transfer to male facilities gravely intensifies certain plaintiffs' risks of serious harm, and that no action by prison officials can meaningfully alleviate those risks. But it is wholly speculative to conclude, at this juncture, that no relief whatsoever could conceivably be available through established grievance channels. And it is precisely such speculation that the PLRA's exhaustion requirement is designed to forestall. Prisoners must pursue "the possibility of *some* relief," *Booth*, 532 U.S. at 738 (emphasis added)—even if there is no "effective" remedy, *id.* at 740—because it is not for courts to preemptively adjudicate the adequacy of such relief. Exhaustion serves to "afford[] corrections officials time and opportunity to address complaints internally," thereby generating an administrative record that "clarifies the contours

8

of the controversy." *Porter*, 534 U.S. at 525. Some measure of relief is plainly available here. Whether it would prove inadequate is a question that cries out for factual development. Yet the majority indulges plaintiffs' request to proceed in the absence of any such administrative record.

The majority objects that the "action complained of" is not an Eighth Amendment violation "in the abstract," but rather "the concrete action the plaintiffs challenge—here, the transfers and their attendant risks." Maj. Op. at 21. The charge is puzzling. This dissent nowhere disputes that the action complained of is the transfer. But the availability of "some relief" for that action can only be assessed by reference to the elements of the constitutional claim the plaintiffs raise. If measuring facts against legal standards is "abstract," the majority's quarrel lies not with my dissent but with the enterprise of judging. Whatever abstraction burdens this case is a consequence of the majority's own making. It has proceeded without the factual record that exhaustion exists to produce, condemned relief as unavailable before the record could show otherwise, and substituted its own anticipatory conclusions for the evidence it declined to await.

At bottom, this case is far simpler than the majority tries to make it appear. The plaintiffs ask us to excuse exhaustion not because no remedies were available, but because none could deliver their preferred remedy—namely, insulation from being transferred to male facilities. But the PLRA demands exhaustion whenever grievance mechanisms "are 'capable of use' to obtain 'some relief *for* the action complained of.'" *Ross*, 578 U.S. at 642 (emphasis added) (quoting *Booth*, 532 U.S. at 738). *For* the action complained of, not *from* the action complained of, as the majority implicitly contends. Courts may not excuse exhaustion simply because the available remedies do not include a plaintiff's preferred choice. *See Porter*, 534 U.S.

9

at 524 ("All 'available' remedies must . . . be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.' Even when the prisoner seeks relief not available in grievance proceedings . . . exhaustion is a prerequisite to suit." (quoting *Booth*, 532 U.S. at 739)); *Kaemmerling*, 553 F.3d at 675 ("Even if an inmate believes that seeking administrative relief from the prison would be futile and even if the grievance system cannot offer the particular form of relief sought, the prisoner nevertheless must exhaust the available administrative process."). A prisoner "may not circumvent the requirement of exhaustion by picking out a remedy that the prison happens not to offer and contending that its absence entitles him to bypass the administrative grievance procedure." *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1174 (7th Cir. 2010). Yet that is precisely what the majority's opinion endorses.

**B**

The majority's sole refuge from the inescapable conclusion that the plaintiffs failed to exhaust available remedies is the assertion that the government did not satisfy its burden of showing those remedies were available. *See* Maj. Op. at 21-22, 24. To sustain that proposition, the majority once again stretches *Kaemmerling* past its breaking point. They aggrandize a fleeting statement—that the government there "failed to carry its burden of showing an administrative remedy available . . . to exhaust," *Kaemmerling*, 553 F.3d at 675—into a holding that under the PLRA "the defendant bears the burden of showing that an administrative remedy was available for the plaintiff to exhaust." Maj. Op. at 7.

But that maneuver can succeed only by unmooring the statement from its context. The government's briefing in *Kaemmerling* was silent about whether administrative remedies

10

could offer even the possibility of some relief. *See* Brief for Appellees at 10-12, *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008) (No. 07-5065). Indeed, as the court observed immediately before the statement the majority now seizes upon, "counsel for the BOP could not articulate a single possible way the prison's administrative system could provide relief or take any action at all in response to Kaemmerling's claim that collecting his DNA would violate his statutory and constitutional rights." *Kaemmerling*, 553 F.3d at 675.

Against this backdrop, *Kaemmerling*'s reference to the government's "burden" was not a pronouncement on burden allocation at all. It was instead a recognition that the choreography of burdens was immaterial because the government had conceded the ultimate question—that administrative remedies were unavailable. *See Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993) (recognizing that "the ultimate purpose" of burden allocation "is typically achieved from the outset" when a party concedes the dispositive issue); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) (observing that "[a] burden-shifting protocol is . . . unnecessary" when "[t]he fact to be uncovered by such a protocol . . . is not in dispute"); *Preston v. Texas Dep't of Fam. & Protective Servs.*, 222 F. App'x 353, 359 (5th Cir. 2007) (explaining that the court "need not make [a] determination" regarding the first two prongs of a burden-shifting inquiry because the plaintiff "failed to create a fact issue at the third step of the burden shifting analysis").

When the parties contest whether administrative remedies were available, *Kaemmerling* offers no guidance. Other circuits, however, have charted a clear course. The majority to consider the issue have uniformly adopted a three-step framework. The government bears only a modest initial burden to establish a generally available grievance procedure, after which the burden

11

shifts to the plaintiff to undertake the more demanding task of demonstrating that the procedure was, in reality, unavailable.[3] Only then does the burden return to the government, which may attempt to rebut the plaintiff's showing of unavailability. *Fordley v. Lizarraga*, 18 F.4th 344, 351 (9th Cir. 2021).

While the convergence of other circuits is not itself determinative, *see infra* at 14-15, the alignment here is the natural product of the PLRA's design. The statute itself is "silent on the allocation of the burden of persuasion," and so one must "begin with the ordinary default rule that plaintiffs bear the risk of failing to prove their claims." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) (quoting *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005)). Exhaustion is, of course, styled an "affirmative defense," *Jones v. Bock*, 549 U.S. 199, 216 (2007), and the burden of proof often rests with the defendant who asserts such a defense, *see, e.g.*, *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). But that convention derives from "the general rule of statutory construction that the burden of proving justification or

---

[3] *See Fordley v. Lizarraga*, 18 F.4th 344, 351 (9th Cir. 2021) ("Once the defendant shows that such a remedy was generally available, the burden shifts to the inmate to show that something in his particular case made the generally available administrative remedies effectively unavailable to him. Because the failure to exhaust is an affirmative defense that defendants must plead and prove, the ultimate burden of proving that the inmate has not exhausted his claims remains with the defendants."); *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) ("[O]nce the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him."); *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011); *Geter v. Baldwin State Prison*, 974 F.3d 1348, 1356 n.14 (11th Cir. 2020); *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

12

exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits." *FTC v. Morton Salt Co.*, 334 U.S. 37, 44-45 (1948). Typically, it is the defendant who claims the benefit of an exception when raising an affirmative defense. Exhaustion under the PLRA, however, reverses that posture. Though styled as an affirmative defense, exhaustion is not an exception to the statutory scheme but its default rule. *See Porter*, 534 U.S. at 525 n.4. Once exhaustion is raised, it is the plaintiff—not the defendant—who seeks departure from the ordinary rule. And "absent some reason to believe that Congress intended otherwise, . . . we should conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief." *Meacham v. Knolls Atomic Power Laboratory*, 554 U.S. 84, 92 (2008) (quoting *Schaffer*, 546 U.S. at 57-58).

The prevailing burden-shifting framework for determining the availability of remedies under the PLRA faithfully reflects this principle.[4] After the defendant identifies a nominally

---

[4] The Sixth and Seventh Circuits have declined to adopt the prevailing burden-shifting framework, holding instead that the government bears the burden of demonstrating the availability of administrative remedies. *See Lamb v. Kendrick*, 52 F.4th 286, 295 (6th Cir. 2022); *Gooch v. Young*, 24 F.4th 624, 627 (7th Cir. 2022). But those decisions arose in a materially distinct context: disputes over whether prison officials obstructed prisoners' access to the grievance process itself, not whether an otherwise accessible process was capable of affording relief. *See Lamb*, 52 F.4th at 295; *Gooch*, 24 F.4th at 627-28; *Davis v. Mason*, 881 F.3d 982, 985 (7th Cir. 2018); *Hill v. Snyder*, 817 F.3d 1037, 1040-41 (7th Cir. 2016). In cases involving impeded access, allocating the burden in this manner may be sensible, given the practical difficulty prisoners face in proving facts uniquely within the knowledge and control of prison officials. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 60 (2005) ("[T]he ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the

13

available administrative process—a showing that may be made simply by "pointing to legally sufficient sources such as statutes, regulations, or grievance procedures," *Hubbs*, 788 F.3d at 59 (cleaned up)—the substantial burden lies with the plaintiff to establish why that procedure was, in reality, unavailable.

The majority's contrary approach thus inverts the PLRA's design. It relieves plaintiffs of their obligation to demonstrate unavailability and imposes on the government a burden the statute nowhere assigns. Neither *Kaemmerling* nor any other authority supports that result. Under the consensus burden-shifting framework, the government undisputedly carried its threshold obligation by identifying a nominally available grievance procedure. The burden thus rested with the plaintiffs to demonstrate that administrative remedies were unavailable to them in fact. They did not satisfy that burden and that failure should have resulted in the dismissal of their complaints.

**II**

The preliminary injunctions should be vacated for an additional reason antecedent to the merits: following its issuance of the initial round of injunctions, the district court lacked authority to issue further preliminary relief.

---

knowledge of his adversary." (quoting *United States v. New York, New Haven & Hartford R.R. Co.*, 355 U.S. 253, 256 n.5 (1957))). Whatever force that allocation may have in such circumstances, however, does not extend to a case like this one. Here, the question is not whether grievance procedures were accessible, but whether they could provide meaningful relief in light of the plaintiffs' particular characteristics and situation—considerations that do not implicate the same evidentiary imbalance and therefore do not justify the same departure from the consensus approach.

14

Congress spoke plainly in the PLRA. Preliminary injunctive relief "shall automatically expire" ninety days after entry unless—before that deadline—the court both makes the findings required for prospective relief under § 3626(a)(1) and "makes the order final." 18 U.S.C. § 3626(a)(2). The district court entered its original preliminary injunction orders on February 18, February 24, March 3, March 10, and March 19, 2025. It did not, however, convert any of those orders into final prospective relief. As a result, each expired by operation of law ninety days after entry.

At that juncture, the statute afforded the district court a single lawful avenue to continue injunctive relief. The court could proceed to a trial on the merits and, if appropriate, enter final, prospective relief. The district court did not do so. Instead, it has repeatedly reissued successive preliminary injunctions, attempting to reset the ninety-day clock each time. Having failed to issue final relief, the district court was without power to continue preliminarily enjoining defendants. The latest orders are therefore invalid and we lack appellate jurisdiction over these interlocutory appeals.

I acknowledge that this practice of issuing rolling injunctions has become familiar in PLRA litigation, and that every circuit to confront the issue—save one, *see Georgia Advocacy Office v. Jackson*, 4 F.4th 1200, 1207-15 (11th Cir. 2021), vacated as moot, 33 F.4th 1325 (11th Cir. 2022) (per curiam)—has acquiesced in that understanding. But "we have no warrant to ignore clear statutory language on the ground that other courts have done so." *Milner v. Department of Navy*, 562 U.S. 562, 576 (2011).

A broad consensus may, of course, reflect sound reasoning and thus merit respectful consideration. But here the consensus rests on little more than inertia. Uncritical adherence to the

15

decisions of other circuits risks ossifying error, undermining the process of percolation through which divergent views sharpen the law. *See Mast, Foos & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 488 (1900). Should uniformity ultimately prove indispensable, the task of reconciling any ensuing conflict properly belongs to our superiors. *See Cruz v. Am. Airlines, Inc.*, 193 F.3d 526, 530 (D.C. Cir. 1999).

This is precisely such an instance in which consensus should not command assent. Only the Ninth Circuit has attempted anything resembling a textual analysis, and its effort falls well short. *See Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001). That opinion summarily declared that "[n]othing in the statute limits the number of times a court may enter preliminary relief," and suggested that "[i]f anything, the [expiration] provision simply imposes a burden on plaintiffs to continue to prove that preliminary relief is warranted." *Id.* Other circuits have dispensed with even that minimal effort, asserting the conclusion without any independent analysis. *See, e.g.*, *Smith v. Edwards*, 88 F.4th 1119, 1125-26 (5th Cir. 2023) (asserting, without explanation, that a preliminary injunction under the PLRA "may be extended by the district court if it makes the requisite findings"); *Alloway v. Hodge*, 72 F. App'x 812, 817 (10th Cir. 2003) (adopting *Mayweathers*'s conclusion with no independent reasoning); *Monroe v. Bowman*, 122 F.4th 688, 697 (7th Cir. 2024) (same).

If Congress intended merely to impose on plaintiffs a continuing burden to demonstrate that preliminary relief remains warranted, § 3626(a)(2) would be an oddly circuitous way of doing so. Congress could instead have permitted preliminary relief to persist unless the district court failed to renew findings at ninety-day intervals, rather than compelling automatic dissolution of relief followed by reissuance upon the same showing. Congress's handiwork elsewhere in the same

16

section exposes the implausibility of a reading that would require such a convoluted approach to maintaining preliminary relief for some indefinite period. In a neighboring provision, Congress authorized termination of final "prospective relief" after specified time periods unless the court makes written findings that the relief remains necessary. *See* 18 U.S.C. § 3626(b). That provision imposes precisely the continuing burden the Ninth Circuit attributes to § 3626(a)(2), but without the peculiar requirement that relief expire regardless of its continued justification. It strains credulity to conclude Congress adopted a more tortuous framework for preliminary injunctions without any discernible justification. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 577 (2019) (explaining that courts should not rely on "the doubtful proposition that Congress sought to accomplish in a 'surpassingly strange manner' what it could have accomplished in a much more straightforward way" (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 647 (2012))).

Properly construed, § 3626(a)(2) operates exactly as the Eleventh Circuit has explained: it recasts preliminary injunctions in prison-conditions litigation into a form of short-lived relief that is far closer in function to a temporary restraining order. *Georgia Advocacy Office*, 4 F.4th at 1209-10. Ordinarily, a preliminary injunction remains "effective until a decision has been reached at a trial on the merits." Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2941 (3d ed. 2025) (Wright & Miller). A TRO, by contrast, is sharply constrained—fourteen days, with at most a single fourteen-day extension—designed to preserve the status quo only long enough for a court to conduct a prompt hearing on whether more enduring relief is warranted. *See* Fed. R. Civ. P. 65(b)(2); 11A Wright & Miller § 2951. Often, it does not endure even that long. This brevity of TROs is intentional, reflecting the deliberate "design[] to restrict the possible adverse effect of an

17

order that is granted without a hearing and to ensure a prompt hearing on the application for a preliminary injunction." 11A Wright & Miller § 2953. The caselaw reveals no effort to evade those time limits through serial reissuance, and the PLRA's ninety-day ceiling on preliminary injunctions reflects the same settled understanding. By imposing a firm temporal boundary on preliminary relief, Congress curtailed the harms of potentially unjustified or overbroad injunctions and expedited final judgments in prison cases.

This constraint of the remedial power of the federal district courts accords precisely with a statutory scheme crafted to curtail the intrusive, open-ended judicial supervision that had come to characterize prison-conditions litigation. *See Woodford v. Ngo*, 548 U.S. 81, 93 (2006).[5] As Judge Calabresi aptly observed, "Congress meant to get the federal courts out of the business of running jails." *Benjamin v. Jacobson*, 172 F.3d 144, 182 (2d Cir. 1999) (en banc) (Calabresi, J., concurring). Permitting district courts to perpetually reissue preliminary injunctions is wholly "inconsistent" and "out of step" with that design. *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 227-28 (2012). The consolidated cases before us illustrate the point starkly. They have languished. The district court has taken no meaningful steps toward final resolution, despite having jurisdiction to do so during the pendency of this appeal. *See* 11A Wright & Miller § 2962 ("An appeal from the grant or denial of a preliminary injunction does not divest the trial court

---

[5] "As a result of prisoner litigation, by 1995" when the PLRA was enacted, "thirty-nine states were under [federal] court order or consent decree to improve prison conditions and control population in their entire state system or at least in their major facilities." Thomas Julian Butler, Commentary, *The Prison Litigation Reform Act: A Separation of Powers Dilemma*, 50 ALA. L. REV. 585, 589 (1999).

18

of jurisdiction or prevent it from taking other steps in the litigation while the appeal is pending.").

To accept the notion that district courts may perpetually reissue preliminary injunctions is therefore to disregard the very reform on which "Congress trained its attention." *Yates v. United States*, 574 U.S. 528, 532 (2015). It would require one to assume that Congress enacted a strict temporal limitation as part of a broader scheme to curb courts' intrusive oversight of prisons, only to invite routine circumvention through a *sub silentio* loophole, invoked by nothing more than a perfunctory order every ninety days. That reading cannot be reconciled with settled principles of statutory construction. *See Rake v. Wade*, 508 U.S. 464, 471 (1993) ("To avoid denying effect to a part of a statute, we accord significance and effect to every word." (cleaned up)). Congress specified one—and only one—path by which a preliminary injunction may persist: conversion to final prospective relief supported by the requisite findings. *See Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021).

This conclusion is confirmed by other features of the statute. Section 3626(a)(2) opens by providing that "[i]n any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief." The singular phrasing—"*an* order for preliminary injunctive relief"—conveys authorization to issue one such order, not a renewable succession of them. *See Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021). A contrary reading strips this sentence of any operative force, reducing it to a superfluous restatement of existing equitable authority. *SW General, Inc. v. NLRB*, 796 F.3d 67, 76 (D.C. Cir. 2015) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence,

19

or word shall be superfluous, void, or insignificant." (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001))).

True, "[t]he canon against surplusage is not an absolute rule." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013). But it carries particular force here, where Congress departed from an otherwise parallel structure. Section 3626(a)(1)(A), governing prospective relief, begins immediately with substantive limitations, requiring that such relief "extend no further than necessary," be "narrowly drawn," and be "the least intrusive means necessary to correct" the violation. Section 3626(a)(2) ultimately adopts those same limitations for preliminary relief, but only after it opens by authorizing the entry of "*an* order for preliminary injunctive relief." If that initial authorization were merely ornamental, its inclusion in § 3626(a)(2)—and its omission from § 3626(a)(1)(A), where Congress could equally have restated courts' authority to grant prospective relief—would be inexplicable. *See Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 983 (D.C. Cir. 2021) ("[W]hen Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—[the reviewing court] presumes that Congress intended a difference in meaning."); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) ("Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices.").

The statutory text resolves the issue, and the inquiry can end there. But looking beyond the text only reinforces the conclusion. The legislative history confirms that Congress understood—and accepted—the precise consequence of the provision it enacted. *See Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527 (1989) (Scalia, J., concurring) (observing that it is "entirely appropriate to consult . . . the legislative history" to determine whether a particular result was

20

unconsidered by the legislature). When the PLRA, then contained in H.R. 2076, first passed both Houses of Congress, it contained the very same automatic-expiration provision at issue here. *See* H.R. 2076, 104th Cong. § 801(a) (1995). During floor debate, Representative Conyers, then the ranking member of the House Judiciary Committee, expressly acknowledged the effect of that design:

> [T]he provisions would render emergency relief ineffective. Preliminary injunctions would mandatorily terminate 90 days after entry unless the court made the injunction final within the 90-day period. It is virtually impossible for the parties to complete discovery and for the court to complete a trial and issue a decision within 90 days. . . . Termination of a preliminary injunction, without attention to whether there is good cause for the injunction to remain in effect, and without allowing adequate time for the parties to conduct discovery and the court to hold a trial would deprive a court of the power to prevent a defendant from returning to life threatening practices. Federal courts would be prevented from issuing any relief in prison or jail conditions cases without a finding of a violation of law, effectively prohibiting court-enforceable settlement agreements.

141 Cong. Rec. H14106 (1995). The debate reflects no disagreement that the provision would operate in exactly this manner. Although President Clinton ultimately vetoed that version of the PLRA for reasons unrelated to its prison-litigation provisions, *see* 141 Cong. Rec. H15166-67 (1995), Congress returned to the matter only months later. In enacting the PLRA in its final form, Congress retained the preliminary-injunction provision verbatim, notwithstanding the concerns Representative Conyers had articulated, and without any further discussion suggesting a retreat from its acknowledged effect. *See* Act of April 26, 1996, Pub. L. No. 104-134, 110 Stat. 1321; *see also Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 946 (D.C.

21

Cir. 2024) (noting that legislative history demonstrating legislative awareness of a given interpretation supports an inference of affirmative ratification upon enactment).

When the text, structure, and contemporaneous legislative understanding align so completely, § 3626 admits of only one meaning.

One final point bears emphasis. The majority suggests that this issue—whether the district court lacked authority to renew the preliminary injunctions—has been forfeited because the government did not raise it. That is mistaken. The restriction on successive preliminary injunctions reflects congressional concerns regarding judicial efficiency and the appropriate limits of judicial authority in litigation concerning conditions in both state and federal prisons—matters that "implicat[e] values beyond the concerns of the parties." *Day v. McDonough*, 547 U.S. 198, 205 (2006) (alteration in original) (quoting *Acosta v. Artuz*, 221 F.3d 117, 123 (2d Cir. 2000)); *see also Chicago & N.W. Transp. Co. v. Ry. Labor Executives' Ass'n*, 908 F.2d 144, 149 (7th Cir. 1990) (Posner, J.) ("An injunction imposes burdens on the court that issues it and potentially affects the rights of third parties; on both grounds the court has a duty independent of the desires of the parties to assure that the injunction is proper."). Thus, "[i]t is of no moment that the government has not made this argument." *United States v. Rashad*, 396 F.3d 398, 404 (D.C. Cir. 2005) (Randolph, J., dissenting). The restriction "is meant to conserve judicial resources, not to confer some right on the government that it may waive by not arguing the point." *Id.*